ROBERT B. SYKES (#3180)
    bob@sykesinjurylaw.com
ALYSON C. McALLISTER (#9886)
    alyson@sykesinjurylaw.com
RACHEL L. SYKES (#11778)
    rachel@sykesinjurylaw.com
**SYKES McALLISTER LAW OFFICES, PLLC**
311 South State Street, Suite 240
Salt Lake City, Utah  84111
Telephone (801) 533-0222
Facsimile (801) 533-8081

RICHARD T. WILLIAMS (#9115)
    rich@arplegal.com
**ALLEN PACE LAW, P.C.**
2550 Washington Blvd., Suite 300
Ogden, Utah 84401
Telephone (801) 393-9600
Facsimile (801) 399-4194

*Attorneys for Plaintiff*

# UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH

# NORTHERN DIVISION

| | |
|---|---|
| KRISTINE BIGGS JOHNSON, | **PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT ON LIABILITY AGAINST DEFENDANT PEAY, WITH MEMORANDUM IN SUPPORT** |
| Plaintiff, | |
| vs. | |
| DANIEL SCOTT PEAY, a Morgan County Sheriff's Sergeant, MORGAN COUNTY, a Political Subdivision; and JOHN and JANE DOES 1-10, | Civil No. 1:14-cv-147-TC |
| Defendants. | Judge Tena Campbell |

## MOTION

Plaintiff, through counsel and pursuant to DUCivR 7-1 and DUCivR 56-1, moves the Court as follows:

1. For Summary Judgment on liability against Defendant Peay, in his individual capacity;

2. For such other and further relief as the Court deems just and proper in the premises.

## INTRODUCTION

Summary Judgment on liability is sought against Defendant Peay, in his individual capacity, based on the fact that said Defendant used unnecessary and excessive deadly force on Plaintiff, in violation of the Fourth Amendment to the United States Constitution, which rights are further secured by the Civil Rights Act of 1871, 42 U.S.C. § 1983 and § 1988. Said violation occurred as a result of Defendant Peay firing his service revolver at Plaintiff's head, resulting in the loss of her left eye and the disfigurement associated therewith. At the time of Defendant Peay's use of deadly force, a reasonable officer on the scene could not have concluded that he or any other officer or person was in immediate danger or at risk of death or serious bodily injury. Here, several officers' dash-cam videos provide irrefutable support for this claim and this Motion.

# STATEMENT OF ELEMENTS AND UNDISPUTED MATERIAL FACTS

## ELEMENTS

**Reasonableness.** The standard in determining whether the use of force is justified under the Fourth Amendment is the *objective reasonableness* of the use of force.

> This case requires us to decide what constitutional standard governs a free citizen's claim that law enforcement officials used excessive force in the course of making an arrest, investigatory stop, or other "seizure" of his person. We hold that such claims are properly analyzed under the Fourth Amendment's "objective reasonableness" standard...

*Graham v. Connor*, 490 U.S. 386, 388 (1989). *See also Sevier v. City of Lawrence, Kan.,* 60 F.3d 695, 699 (10th Cir. 1995); *Brigham City, Utah v. Stuart,* 547 U.S. 398, 404 (2006).

**Reasonableness of Deadly Force.** If a suspect does not pose an immediate threat to the safety of the officer or others, the use of deadly force is constitutionally unreasonable and not justified.

> ***The use of deadly force to prevent the escape of all felony suspects, whatever the circumstances, is constitutionally unreasonable.*** It is not better that all felony suspects die than that they escape. ***Where the suspect poses no immediate threat to the officer and no threat to others, the harm resulting from failing to apprehend him does not justify the use of deadly force*** to do so.

*Tennessee v. Garner*, 471 U.S. 1, 11 (1985) (emphasis added). Further,

> Because "[t]he test of reasonableness under the Fourth Amendment is not capable of precise definition or mechanical application," . . . its proper application requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, ***whether the suspect poses an immediate threat to the safety of the officers or others***, ***and*** whether he is actively resisting arrest or attempting to evade arrest by flight.

*Graham,* 490 U.S. at 396 (emphasis and <u>double</u> emphasis added).

**Clearly Established**. In order to prevail under 42 U.S.C. § 1983, a constitutional right must be shown to have been violated, and that right must have been clearly established.

> The doctrine of qualified immunity shields officials from civil liability ***so long as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.***

*Mullenix v. Luna,* 136 S. Ct. 305, 308 (2015) (emphasis added).

**Use of Video Evidence.** Different characterizations of facts do not amount to "contested issues of fact" where there is video evidence of what happened. In other words, one party's claim that is clearly contradicted by video evidence does not create a contested issue of fact that defeats summary judgment. *Scott v. Harris,* 550 U.S. 372, 380 (2007) ("Respondent's version of events is so utterly discredited by the [video] record that no reasonable jury could have believed him.") In *Scott,* the U.S. Supreme Court determined that courts should give credence to evidence presented on dash-cam (and presumably other) videos. In particular, if video evidence clearly contradicts a Defendant's otherwise unsupported claim, such claim should not hold up a motion for summary judgment simply because the non-moving party argues that it has raised a "question of fact."

> At the summary judgment stage, facts must be viewed in the light most favorable to the nonmoving party ***only if there is a "genuine" dispute as to those facts.***

*Scott,* 550 U.S. at 380 (emphasis added). Further,

> The Court of Appeals should not have relied on such visible fiction; ***it should have viewed the facts in the light depicted by the videotape.***

*Id.* at 380-81 (emphasis added). For the case at bar, facts are evident on the dash-cam videos of Officers Dingman and Hardman (Exhibits 4 and 5).

## BACKGROUND FACTS

Pursuant to DUCivR 56-1(b)(3), the following statement of undisputed facts, with citations to evidentiary support in the record, provides "background and context" for the claim of excessive force asserted in this Motion. Facts 28-33 are relevant to the seconds surrounding the firing of the gun that caused injury.

1. On November 24, 2012, at about 10:00 p.m., Morgan County deputy Christian Peay alleged that he observed Kristine Biggs Johnson (hereinafter, "Ms. Johnson") driving her truck without her headlights on. *See* Exhibit 1, R. Gwynn 11/26/12 narrative re C. Peay.

2. Deputy Christian Peay attempted to pull over Ms. Johnson, but she did not yield, even after the deputy activated his siren along with his overhead emergency lights. *Id.*

3. A vehicular pursuit ensued for roughly 30 minutes. *See* Exhibit 2, C. Peay dash-cam video.

4. Ms. Johnson was eventually cited for a variety of violations, but speeding was not one of them. *See* Exhibit 3, Offense list.

5. During the pursuit, spike strips were deployed, and three of Ms. Johnson's tires were flattened, eventually coming off the wheel rims altogether. *See* Exhibit 4, Officer Dingman dash-cam video at 22:15:30[1].

6. At least six law enforcement vehicles had thereafter joined in the pursuit. Exh. 4, 22:04:55.

7. Ms. Johnson eventually exited I-84 at the 475 East off-ramp in South Weber and turned east onto Cottonwood Drive. Exh. 4, 22:13:27.

8. At approximately 700 East Cottonwood Drive, apparently oblivious to the numerous law enforcement vehicles that were following her with their lights and sirens on, Ms. Johnson slowed and attempted to turn around, making a three-point turn. Exh. 4, 22:15:20[2].

9. As Ms. Johnson was turning around, Defendant Sgt. Daniel Scott Peay (hereinafter "Sgt. Peay") angled his vehicle into the west-bound lane and blocked Ms. Johnson from proceeding west-bound on Cottonwood Drive. Exh. 4, 22:15:20.

10. At the same time, Deputy Christian Peay (hereinafter "Deputy Peay") also stopped and blocked Ms. Johnson from traveling west-bound in the east-bound lane. Exh. 4, 22:15:24.

---

[1] *Note*: dash-cam counter times in the lower left of the screen may not represent the actual time. "22" is the hour, "15" is the minute, and "30" is the second, so "22:15:30" means approximately 10:15 and 30 seconds p.m.

[2] The officers' various dashboard video cameras are not time-synchronized, and will vary somewhat in time showing the same event.

11. At about the same time, Officer Dingman of the South Ogden Police Department, who had joined in the pursuit, pulled his vehicle forward into the gap between the vehicles of Sgt. Peay and Deputy Peay and stopped. Exh. 4, 22:15:28.

12. At this point, four police vehicles were positioned such that Ms. Johnson was blocked from moving to the west. *See* Exhibit 5, Officer Hardman dash-cam, 22:05:58.

13. Ms. Johnson got her truck pointing west-bound, but she was entirely blocked from escaping in the west-bound direction on Cottonwood Drive. Exh. 4, 22:15:31.

14. As Ms. Johnson was making her three-point turn, she first turned left, nosing onto the road's shoulder, then backed up, getting her truck back in line with the roadway. Exh. 4, 22:15:22.

15. During this time, Sgt. Peay had stopped and exited his vehicle; he walked around the back of his vehicle with his gun drawn. Exh. 4, 22:15:27.

16. As Ms. Johnson pulled forward at about 2 or 3 mph, she bumped into the passenger side of Sgt. Peay's truck, and then stopped. Exh. 4, 22:15:31.

17. When Ms. Johnson bumped into the side of Sgt. Peay's truck, Sgt. Peay was positioned behind his truck, near the back bumper and right rear tail light, with his gun aimed at Ms. Johnson. Exh. 4, 22:15:31.

18. Unable to proceed, Ms. Johnson backed up about 6 feet, preparing to turn away from Sgt. Peay's truck. Exh. 4, 22:15:37.

19. As she did so, Sgt. Peay stepped forward, directly in front of Ms. Johnson's truck, and then moved off to the side of Ms. Johnson's vehicle. Exh. 4, 22:15:35 - 22:15:42.

20. Ms. Johnson then began to pull forward, turning her steering wheel and her truck away from Sgt. Peay and his truck. Exh. 4, 22:15:42.

21. Sgt. Peay had stepped off to the passenger side of Johnson's truck, making sure he was not hit as Ms. Johnson pulled forward. Exh. 4, 22:15:43.

22. Beginning at Fact 16, when Ms. Johnson bumped into the side of his truck, Sgt. Peay never took his eyes off Ms. Johnson until he fired his weapon at her. Exh. 4, 22:15:31 - 22:15:44.

23. As Ms. Johnson pulled forward, as described in Fact 20, while she was traveling about 3 mph, she bumped into Deputy Christian Peay's stationary vehicle. Exh. 4, 22:15:44.

24. After she bumped Christian Peay's vehicle, forward progress of her truck ceased. Exh. 4, 22:15:44.

25. It was at this point that Sgt. Peay fired his weapon, the bullet entering Ms. Johnson's left eye and exiting her left temple. Exh. 4, 22:15:44; Exhibit 7, Ms. Johnson's medical record.

26. The above facts and allegations, as well as the facts provided below, are supported and confirmed in the dash-cam videos from Officer Dingman's and Officer Hardman's vehicles. Exhs. 4, 5.

27. Ms. Johnson survived, although her left eye was completely destroyed, her sight in that eye was unable to be restored, and her face was understandably disfigured from such a gunshot wound. *Id.*

**UNDISPUTED MATERIAL FACTS SURROUNDING THE SHOOTING**

28. A small fraction of a second after Ms. Johnson bumped Deputy Peay's vehicle, Sgt. Peay fired his weapon through the windshield of Ms. Johnson's truck, the bullet striking her in the head. Exh. 4, 22:15:44; Exh. 5, 22:06:12. Exhibit 7, Ms. Johnson's medical record. See also Fact 25, *supra.*

29. When he fired his weapon at Ms. Johnson's head, Sgt. Peay was in no immediate danger of serious bodily injury or death. Exh. 4, 22:15:31 – 22:15:44.

30. When Sgt. Peay fired his weapon at Ms. Johnson's head, no other officer or person was in immediate danger of serious bodily injury or death (by being struck by Ms. Johnson's truck or through any other means). Exh. 4, 22:15:44; Exh. 5, 22:06:12.

31. In particular, when Sgt. Peay fired his weapon at Ms. Johnson's head, Deputy Christian Peay was not in immediate danger of serious bodily injury or death by being struck or pinned by Ms. Johnson's truck (or through any other means). Exh. 5, 22:06:11.

32. After viewing the videos, Christian Peay testified at his deposition that neither he, nor Sgt. Scott Peay, were in any danger, as demonstrated in the following exchanges:

> Q. ....about 11:06 or 7, he fires the bullet. Watch this now. Do you see that bullet?
> A. Yes.
> Q. Do you see where Scott is standing?
> A. I do.
> Q. Do you think at the time that that bullet was fired, he was in imminent danger of death or serious bodily injury?
> * * *
> A. ***I feel that Scott was not in danger at that time.***

Exhibit 9, C. Peay Depo. 20:19 - 21:6 (emphasis added).

> Q. At any time that night before the shot was fired, were you in imminent danger of death or serious bodily injury?
> A. No.

*Id,* 24:15-18.

33. This officer-involved shooting was evaluated by the Davis County Attorney's Office and determined to be unjustified. *See* Exhibit 8, Rawlings 1/22/13 letter to Sheriff Breshears. Among other things, Mr. Rawlings wrote "An objective and impartial analysis concludes that the use of potentially lethal force in shooting Kristine Johnson was not necessitated by the facts." *Id.,* p.1.

# ARGUMENT

# POINT I

~ Excessive Force in Violation of the Fourth Amendment ~

**SGT. PEAY'S USE OF DEADLY FORCE WAS UNNECESSARY AND UNREASONABLE IN THE CIRCUMSTANCE.**

The facts are evident on the dash-cam videos of Officers Dingman and Hardman that Sgt. Peay's various claims of immediate danger of death or serious bodily harm to himself or others are contradicted, or a "visible fiction." Facts 12, 13, 15-24, 26, 29-33.

In the event Sgt. Peay claims that his life was in imminent danger, Plaintiff disputes such claim based on the videos. Facts 17, 19-21, 29-33. Normally, this might raise a factual dispute in response to a Motion for Summary Judgment, which could necessitate a denial of the Motion. However, in this case, this is not a "genuine" question of fact. Sgt. Peay's hypothetical claim would be "discredited" by the dash-cam videotapes; i.e., such claim would be a "visible fiction" that is directly contradicted by the video evidence in the record. Facts 17, 19-21, 29-33. Sgt. Peay's life was not in danger (Facts 17, 19-21, 29-33), and a reasonable officer in Peay's shoes would have had no reason to think it was. Facts 17, 19-21, 29-33. In fact, Sgt. Peay testified that he was not in danger at the time he fired his weapon:

> Q. While you shot you were in no danger of getting hit when you shot?
> A. I was not, no.

*See* Exhibit 10, excerpt Sgt. Peay Depo. 27:14-16. Christian Peay likewise affirmed that neither he nor his brother Sgt. Peay were in any danger. Fact 32.

Two days after the shooting, rather than alleging that he feared for his own life, Sgt. Peay expressly contended that he believed it was Deputy Christian Peay's life that was in imminent danger[3].

> I was very concerned that I had waited too long and that my brother had been hit, I didn't, I didn't know if he had or not. . . . I was concerned that with her pushing on that truck that it was actually gonna push it into him and he was pinned between cars or what was going on . . .

Exhibit 11, Sgt. Peay interview by Morgan County officials, p.9.

It is important to note that Sgt. Peay's "subjective belief" is entirely irrelevant to the determination of whether his actions violated the Fourth Amendment. The question is whether his actions were "objectively reasonable":

> ***…the Fourth Amendment measures an officer's conduct against what is objectively reasonable, <u>not by his subjective beliefs</u>.*** *See*, e.g., *Ashcroft v. al-Kidd,* — U.S. —, 131 S.Ct. 2074, 2082 (2011); *Brigham City v. Stuart,* 547 U.S. 398, 404-05 (2006); *United States v. Winder,* 557 F.3d 1129, 1134-35 (10th Cir.2009).

*United States v. Brown,* 555 F. App'x 838, 839 (10th Cir. 2014) (emphasis and double emphasis added).

Given the video evidence that shows the location of Deputy Christian Peay (Facts 30-32), and the low speed of Ms. Johnson's vehicle (Fact 23), a reasonable officer at the scene in a like circumstance could ***not*** reasonably conclude that Deputy Christian

---

[3] Deputy Christian Peay is Sgt. Daniel Scott Peay's brother.

Peay was in danger of serious bodily injury or death. Exh. 5, 22:06:08 – 22:06:16. He was simply in no danger of being struck by Ms. Johnson's slow-moving truck, nor in danger of being "pinned between cars." Facts 24, 30-33. It was therefore not reasonable for Sgt. Peay to speculate that his brother's life *might* be in imminent danger. Sgt. Peay admitted that he did not even know where his brother was located at that point:

> ***I can remember seeing Christian in my peripheral vision and at some point,*** you know as all the attention came in there, ***I lost sight of him.***

Exh. 11, p.9.

Deadly force may not be used unless someone is objectively in genuine and immediate danger of serious injury or death. *Tennessee v. Garner*, 471 U.S. 1 (1985). An officer's subjective imagining that someone *might* be in such danger is entirely insufficient to justify the use of deadly force.

> An action is "reasonable" under the Fourth Amendment, regardless of the individual officer's state of mind, as long as the circumstances, ***viewed objectively***, justify [the] action. . . . ***The officer's subjective motivation is irrelevant***.

*Brigham City, Utah v. Stuart,* 547 U.S. 398, 404 (2006) (emphasis and <u>double</u> emphasis added, internal citation and punctuation omitted). If the standard was based on the officer's subjective imagination, law enforcement officers would essentially be granted a "license to kill" in practically any situation (e.g., "I *thought* he was going to pull out a gun from a concealed holster and start shooting. I didn't know he didn't have a gun.") But Sgt. Peay's justification for his use of deadly force in this instance is based purely on his subjective imagination, not on personal knowledge that Deputy Peay or anyone

else was in actual danger of serious bodily injury or death. Sgt. Peay _thought_ that Christian Peay _might_ be in danger, even though he had "lost sight of him." Exh. 11, p.9. Given the evidence visible on the dash-cam videos, with Ms. Johnson hemmed in by the officers' vehicles, not only was Sgt. Peay _wrong_ to fear for Deputy Peay, it was _unreasonable_ for Sgt. Peay to fear for Deputy Peay. There was simply no objective basis for such a fear in the circumstance. The use of deadly force cannot be predicated upon an officer's unreasonable belief or paranoia.

Further, Sgt. Peay's videotaped interview before the investigating officers from Davis County two days after the incident is very troubling. Several of Sgt. Peay's claims from that interview are directly contradicted by the dash-cam video evidence. For example, Sgt. Peay claimed:

> ***And after she hit it, it still didn't stop***, she was revving her engine, and ***she was applying force to the front of the car...***

Exh. 11, p.9. This refers to Ms. Johnson bumping Deputy Christian Peay's truck at about 3 mph. In sharp contrast, the video shows that Sgt. Peay fired his weapon at practically the same instant as the bump. There was no continual force applied to Deputy Peay's vehicle. It is clear from the videos that Ms. Johnson's truck stopped after bumping Deputy Peay's truck, contrary to Sgt. Peay's claim. Exh. 5, 22:06:12.

Sgt. Peay also claimed:

> I was concerned that ***with her pushing on that truck*** that it was actually gonna push it into him and he was pinned between cars...

<em>-4-</em>

Exh. 11, p.9.  However, after viewing the dash-cam evidence, one must objectively conclude that Sgt. Peay is simply fabricating this "concern."  It is apparent that Ms. Johnson was not "pushing on that truck."  Her truck stopped dead after the bump.  *One or two tenths of a second later*, after the bump, and after Ms. Johnson's truck had stopped, Sgt. Peay fired at Ms. Johnson's head, hitting her in the left eye.

If Sgt. Peay had taken a half second to glance over to verify where Deputy Peay was positioned, he would have seen that his alleged fear for his brother's safety was simply imagined, unfounded, and unjustified.

No one was in immediate danger of severe injury or death when Sgt. Peay used deadly force against Ms. Johnson.  Facts 28-32.  A reasonable officer would have had no reason to think otherwise.  Ms. Johnson's progress was blocked by four officers' vehicles that were stopped across the road.  Fact 12.  There were another six to eight police vehicles behind those front four vehicles.  Ms. Johnson's truck was running on three (3) rims; there were no tires at all on three of the rims.  Fact 5.  Sgt. Peay's use of deadly force was unnecessary, and therefore in violation of the Fourth Amendment to the United States Constitution.

Sgt. Peay's unnecessary use of deadly force caused the loss of Ms. Johnson's left eye, disfigurement, and associated physical and mental pain and suffering.  Facts 25, 27.

## CONCLUSION

It is fortunate that we have multiple dash-cam videos of this incident. These videos tell the whole story. The facts cannot be in dispute when they are visible on the video, which shows that Sgt. Peay's use of deadly force was unnecessary in the circumstance, and therefore violative of Ms. Johnson's Fourth Amendment rights. Summary Judgment on Sgt. Peay's liability is therefore warranted.

DATED this 13th day of January, 2016.

**SYKES McALLISTER LAW OFFICES, PLLC**

/s/ *Robert B. Sykes*
ROBERT B. SYKES
ALYSON C. McALLISTER
RACHEL L. SYKES
*Attorneys for Plaintiffs*

Q:\CLIENT\3022 BIGGS-JOHNSON\3. MOT\6. P's MSJ\151202.P's MSJ.REVISED-2.wpd

# LIST OF EXHIBITS

[Exhibits 2, 4, and 5 filed conventionally]

1. R. Gwynn 11/26/12 narrative re Christian Peay

2. Christian Peay dash-cam video

3. Ms. Biggs' offenses listed

4. Officer Dingman dash-cam video

5. Officer Hardman dash-cam video

6. [No exhibit for this number]

7. Ms. Biggs 11/25/12 medical record excerpt

8. Davis County Attorney Troy Rawlings' January 22, 2013, letter to Sheriff Breshears

9. Deputy Christian Peay deposition excerpts

10. Sgt. Peay deposition excerpts

11. Sgt. Peay interview transcript excerpt