PETER STIRBA (Bar No. 3118)
JULIA D. KYTE (Bar No. 13113)
JEFFREY D. MANN (Bar No. 13795)
**STIRBA, P.C.**
215 South State Street, Suite 750
P.O. Box 810
Salt Lake City, UT 84110-0810
Telephone: (801) 364-8300
Fax:  (801) 364-8355
Email: jmann@stirba.com
*Attorneys for Defendants*

## IN THE UNITED STATES DISTRICT COURT

## DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| KRISTINE BIGGS JOHNSON,<br><br>      Plaintiff,<br><br>v.<br><br>DANIEL SCOTT PEAY, a Morgan County Sheriff's Sergeant, MORGAN COUNTY, a Political Subdivision; and JOHN AND JANE DOES 1-10,<br><br>      Defendants. | **DEFENDANTS' MEMORANDUM IN OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT ON LIABILITY AGAINST DEFENDANT PEAY**<br><br>Case No. 1:14-cv-00147-TC<br><br><br>Judge Tena Campbell<br>Magistrate Judge Brooke C. Wells |

Defendants Sergeant Daniel Scott Peay ("Sergeant Peay") and Morgan County, (collectively, "Defendants"), by and through the undersigned counsel of record, and pursuant to Fed. R. Civ. P. 56 and DUCivR 56-1(c), hereby submit this Memorandum in Opposition to Plaintiff's Motion for Summary Judgment on Liability Against Defendant Peay.

# TABLE OF CONTENTS

**TABLE OF CONTENTS** ......................................................................................... **ii**

**TABLE OF AUTHORITIES** ................................................................................ **iii**

**INTRODUCTION** ................................................................................................. **1**

**BACKGROUND** .................................................................................................... **2**

**RESPONSE TO STATEMENT OF ELEMENTS AND UNDISPUTED MATERIAL FACTS** ..................................................................................................................... **4**

    I.  RESPONSE TO PLAINTIFF'S ELEMENTS .................................................. 4

    II.  RESPONSE TO PLAINTIFF'S FACTS ........................................................... 4

**STATEMENT OF ADDITIONAL UNDISPUTED MATERIAL FACTS** ............ **16**

**ARGUMENT** ......................................................................................................... **20**

    I.  PLAINTIFF'S MOTION SHOULD BE DENIED BECAUSE IT FAILS TO COMPLY WITH THE LOCAL RULES AND THIS COURT'S ORDER ................... 20

    II.  PLAINTIFF'S MOTION SHOULD BE DENIED BECAUSE SERGEANT PEAY IS ENTITLED TO QUALIFIED IMMUNITY ..................................................... 22

        A.  Sergeant Peay Did Not Violate Plaintiff's Fourth Amendment Right Because The Use Of Force Was Objectively Reasonable ......................................... 23

            1.  Deadly force was reasonable because Sergeant Peay reasonably believed that Ms. Johnson posed a threat of serious bodily harm or death ........................ 23

            2.  Viewed from the correct perspective, rather than with the 20/20 vision of hindsight, Sergeant Peay's belief was reasonable, even if it was mistaken .......... 27

            3.  Sergeant Peay need not have used alternative means ........................... 29

        B.  Sergeant Peay Did Not Violate Clearly Established Law ........................... 30

**CONCLUSION** ...................................................................................................... **33**

# TABLE OF AUTHORITIES

**Cases**

*Adickes v. S.H. Kress & Co.*, 398 U.S. 144 (1970).................................................................. 22

*Blossom v. Yarbrough*, 429 F.3d 963 (10th Cir. 2005)............................................................. 29

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) ........................................................................ 22

*Estate of Larsen ex rel. Sturdivan v. Murr*, 511 F.3d 1255 (10th Cir. 2008) ............... 4, 22, 23, 24

*Global Fitness Holdings, LLC v. Federal Recovery Acceptance, Inc.*, --- F.Supp.3d ----, 2015 WL 5098826 (D. Utah Aug. 31, 2015) ............................................................................ 21

*Graham v. Connor*, 490 U.S. 386 (1989) ......................................................................... passim

*Hunter v. Bryant*, 502 U.S. 224 (1991)............................................................................ 28, 29

*Jiron v. City of Lakewood*, 392 F.3d 410 (10th Cir. 2004) ...................................................... 24

*McCollough v. Antolini*, 559 F.3d 1201 (11th Cir. 2009) ........................................................ 33

*Medina v. Cram*, 252 F.3d 1124 (10th Cir. 2001) .................................................................. 29

*Morris v. Noe*, 672 F.3d 1185 (10th Cir. 2012) ...................................................................... 31

*Pearson v. Callahan*, 555 U.S. 223 (2009)...................................................................... passim

*Plumhoff v. Rickard*, 134 S.Ct. 2012 (2014)...........................................................30, 31, 32, 33

*Robinson v. Arrugueta*, 415 F.3d 1252 (11th Cir. 2005) ...................................................32, 33

*Saucier v. Katz*, 533 U.S. 194 (2001) .............................................................................. 28, 31

*Scott v. Harris*, 550 U.S. 372 (2007) .............................................................................. 4, 5, 22

*Smith v. Freland*, 954 F.3d 343 (6th Cir. 1992)..................................................................... 30

*Specht v. Jensen*, 853 F.2d 805 (10th Cir. 1988) ................................................................... 16

*Stanton v. Sims*, 134 S.Ct. 3 (2013) ...................................................................................... 31

*Summit Financial Resources, L.P. v. Walthers Oil Co.*, 2008 WL 3346140 (D. Utah Aug. 11, 2008) (unpublished)............................................................................................................ 21

*Tennessee v. Garner*, 471 U.S. 1 (1985)............................................................................... 23

*Thomas v. Durastanti*, 607 F.3d 655 (10th Cir. 2010)........................................................ passim

*Webb v. Scott*, 2014 WL 931025 (D. Utah Mar. 10, 2014) (unpublished) ................................. 21

**Statutes**

42 U.S.C. § 1983 (2012) .................................................................................................. 1, 4, 22

**Rules**

DUCivR 56-1 .................................................................................................................... 21

Fed. R. Civ. P. 56 ............................................................................................................. 22

# INTRODUCTION

Plaintiff Krinstine Biggs Johnson has filed a motion seeking summary judgment only on the liability of Defendant Sergeant Peay and only on the First Cause of Action for an alleged use of deadly force in violation of the Fourth Amendment, pursuant to 42 U.S.C. § 1983. Plaintiff's motion fails to meet the standard for summary judgment for three reasons.

First, it fails to identify undisputed material facts to support her claim. Her statement of facts is full of misrepresented facts, false interpretations of the dash-cam videos, conclusory statements, and inadmissible evidence. Only one fact cites to deposition testimony and even that merely offers a legal conclusion as opposed to an actual statement of fact. Moreover, Plaintiff omits critical undisputed facts that are necessary for a correct analysis under § 1983.

Second, it analyzes the reasonableness of Sergeant Peay's conduct from the improper view of hindsight, rather than from the Supreme Court mandated perspective of a reasonable officer on the scene based on the totality of the circumstances.

Third, it fails to establish that Sergeant Peay's actions violated a *clearly established* constitutional right, as required to prevail on a claim under § 1983. Plaintiff does not cite a single case that suggests that Sergeant Peay's conduct was unreasonable or that he should have known his conduct was unreasonable. In fact, the clear weight of authority establishes that Sergeant Peay's conduct was reasonable when viewed under the proper standard, based on all the facts and circumstances of this particular case.

In addition to the above, Plaintiff's motion fails to comply with local rule 56-1 and this Court's Order, and should be dismissed on that basis alone. As a result of these fatal flaws, Defendants respectfully ask this Court to deny Plaintiff's motion.

## BACKGROUND

On the night of November 25, 2012, Plaintiff Kristine Biggs Johnson ("Plaintiff" or "Ms. Johnson") was driving from Wyoming through Utah with altered license plates. A week before, she pled guilty in Wyoming to a charge of driving under the influence. As part of her probation, she was ordered to have a substance abuse evaluation, not to consume or possess any alcohol, and not to leave the state without permission from probation. Her license had also been suspended since 2011.

Ms. Johnson has criminal history in three states that includes assaulting a police officer, resisting arrest, domestic violence, and at least two convictions for driving under the influence. She has also threatened to commit suicide on several occasions and threatened to shoot to kill anyone, including law enforcement, that tried to intervene. (*See* Deposition of Kristine Biggs Johnson ("Johnson Dep.") 28:7–36:6.)[1] A few months before the events of this case, Ms. Johnson was taken to the hospital to have her stomach pumped for ingesting too much alcohol.

Sometime in the evening of November 25, Ms. Johnson stopped at a gas station in Evanston, Wyoming and purchased a large bottle of vodka. A few minutes before 10:00 p.m., Deputy Christian Peay ("Deputy Peay") observed Ms. Johnson driving without headlights on going the opposite direction of him on Interstate 84 in Morgan County, Utah. Deputy Peay alerted his brother, Sergeant Daniel Scott Peay ("Sergeant Peay"), who was in the area, of Ms. Johnson's vehicle and the two attempted to pull her over with lights and sirens. However, Ms. Johnson did not stop.

---

[1] Cited portions of Ms. Johnson's deposition transcript are included in Defendants' Appendix as Ex. A.

Instead, Ms. Johnson fled from the police, led them on a pursuit through Morgan, Weber, and Davis counties that lasted approximately thirty minutes, reached speeds of 90 miles per hour, and continued even after the police had deployed tire spikes, Ms. Johnson's vehicle was driving on rims, and she had crashed into the highway's center concrete barrier. When it appeared as though Ms. Johnson was finally giving up, she slowed down on East Cottonwood Drive in Davis County and several police cars pulled up behind her.

But rather than submit to the authorities, Ms. Johnson abruptly turned her car around and rammed Sergeant Peay's patrol vehicle, nearly hitting Sergeant Peay. Sergeant Peay yelled at Ms. Johnson to stop the car with his service revolver aimed at her, but Ms. Johnson proceeded to back up her vehicle, and with a look of rage on her face she screamed something, turned her gaze towards Sergeant Peay's brother, Deputy Christian Peay, and rammed into Deputy Peay's patrol vehicle near where Deputy Peay was standing. Fearing for the life and safety of his brother as well as other officers on the scene, Sergeant Peay fired a single shot through the windshield of Ms. Johnson's truck, which hit Ms. Johnson near her left eye.

When Ms. Johnson was arrested, the officers retrieved a half empty bottle of vodka from her vehicle and a blood test revealed that Ms. Johnson had a blood-alcohol level of .358, almost four times the legal limit. Ms. Johnson was charged with a variety of crimes including aggravated assault for the use of her vehicle as a weapon against the police officers, driving under the influence, and failure to stop at the command of a police officer, and she eventually pled guilty to the latter two.

<u>**RESPONSE TO STATEMENT OF ELEMENTS AND**</u>
<u>**UNDISPUTED MATERIAL FACTS**</u>

## I.      RESPONSE TO PLAINTIFF'S ELEMENTS

Defendants disagree with Plaintiff's stated elements. The correct legal elements that Plaintiff must show in order to prove a violation of Plaintiff's Fourth Amendment rights under 42 U.S.C. § 1983 are as follows: (1) Sergeant Peay was acting under color or authority of law; (2) Sergeant Peay violated Plaintiff's constitutional rights because the force he used was objectively unreasonable, based on the totality of the circumstances and viewed from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight; (3) Sergeant Peay's use of force was the proximate cause of Plaintiff's injury; and (4) Sergeant Peay should have known that he was violating Plaintiff's constitutional rights because the law was clearly established at the time. 42 U.S.C. § 1983 (2012); *see Pearson v. Callahan*, 555 U.S. 223, 231 (2009); *Graham v. Connor*, 490 U.S. 386, 394–97 (1989); *Estate of Larsen ex rel. Sturdivan v. Murr*, 511 F.3d 1255, 1259 (10th Cir. 2008).

## II.      RESPONSE TO PLAINTIFF'S FACTS

Plaintiff's statement of facts relies almost entirely upon two dash-cam videos of the events of this case, (Pl.'s Ex. 4 & 5), without hardly any citations to deposition testimony or other record evidence. These dash-cam videos "did not capture everything," *see Thomas v. Durastanti*, 607 F.3d 655, 659 (10th Cir. 2010), and in several instances, the videotape "quite clearly contradicts the version of the story told by" the Plaintiff. *See Scott v. Harris*, 550 U.S. 372, 378 (2007).

Defendants object to each and every instance of Plaintiff's self-serving interpretations of the events depicted in the videos that are unsupported by or contradicted by the videos

themselves and other record evidence. Defendants trust that the Court is capable of correctly interpreting the videos in conjunction with the other record evidence and viewing it all together "in the light most favorable to the non-moving party" for purposes of summary judgment. *Scott*, 550 U.S. at 378–81 & n.5 (the Supreme Court was "happy to allow the videotape to speak for itself"); *Thomas*, 607 F.3d at 659 ("We rely on that video evidence, while acknowledging that it did not capture everything. Therefore, in addition to relying on the video, we also continue to view the evidence in the light most favorable to" the non-moving party).

Defendants respond more specifically to Plaintiff's Statement of "Background Facts" and "Undisputed Material Facts Surrounding the Shooting" as follows:

*1.       On November 24, 2012, at about 10:00 p.m., Morgan County deputy Christian Peay alleged that he observed Kristine Biggs Johnson (hereinafter "Ms. Johnson") driving her truck without her headlights on. See Exhibit 1, R. Gwynn 11/26/12 narrative re C. Peay.*

RESPONSE: Disputed. Deputy Peay observed Ms. Johnson driving without headlights on Sunday, November **25**, 2012 a few minutes before 10:00 p.m. (Deposition of Deputy Christian Peay ("Deputy Peay Dep.") 24:23–25.)[2]

*2.       Deputy Christian Peay attempted to pull over Ms. Johnson, but she did not yield, even after the deputy activated his siren along with his overhead emergency lights. Id.*

RESPONSE: Undisputed.

*3.       A vehicular pursuit ensued for roughly 30 minutes. See Exhibit 2, C. Peay dash-cam video.*

RESPONSE: Undisputed.

---

[2] Cited portions of Deputy Peay's deposition transcript are included in Defendants' Appendix as Ex. B.

*4.      Ms. Johnson was eventually cited for a variety of violations, but speeding was not one of them. See Exhibit 3, Offense list.*

RESPONSE: Undisputed.

*5.      During the pursuit, spike strips were deployed, and three of Ms. Johnson's tires were flattened, eventually coming off the wheel rims altogether. See Exhibit 4, Officer Dingman dash-cam video at 22:15:30.*

RESPONSE: Disputed. Two tires came off the rims entirely while a third (the right front tire) did not come off the rim, but was severely damaged. (Photos of Johnson Vehicle, MCSO_00104 & 106.)[3]

*6.      At least six law enforcement vehicles had thereafter joined in the pursuit. Exh. 4, 22:04:55.*

RESPONSE: Disputed. There were at least seven law enforcement vehicles involved in the pursuit of Ms. Johnson, including Sergeant Peay and Deputy Peay. (*See* Johnson Dep. 60:25–61:4.)

*7.      Ms. Johnson eventually exited I-84 at the 475 East off-ramp in South Weber and turned east onto Cottonwood Drive. Exh. 4, 22:13:27.*

RESPONSE: Undisputed.

*8.      At approximately 700 East Cottonwood Drive, apparently oblivious to the numerous law enforcement vehicles that were following her with their lights and sirens on, Ms. Johnson slowed and attempted to turn around, making a three-point turn. Exh. 4, 22:15:20.*

---

[3] Cited documents bates labeled "MCSO" are included in Defendants' Appendix as Ex. J.

RESPONSE: Disputed. Ms. Johnson testified that her last memory of the events of the night in question is when she stopped at a gas station in Evanston, Wyoming some time prior to the pursuit, and that she specifically did not remember whether she was aware that a police officer was behind her. (Johnson Dep. 60:19–61:8; Police Interview with Kristine Biggs ("Ms. Johnson Interview") 6:11–8:7, 9:12–24.)[4]

9.      As Ms. Johnson was turning around, Defendant Sgt. Daniel Scott Peay (hereinafter "Sgt. Peay") angled his vehicle into the west-bound lane and blocked Ms. Johnson from proceeding west-bound on Cottonwood Drive. Exh. 4, 22:15:20.

RESPONSE: Undisputed.

10.      At the same time, Deputy Christian Peay (hereinafter "Deputy Peay") also stopped and blocked Ms. Johnson from traveling west-bound in the east-bound lane. Exh. 4, 22:15:24.

RESPONSE: Disputed. Deputy Peay stopped his patrol vehicle in the east-bound land not "at the same time" but shortly after Sergeant Peay stopped his patrol vehicle in the west-bound lane as Ms. Johnson was turning around. (See Deputy Peay dash-cam video, Pl.'s Ex. 2 at 28:15–28:30.)[5]

11.      At about the same time, Officer Dingman of the South Ogden Police Department, who had joined in the pursuit, pulled his vehicle forward into the gap between the vehicles of Sgt. Peay and Deputy Peay and stopped. Exh. 4, 22:15:28.

_____

[4] Cited portions of Ms. Johnson's interview transcript are included in Defendants' Appendix as Ex. I.

[5] Citations to Deputy Peay's dash-cam video are to the minutes and seconds of the video itself because it does not have a running time stamp in the bottom left corner. Citations to the dash-cam videos of Officer Dingman and Officer Handman are to the running time stamps, consistent with Plaintiff's citations.

RESPONSE: Disputed. Officer Dingman pulled his vehicle forward between Sergeant Peay's and Deputy Peay's patrol vehicles several seconds after they had already stopped, as Sergeant Peay was exiting his patrol vehicle and as Ms. Johnson was backing up and ramming Sergeant Peay's vehicle. (*See* Dingman dash-cam video, Pl.'s Ex. 4 at 22:15:15–22:15:25.)

12.    *At this point, four police vehicles were positioned such that Ms. Johnson was blocked from moving to the west. See Exhibit 5, Officer Hardman dash-cam, 22:05:58.*

RESPONSE: Disputed. Officer Dingman testified that Ms. Johnson was not "completely blocked" from proceeding west, as she could have gone around the police vehicles on the shoulder. (Deposition of Jeffrey Dingman ("Dingman Dep.") 26:10–18; *see* Hardman dash-cam video, Pl.'s Ex. 5 at 22:05:40–22:06:15.)[6]

13.    *Ms. Johnson got her truck pointing west-bound, but she was entirely blocked from escaping in the west-bound direction on Cottonwood Drive. Exh. 4, 22:15:31.*

RESPONSE: Disputed. Officer Dingman testified that Ms. Johnson was not "completely blocked" from proceeding west, as she could have gone around the police vehicles on the shoulder. (Dingman Dep. 26:10–18; *see* Hardman dash-cam video, Pl.'s Ex. 5 at 22:05:40–22:06:15.)

14.    *As Ms. Johnson was making her three-point turn, she first turned left, nosing onto the road's shoulder, then backed up, getting her truck back in line with the roadway. Exh. 4, 22:15:22.*

RESPONSE: Undisputed.

---

[6] Cited portions of Officer Dingman's deposition transcript are included in Defendants' Appendix as Ex. C.

*15.    During this time, Sgt. Peay had stopped and exited his vehicle; he walked around the back of this vehicle with his gun drawn. Exh. 4, 22:15:27.*

RESPONSE: Disputed. As Ms. Johnson was backing up and turning toward the officers, Sergeant Peay exited his vehicle and walked around the back of it with his gun drawn. (*See* Dingman dash-cam video, Pl.'s Ex. 4, 22:15:25–22:15:35.)

*16.    As Ms. Johnson pulled forward at about 2 or 3 mph, she bumped into the passenger side of Sgt. Peay's truck, and then stopped. Exh. 4, 22:15:31.*

RESPONSE: Disputed. A vehicle crash report estimated that Plaintiff's vehicle was traveling approximately 15 mph at the time of impact with Sergeant Peay's truck. (Deposition of Eric Prescott ("Prescott Dep.") 28:5–25; *see* Vehicle Crash Report, MCSO_00318–19.)[7] Sergeant Peay and Deputy Peay estimated it was traveling between 5 and 10 miles per hour. (Deposition of Sergeant Scott Peay ("Sergeant Peay Dep.") 56:15–57:4; Deputy Peay Dep. 21:17–22:10.)[8] Plaintiff's vehicle struck Sergeant Peay's truck not just on the passenger side, but only "inches or a foot" from Sergeant Peay, who had to back up to avoid being hit. (Sergeant Peay Dep. 56:7–14, 78:15–80:25.)

*17.    When Ms. Johnson bumped into the side of Sgt. Peay's truck, Sgt. Peay was positioned behind his truck, near the back bumper and right rear taillight, with his gun aimed at Ms. Johnson. Exh. 4, 22:15:31.*

---

[7] Cited portions of Officer Prescott's deposition transcript are included in Defendants' Appendix as Ex. D.
[8] Cited portions of Sergeant Peay's deposition transcript are included in Defendants' Appendix as Ex. E.

RESPONSE: Disputed. Sergeant Peay was moving towards Ms. Johnson's vehicle on foot and was at the rear right corner of his truck, only "inches or a foot" from Ms. Johnson's truck when she rammed Sergeant Peay's truck. (Sergeant Peay Dep. 56:7–14, 78:15–80:25.)

18.    *Unable to proceed, Ms. Johnson backed up about 6 feet, preparing to turn away from Sgt. Peay's truck. Exh. 4, 22:15:37.*

RESPONSE: Disputed. Sergeant Peay testified that after Ms. Johnson backed up, she came forward and he "had to back out of the way" because he "felt she was coming towards [him]," (Sergeant Peay Dep. 35:2–8), until she turned and "went directly toward Christian." (Sergeant Peay Dep. 85:18–21; *see id.* at 57:9–58:16.) Deputy Peay stated Ms. Johnson "backed up about ten feet" and then she "looked directly at me and the expression on her face changed. She looked as if she was targeting me to run me over." (Deputy Peay Dep. 59:11–17; *see* Deputy Peay's Incident Report, MCSO_00021.)[9]

19.    *As she did so, Sgt. Peay stepped forward, directly in front of Ms. Johnson's truck, and then moved off to the side of Ms. Johnson's vehicle. Exh. 4, 22:15:35 – 22:15:42.*

RESPONSE: Disputed. As Ms. Johnson backed up her vehicle, Sergeant Peay stepped forward, and as Ms. Johnson pulled forward again toward Sergeant Peay, he "had to back out of the way" because he "felt she was coming towards [him]." (Sergeant Peay Dep. 35:2–8.)

20.    *Ms. Johnson then began to pull forward, turning her steering wheel and her truck away from Sgt. Peay and his truck. Exh. 4, 22:15:42.*

---

[9] Deputy Peay testified in his deposition that he would rely on the content of his written report (MCSO_00019–21), which he prepared the day after the incident, because he does not now recall much of the events surrounding the pursuit of Ms. Johnson, and because his resignation from Morgan County has left him bitter toward the County and may have skewed his memory. (Deputy Peay Dep. 53:25–54:25, 57:14–58:6, 75:19–76:4, 78:4–5.)

RESPONSE: Disputed. As Ms. Johnson pulled forward again toward Sergeant Peay, he "had to back out of the way" because he "felt she was coming towards [him]," (Sergeant Peay Dep. 35:2–8, 78:15–79:17), until she turned and "went directly toward Christian." (Sergeant Peay Dep. 85:18–21; *see id.* at 57:9–58:16.)

21.     *Sgt. Peay had stepped off to the passenger side of Johnson's truck, making sure he was not hit as Ms. Johnson pulled forward. Exh. 4, 22:15:43.*

RESPONSE: Disputed. As Ms. Johnson pulled forward again toward Sergeant Peay, he "had to back out of the way" because he "felt she was coming towards [him]." (Sergeant Peay Dep. 35:2–8, 78:15–79:17.)

22.     *Beginning at Fact 16, when Ms. Johnson bumped into the side of his truck, Sgt. Peay never took his eyes off Ms. Johnson until he fired his weapon at her. Exh. 4, 22:15:31 – 22:15:44.*

RESPONSE: Disputed. Sergeant Peay testified that he experienced tunnel vision during the incident: "After I saw Christian off to my right side and as she came to him and the stress increased, my eyesight came in a little bit and I was focused on her completely and I couldn't see my brother anymore. I wasn't seeing to the side as much as I was to the front." (Sergeant Peay Dep. 76:8–24.)

23.     *As Ms. Johnson pulled forward, as described in Fact 20, while she was traveling about 3 mph, she bumped into Deputy Christian Peay's stationary vehicle. Exh. 4, 22:15:44.*

RESPONSE: Disputed. A vehicle crash report estimated that Plaintiff's vehicle was traveling approximately 15 mph at the time of impact with Depupty Peay's truck. (Prescott Dep. 28:5–25; *see* Vehicle Crash Report, MCSO_00318–19.) Sergeant Peay and Deputy Peay

estimated it was traveling between 5 and 10 miles per hour when it rammed Deputy Peay's truck. (Sergeant Peay Dep. 56:15–57:4; Deputy Peay Dep. 21:17–22:10.)

24.     *After she bumped Christian Peay's vehicle, forward progress of her truck ceased. Exh. 4, 22:15:44.*

RESPONSE: Disputed. Sergeant Peay testified: "She rams the vehicle and she is still accelerating. Her tires are spinning. She is churning up the asphalt and she is still moving. She is pushing against that vehicle." (Sergeant Peay Dep. 85:18–86:13.)

25.     *It was at this point that Sgt. Peay fired his weapon, the bullet entering Ms. Johnson's left eye and exiting her left temple. Exh. 4, 22:15:44; Exh. 7, Ms. Johnson's medical record.*

RESPONSE: Disputed. Sergeant Peay testified that he fired at approximately the moment of impact between Ms. Johnson's truck and Deputy Peay's truck because "as she hit right here, Christian dropped out of my view. I didn't know if he was under her vehicle, if she had hit him, or if she was pinning him between the vehicles. And I fired to stop her from injuring my brother." (Sergeant Peay Dep. 59:1–4, 60:5–23.)

26.     *The above facts and allegations, as well as the facts provided below, are supported and confirmed in the dash-cam videos from Officer Dingman's and Officer Hardman's vehicles. Exhs. 4, 5.*

RESPONSE: Disputed. Please see individual responses to each factual assertion.

27.     *Ms. Johnson survived, although her left eye was completely destroyed, her sight in that eye was unable to be restored, and her face was understandably disfigured from such a gunshot wound. Id.*

RESPONSE: Undisputed.

28.	*A small fraction of a second after Ms. Johnson bumped Deputy Peay's vehicle, Sgt. Peay fired his weapon through the windshield of Ms. Johnson's truck, the bullet striking her in the head. Exh. 4, 22:15:44; Exh. 5, 22:06:12. Exhibit 7, Ms. Johnson's medical record. See also Fact 25, supra.*

RESPONSE: Disputed. Sergeant Peay testified that he fired at approximately the moment of impact between Ms. Johnson's truck and Deputy Peay's truck because "as she hit right here, Christian dropped out of my view. I didn't know if he was under her vehicle, if she had hit him, or if she was pinning him between the vehicles. And I fired to stop her from injuring my brother." (Sergeant Peay Dep. 59:1–4, 60:5–23.)

29.	*When he fired his weapon at Ms. Johnson's head, Sgt. Peay was in no immediate danger of serious bodily injury or death. Exh. 4, 22:15:31 – 22:15:44.*

RESPONSE: Disputed. This is a conclusory and argumentative statement, not a statement of fact.

30.	*When Sgt. Peay fired his weapon at Ms. Johnson's head, no other officer or person was in immediate danger of serious bodily injury or death (by being struck by Ms. Johnson's truck or through any other means). Exh. 4, 22:15:44; Exh. 5, 22:06:12.*

RESPONSE: Disputed. This is a conclusory and argumentative statement, not a statement of fact. Deputy Peay believed that "she could have nailed me, I was standing right there," (Deputy Peay Dep. 66:12–22; Police Interview of Christian Peay ("Deputy Peay Interview") 7:18–20),[10] and that "if Scott did not shoot her, I would have been struck by her vehicle."

---

[10] Deputy Peay was interviewed at 1:06 a.m. on November 26, 2012, just a few hours after the

(Deputy Peay Dep. 68:1–15; MCSO_00926; *see* Deputy Peay Dep. 72:19–73:13.) Sergeant Peay feared for the safety of Deputy Peay and the other officers because Ms. Johnson was not backing down. (Interview with Sergeant Daniel Scott Peay ("Sergeant Peay Interview") 17:7–19:25.)[11] Officers Dingman and Hardman likewise testified that they believed that Ms. Johnson's conduct placed Sergeant Peay, Deputy Peay, and the other officers on the scene in danger. (Dingman Dep. 28:8–30:18, 35:11–15; Deposition of Todd Hardman ("Hardman Dep.") 15:9–17:25.)[12]

*31.     In particular, when Sgt. Peay fired his weapon at Ms. Johnson's head, Deputy Christian Peay was not in immediate danger of serious bodily injury or death by being struck or pinned by Ms. Johnson's truck (or through any other means). Exh. 5, 22:06:11.*

RESPONSE: Disputed. This is a conclusory and argumentative statement, not a statement of fact. Both Sergeant Peay and Deputy Peay stated right after the incident that they believed they and/or other officers were in danger of serious bodily injury or death. (Sergeant Peay Dep. 39:3–9, 60:12–23, 78:8–14; *see* Deputy Peay Dep. 26:6–9 ("he thought that I was being ran over."); *see* Sergeant Peay Interview 18:17–19:9 ("I was very concerned that I had waited too long and that my brother had been hit."); Deputy Peay Dep. 57:14–58:6, 66:12–22, 68:3–15, 72:19–73:1.)

*32.     After viewing the videos, Christian Peay testified at his deposition that neither he, nor Sgt. Peay, were in any danger, as demonstrated in the following exchanges:*

---

incident, and that interview was recorded and later transcribed. (Deputy Peay Interview 2:1–8; *see* Deputy Peay Dep. 60:7–13.) Cited portions of Deputy Peay's interview transcript are included in Defendants' Appendix as Ex. G.

[11] Cited portions of Sergeant Peay's interview transcript are included in Defendants' Appendix as Ex. H

[12] Cited portions of Officer Hardman's deposition transcript are included in Defendants' Appendix as Ex. F.

> Q. . . . . *about 11:06 or 7, he fires the bullet. Watch this now. Do you see that bullet?*
> A. *Yes.*
> Q. *Do you see where Scott is standing?*
> A. *I do.*
> Q. *Do you think at the time that that bullet was fired, he was in imminent danger of death or serious bodily injury?*
>
> \* \* \*
>
> A. *I feel that Scott was not in danger at that time.*

*Exhibit 9, C. Peay Depo. 20:19–21:6 (emphasis added)*

> Q. *At any time that night before the shot was fired, were you in imminent danger of death or serious bodily injury?*
> A. *No.*

*Id., 24:15–18.*

RESPONSE: Disputed. This is a conclusory and argumentative statement, not a statement of fact. Deputy Peay also testified that his report and statements made closer to the time of the incident would more accurately reflect his beliefs at the time, (Deputy Peay Dep. 57:14–58:6, 75:19–76:3), which included that "she could have nailed me, I was standing right there," (Deputy Peay Dep. 66:12–22, Deputy Peay Interview 7:18–20), and that "if Scott did not shoot her, I would have been struck by her vehicle." (Deputy Peay Dep. 68:3–15; Deputy Peay Facebook post, MCSO_00926; *see* Deputy Peay Dep. 72:19–73:13.)

33. *This officer-involved shooting was evaluated by the Davis County Attorney's Office and determined to be unjustified. See Exhibit 8, Rawlings 1/22/13 letter to Sheriff Breshears. Among other things, Mr. Rawlings wrote "An objective and impartial analysis concludes that the use of potentially lethal force in shooting Kristine Johnson was not necessitated by the facts." Id., p.1.*

RESPONSE: Disputed. Mr. Rawlings' conclusion is not a statement of fact. Defendants object to the use of Mr. Rawlings' opinion because it is an inadmissible legal conclusion. *See Specht v. Jensen*, 853 F.2d 805, 807–10 (10th Cir. 1988) (legal conclusion of ultimate issue of violation of constitutional right in § 1983 case was inadmissible). Moreover, it is irrelevant to the reasonableness analysis under a qualified immunity standard.

## STATEMENT OF ADDITIONAL UNDISPUTED MATERIAL FACTS

1.      After Deputy Peay saw Ms. Johnson's truck driving without headlights, he notified Sergeant Peay. (Deputy Peay Incident Report, MCSO_00019.)

2.      Within a few minutes, Sergeant Peay joined Deputy Peay and they both pursued Ms. Johnson "directly behind" her with their emergency lights and sirens activated, but Ms. Johnson "made no attempt to slow down and stop." (MCSO_00019–20.)

3.      During the pursuit, speeds fluctuated between approximately 75 and 90 miles per hour even though the speed limit was 70 miles per hour, and Ms. Johnson drove erratically as she repeatedly failed to stay in her lane. (MCSO_00020; Sergeant Peay Dep. 40:19–21; *see generally* Deputy Peay Dash-cam video, Pl.'s Ex. 2 (showing Ms. Johnson's driving pattern during the pursuit and posted speed limit.))

4.      Dispatch ran Ms. Johnson's license plate number and discovered that it was not on file. (MCSO_00020.)

5.      After spikes were deployed and Ms. Johnson was driving on rims, she "almost drove off the right shoulder and then went across both lanes and struck the cement barrier" but did not stop. (MCSO_00020; Sergeant Peay Dep. 41:16–17.)

6.       When Ms. Johnson slowed on Cottonwood Drive, Sergeant Peay notified the other officers over the radio that he "wanted everybody to do a high risk felony stop . . . . Because [he] was concerned about everybody's safety." (Sergeant Peay Interview 16:4–12.)

7.       Sergeant Peay came around the rear of his vehicle and realized Ms. Johnson "had a look of rage on her face . . . . directed at me," which influenced how he thought things would transpire. (Sergeant Peay Interview 17:16–18:10; Sergeant Peay Dep. 35:2–8, 43:2–16, 46:14–48:9.)

8.       Sergeant Peay believed Ms. Johnson "was turning around and was going to use the truck as a weapon" because "she wasn't pinned in, she could have went up the road or stopped, but rather she was turning and coming at us." (Sergeant Peay Dep. 43:17–44:5; *see id.* at 48:13–19 ("She was clearly using her vehicle as a weapon to come at me."); *id.* at 75:4–5 ("She wasn't fleeing anymore, she was attacking us."); *id.* at 89:12–15 ("she is using her vehicle as a weapon"); Sergeant Peay Interview 17:16–18:10.)

9.       Sergeant Peay said about Ms. Johnson driving her vehicle towards him: "there was no question in my mind when she came, that she was trying to hit me, that it wasn't my truck she was trying to hit, she was looking at me and coming after me and trying to hit me." (Sergeant Peay Dep. 43:23–44:5; Sergeant Peay Interview 17:16–18:10.)

10.     Sergeant Peay also testified: "she was focused on me and she tried to hit me. She was looking at me. I could clearly see her through the windshield. She was screaming and revving her engine and she came at me . . . . She had an expression of rage on her face . . . ." (Sergeant Peay Dep. 46:14–48:9.)

11.      Ms. Johnson's car came "within inches or a foot" of Sergeant Peay, pushing his truck towards him, but Sergeant Peay was able to "bend backwards at the waist and move [his] feet and legs backwards to avoid being hit." (Sergeant Peay Dep. 56:7–14, 78:15–80:25.)

12.      Ms. Johnson backed up again and Sergeant Peay "tried to communicate with her yelling for her to stop and get out of her truck . . . ." (Sergeant Peay Dep. 81:17–23; Sergeant Peay Interview 17:16–18:10.)

13.      Deputy Peay also saw that when Ms. Johnson turned around on Cottonwood Drive she "struck Sgt. Peay's Patrol vehicle and nearly hit[] Sgt. Peay" who "was outside of his vehicle and standing on the right side of it at the time giving the driver commands to stop." (MCSO_00021.)

14.      Deputy Peay exited his patrol truck as "Sgt. Peay was still giving her commands to stop." (MCSO_00021.)

15.      Deputy Peay confirmed that after Ms. Johnson backed up she "looked directly at me and the expression on her face changed. She looked as if she was targeting me to run me over." (Deputy Peay Dep. 59:11–60:6; MCSO_00021; *see* Deputy Peay Interview 5:16–7:29.)

16.      Deputy Peay interpreted Ms. Johnson's "look on her face" as if "she wanted to do a suicide by cop . . . ." (Deputy Peay Dep. 65:20–66:11; Deputy Peay Interview 7:7–20.)

17.      Ms. Johnson then drove "right at" Deputy Peay, striking "the left side of [his] front bumper," with enough force to move his patrol vehicle. (MCSO_00021; *see* Deputy Peay Interview 17:14–16.)

18.    As Ms. Johnson drove forward into Deputy Peay's vehicle, Deputy Peay stepped back to avoid being hit. (*See* Hardman dash-cam video, Pl.'s Ex. 5 at 22:06:00–22:06:15; Sergeant Peay Dep. 61:14–17.)

19.    Deputy Peay believed Ms. Johnson was trying to hit him with her vehicle (Deputy Peay Dep. 72:19–73:13), that "she could have nailed me, I was standing right there," (*Id.* at 66:12–22; Deputy Peay Interview 7:7–20), and that "if Scott did not shoot her, I would have been struck by her vehicle." (Deputy Peay Dep. 68:3–15.)

20.    Sergeant Peay, who was experiencing tunnel vision, could not see Deputy Peay as Ms. Johnson rammed Deputy Peay's truck. (Sergeant Peay Dep. 76:8–24.)

21.    Sergeant Peay believed that Ms. Johnson may have hit Deputy Peay or that she would pin Deputy Peay by pushing the vehicle into him: "sometime between that time when she backed up and started coming forward again I saw Christian out of my peripheral vision and he was to my right . . . just to the side of Dingmann's vehicle . . . . She took her focus off me and looked directly over at him and she screamed, revved her engine and went forward. And as she hit right here, Christian dropped out of my view. I didn't know if he was under her vehicle, if she had hit him, or if she was pinning him between the vehicles. And I fired to stop her from injuring my brother." (Sergeant Peay Dep. 60:12–23; *see id.* at 39:3–9, 78:8–14; Sergeant Peay Interview 18:17–19:9; *see* Deputy Peay Dep. 26:6–9 ("he thought that I was being ran over."))

22.    After the shot was fired, Ms. Johnson's truck stopped. (Sergeant Peay Dep. 60:24–25.)

23.    Although it was later determined that Ms. Johnson had a blood alcohol level of 358 mg/dL (0.358 g%), Sergeant Peay was unaware of that fact during the pursuit and when he

fired his service weapon. (Johnson Dep. 63:11–64:23; Sergeant Peay Dep. 48:10–14; Ms. Johnson Lab Report, ORMC 0112–119.)[13]

24.     Ms. Johnson admitted shortly after the incident that "she was attempting death by cop when she repeatedly rammed her car into a police vehicle," and that she "had every intention of trying to kill [her]self . . . ." (Johnson Dep. 67:5–20, 75:12–77:21; Ms. Johnson Interview 2:13–17; Ms. Johnson Medical Records, ORMC 245–247.)[14]

25.     Deputy Peay admitted during his deposition that he was "very bitter" towards the Morgan County Sheriff's Office on account of his alleged forced resignation in 2013 for matters unrelated to this incident with Ms. Johnson, and that his bitterness might have influenced how he now remembers these events. (Deputy Peay Dep. 75:19–76:4, 78:4–5; *see id.* at 30:11–37:1.)

## ARGUMENT

### I.     PLAINTIFF'S MOTION SHOULD BE DENIED BECAUSE IT FAILS TO COMPLY WITH THE LOCAL RULES AND THIS COURT'S ORDER

Plaintiff originally filed her motion for summary judgment on December 9, 2015. (D.E. 29). Defendants filed a motion for sanctions arguing that Plaintiff's motion failed to comply with DUCivR 56-1, by not having a correct section entitled "Statement of Elements and Undisputed Material Facts" or a separately filed appendix. (D.E. 34.) The Court granted Defendants' motion in part and ordered Plaintiff to "correct the deficiencies noted by the Defendants." (D.E. 36.)

---

[13] A custodian of records from the Ogden Regional Medical Center has certified these records as being true and correct copies. (ORMC 0020.) Cited documents bates labeled "ORMC" are included in Defendants' Appendix as Ex. K.

[14] A custodian of records from the Ogden Regional Medical Center has certified these records as being true and correct copies. (ORMC 0020.)

As Defendants argued previously in their motion for sanctions (D.E. 34 at 4–8),[15] courts in the United States District Court for the District of Utah often deny motions that fail to follow the local rules. *See, e.g. Global Fitness Holdings, LLC v. Federal Recovery Acceptance, Inc.*, --- F.Supp.3d ----, 2015 WL 5098826 at *6 (D. Utah Aug. 31, 2015) (the motion "fail[ed] to properly provide statements of facts for each of the elements of unjust enrichment" and "failed to 'cite[] with particularity the evidence in the record supporting each factual assertion' as required by D.U.Civ.R. 56-1(b)"); *Webb v. Scott*, 2014 WL 931025 at *3 (D. Utah Mar. 10, 2014) (unpublished) ("Plaintiff failed to coherently list the legal elements required to prevail on his motion . . . . Moreover, for each aforementioned element, Plaintiff failed to include a statement of undisputed material fact that cited to the record."); *Summit Financial Resources, L.P. v. Walthers Oil Co.*, 2008 WL 3346140 at *1 (D. Utah Aug. 11, 2008) (unpublished), (denied motion to dismiss because it "fail[ed] to comply with the local rules")

While Plaintiff's motion now contains a section with the appropriate heading, it still does not comply with the requirements described in DUCivR 56-1 because it fails to include "[u]nder each element, a concise statement of the material facts necessary to meet that element," it does not cite with particularity the evidence to support each factual assertion, and Plaintiff still did not file a separate appendix, properly prepared as required by the local rules. *See* DUCivR 56-1(b) and (f). Plaintiff's failure leaves the court without a distilled section of the precise elements, legal authority, and relevant material facts. As a result of Plaintiff's continued failure to comply with DUCivR 56-1 and this Court's Order, Plaintiff's motion should be denied.

---

[15] Defendants incorporate the arguments from their motion for sanctions herein by reference. (D.E. 34.)

## II. PLAINTIFF'S MOTION SHOULD BE DENIED BECAUSE SERGEANT PEAY IS ENTITLED TO QUALIFIED IMMUNITY

To prevail on her motion for summary judgment, Plaintiff carries the burden of showing "that there is no genuine dispute as to any material fact and that the movant is entitled judgment as a matter of law." FED. R. CIV. P. 56(a); *see Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). "[C]ourts are required to view the facts and draw reasonable inferences in the light most favorable to the party opposing the summary judgment motion." *Scott v. Harris*, 550 U.S. 372, 378 (2007) (quotation omitted). If Plaintiff's version of the events is "blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Id.*

In order to prevail on her first cause of action for a violation of Plaintiff's Fourth Amendment rights under 42 U.S.C. § 1983, Plaintiff must prove each of the following elements: Sergeant Peay was acting under color or authority of law; Sergeant Peay violated Plaintiff's constitutional rights because the force he used was objectively unreasonable, based on the totality of the circumstances and viewed from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight; Sergeant Peay's use of force was the proximate cause of Plaintiff's injury; and Sergeant Peay should have known that he was violating Plaintiff's constitutional rights because the law was clearly established at the time. 42 U.S.C. § 1983 (2012); *see Pearson v. Callahan*, 555 U.S. 223, 231 (2009); *Graham v. Connor*, 490 U.S. 386, 394–97 (1989); *Estate of Larsen ex rel. Sturdivan v. Murr*, 511 F.3d 1255, 1259 (10th Cir. 2008).

Sergeant Peay is entitled to qualified immunity unless the Plaintiff can show (A) that he violated her Fourth Amendment right and (B) that the contours of that right were clearly established at the time. *Pearson*, 555 U.S. at 232. Ms. Johnson has failed to even *address* each of these prongs of qualified immunity let alone prove them. Accordingly, Plaintiff's motion should be denied.

### A. Sergeant Peay Did Not Violate Plaintiff's Fourth Amendment Right Because The Use Of Force Was Objectively Reasonable

The Fourth Amendment requires a police officer's use of force to be "objectively reasonable." *Tennessee v. Garner*, 471 U.S. 1, 8–9 (1985). "The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham*, 490 U.S. at 396. "The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments – in circumstances that are tense, uncertain, and rapidly evolving – about the amount of force that is necessary in a particular situation." *Id.* at 396–97. The "proper application" of the objective reasonableness test "requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Id.* at 396.

### 1. Deadly force was reasonable because Sergeant Peay reasonably believed that Ms. Johnson posed a threat of serious bodily harm or death

An officer's use of deadly force is justified if a reasonable officer would have had probable cause to believe that the suspect posed a threat of serious physical harm either to the officer himself or to others. *Larsen*, 511 F.3d at 1260; *Jiron v. City of Lakewood*, 392 F.3d 410,

415 (10th Cir. 2004); *see Graham*, 490 U.S. at 396–97. "Thus, if threatened by a weapon (***which may include a vehicle attempting to run over an officer***), an officer may use deadly force." *Thomas v. Durastanti*, 607 F.3d 655, 664 (10th Cir. 2010) (emphasis added). When faced with such a threat, "[a] reasonable officer need not await the 'glint of steel' before taking self-protective action" because by then, it may be too late. *Estate of Larsen*, 511 F.3d at 1260.

When assessing the degree of the threat facing the officer, a court must consider several "non-exclusive factors" including "(1) whether the officers ordered the suspect to drop his weapon, and the suspect's compliance with police commands; (2) whether any hostile motions were made with the weapon towards the officers; (3) the distance separating the officers and the suspect; and (4) the manifest intentions of the suspect." *Id.* However, at its fundamental level, "the inquiry is always whether, from the perspective of a reasonable officer on the scene, the totality of the circumstances justified the use of force." *Id.*

Here, the undisputed material facts show that prior to using deadly force, each of these factors was met. As a preliminary matter, the law is clear that a vehicle can be a weapon. *Thomas*, 607 F.3d at 664–65, 671.

As to the first factor, after Sergeant Peay exited his patrol vehicle and narrowly avoided being hit by Ms. Johnson's vehicle, Sergeant Peay ordered Ms. Johnson to stop and get out of the car. Ms. Johnson ignored Sergeant Peay's commands and proceeded to back up, rev her engine, and ram Deputy Peay's truck near where Deputy Peay was standing. (Sergeant Peay Dep. 81:17–23; *see* MCSO_00019–21.) Second, Ms. Johnson exhibited several hostile motions including, screaming and looking directly at Sergeant Peay and Deputy Peay with an expression of rage as she used her vehicle as a weapon to ram their patrol vehicles, nearly hitting both of them. Next,

Ms. Johnson's truck was in close proximity to the officers and at the time the force was used, she had rammed an officer's vehicle for the second time, nearly striking at least two officers. Finally, given that Ms. Johnson's path was clear in front of her, the road was not a dead-end, and that she intentionally turned her vehicle around and repeatedly rammed the officers' vehicles, her manifest intentions were to harm the police officers. She gave no indication that she would heed the officers' commands, terminate her flight, or stop attacking them. Both Sergeant Peay and Deputy Peay believed that she was trying to run them over with her car.

Other important facts beyond these non-exclusive factors provide additional context in order to view Sergeant Peay's use of force under the totality of the circumstances and show that it was reasonable.

Prior to the shooting, officers had pursued Ms. Johnson for approximately 26 minutes, as she drove recklessly, crashed into the center barrier, and exceeded the speed limit, reaching speeds of at least 90 miles per hour. Ms. Johnson refused to stop despite several police cars pursuing her with their lights and sirens on, even after tire spikes had been deployed and she was driving on the rims of her car. After exiting the freeway and turning east onto Cottonwood Drive, Ms. Johnson slowed and made a three point turn to face west towards the pursuing officers. Even though the road was not a dead end – a sign indicated as much at the place where she began to turn – and Ms. Johnson could have continued east or gone onto the shoulder around the patrol vehicles, she intentionally rammed two police vehicles. First, she slammed into Sergeant Peay's truck, a mere feet or even inches from where Sergeant Peay stood. Sergeant Peay had to move to avoid being hit. Then the suspect backed up and went forward again, causing Sergeant Peay to have to move again, and the suspect rammed Deputy Peay's truck. In addition to the many police

cars there with the lights on, Sergeant Peay yelled at the suspect to stop the car. Sergeant Peay saw a look of rage on her face as Ms. Johnson turned and looked toward Deputy Peay and accelerated to ram Deputy Peay's truck near where Sergeant Peay had just seen Deputy Peay standing. Ms. Johnson later admitted that she was attempting to commit suicide by cop by repeatedly ramming her car into police vehicles.

By the time Sergeant Peay fired, Ms. Johnson had committed aggravated assault against a peace officer, driven recklessly, posed a significant threat to the safety of the officers and others on the road, and had been and was actively fleeing from police. *See Graham*, 490 U.S. at 396.

The last sequence of events – Ms. Johnson turning her vehicle around, ramming the two police vehicles, nearly hitting two officers, and Sergeant Peay firing one round – all transpired in less than 30 seconds. Under these circumstances, which were "tense, uncertain, and rapidly evolving," it was reasonable for Sergeant Peay to conclude that Ms. Johnson's use of her vehicle as a weapon created a risk of serious injury or death to himself or others.

If Ms. Johnson had fired a gun at Sergeant Peay and Deputy Peay, there would be no question that deadly force would be authorized. The fact that Ms. Johnson's weapon of choice was a large truck should not change the analysis as "it goes without saying that an officer in close quarters is no match for a two-ton vehicle." *Thomas*, 607 F.3d at 665.

Plaintiff's claim that Sergeant Peay's belief that Ms. Johnson posed a threat is a "visible fiction"[16] is erroneous. The dash-cam videos with Plaintiff's self-serving and, at times, false interpretations of them, do not present the "totality of the circumstances," nor do they present the facts from Sergeant Peay's perspective. By viewing the scene from a perspective other than

---

[16] Pl.'s Mot. for Summ. J. at 1–3.

Sergeant Peay, a court cannot possibly fully consider whether Sergeant Peay's use of force was reasonable. For example, although one can hear voices in the dash-cam videos, it is difficult make out what they are saying or who is saying them. It is difficult to see Ms. Johnson's face and the look of rage that was visible to Sergeant Peay and Deputy Peay. As Sergeant Peay testified in his deposition, he recalled "how the person in the vehicle turned the vehicle around and came at me, how she screamed in rage, how she rammed my vehicle . . . . how she looked over at my brother, screamed, put it in gear, revved her engine up and went after him." (Sergeant Peay Dep. 39:3–9.) Those important facts and circumstances are not presented in the video and must be considered in order to correctly calculate the reasonableness of Sergeant Peay's actions.

> **2.** **Viewed from the correct perspective, rather than with the 20/20 vision of hindsight, Sergeant Peay's belief was reasonable, even if it was mistaken**

Plaintiff argues that "[a]n officer's subjective imagining that someone *might* be in such danger is entirely insufficient to justify the use of deadly force," and that Sergeant Peay's use of force was unjustified because it was not based "on personal knowledge that Deputy Peay or anyone else was in actual danger of serious bodily injury or death."[17]

Plaintiff misunderstands the standard applicable here and wrongly focuses on whether Sergeant Peay or Deputy Peay were *actually* in imminent danger at the time Sergeant Peay fired his weapon. In so doing, Plaintiff improperly judges the use of force "with the 20/20 vision of hindsight," which the Supreme Court has explicitly rejected, as opposed to "from the perspective of a reasonable officer on the scene" in light of all of the facts and circumstances of the particular case. *Graham*, 490 U.S. at 396–97.

---

[17] *Id.* at 3–4.

The question is not whether Sergeant Peay was right about the threat of harm, but rather whether it was reasonable for him to believe there was a threat of harm under the particular facts and circumstances and judged from the perspective of a reasonable officer on the scene. *See Saucier v. Katz*, 533 U.S. 194, 205–07 (2001); *Hunter v. Bryant*, 502 U.S. 224, 228–29 (1991); *Graham*, 490 U.S. at 396–97; *Thomas*, 607 F.3d at 665–66 (the officer's "reasonable perceptions are what matters").

Plaintiff attempts to show that no one was in danger when she drove her two-ton truck at police officers by citing to the deposition testimony of Deputy Peay after he had a chance to view two dash-cam videos of the incident. Not only do the dash-cam videos not show the whole picture, this tactic is classic 20/20 hindsight. Deputy Peay later admitted during his deposition that he would rely on his reports and statements made closer to the time of the incident as they would likely more accurately portray how he thought at the time and would not be tainted with a bitterness he now has towards Morgan County after he resigned. (Deputy Peay Dep. 57:14–58:6, 75:19–76:3.) Sergeant Peay and Deputy Peay both stated right after the events took place that they unequivocally believed that Deputy Peay was in danger. Other officers on the scene agreed. There is no question that Sergeant Peay reasonably believed that Ms. Johnson was using her truck as a deadly weapon to harm the officers.

Moreover, even if Sergeant Peay was wrong and no one was in actual danger, he would still be entitled to qualified immunity so long as his mistaken belief was reasonable. "An officer may be found to have acted reasonably even if he has a mistaken belief as to the facts establishing the existence of exigent circumstances." *Thomas*, 607 F.3d at 666; *see Pearson*, 555 U.S. at 231 (qualified immunity applies for a mistake of law, a mistake of fact, or a mistake

based on mixed questions of law and fact); *Hunter*, 502 U.S. at 227–29 ("the qualified immunity standard gives ample room for mistaken judgments" (quotation omitted)). Therefore, Plaintiff's argument about actual danger is inconsistent with the qualified immunity standard and would not subject Sergeant Peay to liability. Given the totality of the circumstances described above, it was reasonable for Sergeant Peay to believe that Ms. Johnson was threatening the officers with serious bodily harm or death by trying to hit them with her truck.

### 3.       Sergeant Peay need not have used alternative means

In addition, Plaintiff argues that Sergeant Peay could have avoided using deadly force if he "had taken a half second to glance over to verify where Deputy Peay was positioned" because "he would have seen that his alleged fear for his brother's safety was simply imagined, unfounded, and unjustified."[18] First of all, this is once again a hindsight viewpoint that has no place in a qualified immunity analysis. Secondly, it assumes that Deputy Peay was not in danger and Ms. Johnson would have stopped, when the evidence suggests that if Sergeant Peay had not fired, Ms. Johnson would have harmed Deputy Peay, and that she would have continued using her vehicle as a weapon to harm other officers as well. And finally, it presumes that there was an alternative means to deadly force to stop the threat of harm.

"[T]he reasonableness standard does not require that officers use alternative, less intrusive means when confronted with a threat of serious bodily injury." *Blossom v. Yarbrough*, 429 F.3d 963, 968 (10th Cir. 2005); *Medina v. Cram*, 252 F.3d 1124, 1132–33 (10th Cir. 2001). What matters is whether the officer's beliefs and perceptions were reasonable in light of the

---

[18] Pl.'s Mot. for Summ. J. at 5.

circumstances he faced at the time. *See Thomas*, 607 F.3d at 665–66. As the Sixth Circuit has compellingly stated:

> [U]nder *Graham*, we must avoid substituting our personal notions of proper police procedure for the instantaneous decision of the officer at the scene. We must never allow the theoretical, sanitized world of our imagination to replace the dangerous and complex world that police [officers] face every day. What constitutes "reasonable" action may seem quite different to someone facing a possible assailant than to someone analyzing the question at leisure.

*Smith v. Freland*, 954 F.3d 343, 347 (6th Cir. 1992). In other words, a court should not second-guess the split-second decisions of officers who face real life dangers "in circumstances that are tense, uncertain, and rapidly evolving." *Graham*, 490 U.S. at 396–97.

Sergeant Peay had less than 30 seconds to assess the danger Ms. Johnson posed to himself and the other officers and make a choice with life and death consequences. To second-guess that decision, based on hindsight and unreasonable assumptions, is inconsistent with the reasonableness standard applicable in this case as stated in *Graham* and is progeny. Sergeant Peay faced a real-life threat of serious harm or even death. He acted reasonably under those circumstances and is therefore entitled to qualified immunity. Plaintiff's motion should be denied.

### B. Sergeant Peay Did Not Violate Clearly Established Law

In addition to Plaintiff's failure to prove that Sergeant Peay's use of force was not objectively reasonable, Plaintiff completely fails to even address, let alone prove, that the law was clearly established. "An official sued under § 1983 is entitled to qualified immunity unless it is shown that the official violated a statutory or constitutional right that was clearly established at the time of the challenged conduct." *Plumhoff v. Rickard*, 134 S.Ct. 2012, 2023 (2014) (quotations omitted); *Pearson*, 555 U.S. at 232. "[A] defendant cannot be said to have violated a

clearly established right unless the right's contours were sufficiently definite that any reasonable official in the defendant's shoes would have understood that he was violating it." *Plumhoff*, 134 S.Ct. at 2023; *see Saucier*, 533 U.S. at 202 (a right is clearly established if "it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted"). The law must be sufficiently obvious that only a "plainly incompetent" officer would not have known he were violating it. *Stanton v. Sims*, 134 S.Ct. 3, 5 (2013).

"Ordinarily, in order for the law to be clearly established, there must be a Supreme Court or Tenth Circuit decision on point, or the clearly established weight of authority from other courts must have found the law to be as the plaintiff maintains." *Morris v. Noe*, 672 F.3d 1185, 1196 (10th Cir. 2012) (quotation omitted). In other words, existing precedent must have placed the specific constitutional question faced by the officer "beyond debate." *Plumhoff*, 134 S.Ct. at 2023 (quotations omitted). A court must not "define clearly established law at a high level of generality" because doing so "avoids the crucial question whether the official acted reasonably in the particular circumstances that he or she faced." *Id.*

The entirety of Plaintiff's argument section seeks to show that Sergeant Peay's use of force was unnecessary and unreasonable and therefore violated her Fourth Amendment rights. Even if Plaintiff was correct, and she is not, Plaintiff provides no argument whatsoever that the law was clearly established. Failing to do so, Plaintiff cannot show that Sergeant Peay is not entitled to qualified immunity and her motion must be denied.

Moreover, existing precedent actually shows that the law was clearly established in Sergeant Peay's favor – that his use of force under the circumstances was objectively reasonable.

For example, in *Plumhoff v. Rickard*, 134 S.Ct. 2012, 2017 (2014), the Supreme Court held that officers acted reasonably when they fired 15 shots at a fleeing vehicle that had been driving recklessly after the vehicle refused to stop, crashed into three patrol cars, and nearly hit an officer who was on foot. "Under the circumstances at the moment the shots were fired, all that a reasonable police officer could have concluded was that Rickard was intent on resuming his flight and that, if he was allowed to do so, he would once again pose a deadly threat for others on the road." *Id.* at 2021–22.

Similarly, the Tenth Circuit in *Thomas v. Durastanti*, 607 F.3d 655, 660–61 (10th Cir. 2010), held that it was reasonable for a police officer to shoot at the driver of a vehicle that was fleeing and creating a danger of running over the officers on the scene.

> A reasonable officer could certainly conclude that the Lincoln's occupants had notice of police presence. Yet, the driver was pulling away from a traffic stop. In the process, the driver was advancing toward Agent Durastanti placing him in harm's way . . . . it goes without saying that an officer in close quarters is no match for a two-ton vehicle . . . . Although Agent Durastanti's reasonable perceptions are what matters, he had mere seconds to react, and his actions in firing the first couple of shots were reasonable, even if mistaken.

*Id.* at 665–66. The court also pointed out that "[t]he fact that flight from a traffic stop may have precipitated these events does not make the vehicle any less dangerous." *Id.* at 671.

Other circuits are in agreement. In *Robinson v. Arrugueta*, 415 F.3d 1252, 1254 (11th Cir. 2005), the court concluded that it was reasonable for a police officer (Arrugueta) to shoot a suspect (Walters) who disobeyed the officer's orders and was driving a vehicle at around one or two miles per hour toward the officer.

> [W]e conclude that a reasonable officer could have perceived that Walters was using the [vehicle] as a deadly weapon. Arrugueta had probable cause to believe that Walters posed a threat of serious physical harm . . . . Because it is constitutionally reasonable for an officer to use deadly force when a suspect is

threatening escape and possible harm to others, it is also constitutionally reasonable for an officer to use deadly force when he has probable cause to believe that his own life is in peril.

*Id.* at 1256. Even a small vehicle traveling at one or two miles per hour was a "deadly weapon" that justified the use of deadly force. *See also Thomas*, 607 F.3d at 671 ("courts have little difficulty in concluding that an officer's reasonable perception that a vehicle may be used as a weapon may allow for the use of deadly force"); *McCollough v. Antolini*, 559 F.3d 1201, 1207 (11th Cir. 2009) ("We have . . . consistently upheld an officer's use of force and granted qualified immunity in cases where the decedent used or threatened to use his car as a weapon to endanger officers or civilians immediately preceding the officer's use of deadly force.")

These cases provide sufficient clarity that the use of deadly force is reasonable when a suspect is using her vehicle as a deadly weapon and creating a threat of serious bodily harm or death to law enforcement officers or others on the road. At a minimum, these cases show that the right's contours were ***not*** "sufficiently definite that any reasonable official in [Sergeant Peay's] shoes would have understood that he was violating it." *Plumhoff*, 134 S.Ct. at 2023. Accordingly, this Court should deny Plaintiff's motion for summary judgment because the case law, rather than showing that Sergeant Peay violated clearly established law, actually show that the use of force comported with clearly established law, as it was objectively reasonable under the circumstances.

## CONCLUSION

Plaintiff has not shown that Sergeant Peay is not entitled to qualified immunity. In fact, the undisputed material facts show that Sergeant Peay's use of force under the specific facts and

circumstances of this case was objectively reasonable and that he did not violate clearly established law. Sergeant Peay respectfully asks this Court to deny Plaintiff's motion.

DATED this 10th day of February, 2016.

**STIRBA, P.C.**

By: _____/s/ Jeffrey D. Mann_____
        PETER STIRBA
        JULIA D. KYTE
        JEFFREY D. MANN
        ***Attorneys for Defendants***

## CERTIFICATE OF SERVICE

I hereby certify that on this 10th day of February, 2016, a true copy of the foregoing **DEFENDANTS' MEMORANDUM IN OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT ON LIABILITY AGAINST DEFENDANT PEAY** was served by the method indicated below, to the following:

Robert B. Sykes                                      (  ) U.S. Mail, Postage Prepaid
Alyson Carter McAllister                       (  ) Hand Delivered
Rachel L. Sykes                                       (  ) Overnight Mail
SYKES McALLISTER LAW OFFICES,       (  ) Facsimile
PLLC                                                         (X) Electronic Filing
311 South State Street, Suite 240
Salt Lake City, Utah 84111


Richard T. Williams                               (  ) U.S. Mail, Postage Prepaid
ALLEN PACE LAW, P.C.                            (  ) Hand Delivered
2550 Washington Blvd., Suite 300          (  ) Overnight Mail
Ogden, Utah 84401                                  (  ) Facsimile
                                                                   (X) Electronic Filing


_____
/s/ Zachary B. Hoddy
Legal Assistant