# EXHIBIT "A"

## "Deposition Of Kristine Biggs Johnson"

### (cited pages only)

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

```
KRISTINE BIGGS JOHNSON,           )
                                  )CASE NO.
              PLAINTIFF,          )1:14-cv-00147-TC
                                  )
Vs.                               )
                                  )
DANIEL PEAY, A MORGAN COUNTY      )
SHERIFF'S SERGEANT, MORGAN        )
COUNTY, A POLITICAL               )
SUBDIVISION; AND JOHN AND         )
JANE DOES 1-10                    )
                                  )
              DEFENDANTS.         )
_____  )
```

Deposition of Kristine Biggs Johnson

Taken:  October 14, 2015

Reported by: Linda J. Smurthwaite, RDR

### *Intermountain Court Reporters*
### *Murray, UT 84107*
### *(801) 263-1396*



1

1    Deposition of Kristine Biggs Johnson, taken on behalf

2  of Defendant, at 215 So. State Street, Salt Lake City,

3  Utah, on October 14, 2015, commencing at 9:00 AM, before

4  LINDA J. SMURTHWAITE, Certified Shorthand Reporter,

5  Registered Professional Reporter and Notary Public in and

6  for the State of Utah, pursuant to Notice.

7  APPEARANCES

8

    FOR THE PLAINTIFF:    SYKES MCALLISTER LAW OFFICES

9                        BY: Rachel Sykes

                          311 So. State Street

10                       Suite 240

                          SLC, UT 84111

11

12  FOR DEFENDANT:         STIRBA, P.C.

                          BY: Julia Kyte

13                       Peter Stirba

                          215 So. State Street

14                       Suite 750

                          Salt Lake City, UT 84111

15                       (801) 364-8300

                          Jkyte@stirba.com

16

17

18

19

20

21

22

23

24

25

                                                    2

```
 1                          I N D E X

 2

 3   WITNESS              EXAMINATION BY           PAGE

 4   Ms. Johnson      Ms. Kyte                      4

 5

 6

 7   EXHIBITS:

 8   No. 23 Notice of Deposition                    6

 9   No. 24 Records Request                        25

10   No. 25 Case Report Detail                     27

11   No. 26 Mesa County Arrest Record              37

12   No. 27 Sweetwater County Appearance Order and

13          Sheriff's Report                       39

14   No. 28 Ogden Regional Medical Record          63

15   No. 29 Audio CD of Interview 11-28-12         65

16   No. 30 Transcript of Hospital Interview

17          with Kristine Biggs Johnson 11-28-12   66

18   No. 31 Deft's Response to Plf's

19          First Set of Interrogatories           71

20   No. 32 Ogden Regional Clinical Document       74

21   No. 33 Ogden Clinical Document Enlarged       78

22   No. 34 Ogden Regional Medical Record          79

23   No. 35 VA Records                             79

24   No. 36 Court Documents Guilty Plea            83

25
```

Intermountain Court Reporters *** (801) 263-1396

1    Salt Lake City, Utah, October 14, 2015, 9:00 a.m.

2              KRISTINE BIGGS JOHNSON

3         was duly sworn, was examined and

4         testified as follows:

5    BY MS. KYTE:

6         Q.    Good morning.

7         A.    Morning.

8         Q.    Could you please state your full name and

9    spell it for the court reporter?

10        A.    Kristine Nicole Johnson, K-r-i-s-t-i-n-e

11   N-i-c-o-l-e J-o-h-n-s-o-n.

12        Q.    Ms. Johnson, I introduced myself earlier, but

13   my name is Julia Kyte and I'm here today as one of the

14   attorneys of record on behalf of the defendants, okay?

15        A.    Okay.

16        Q.    And for purposes of this deposition, earlier

17   records in 2012 indicated your last name was Biggs; is

18   that correct?

19        A.    It was Biggs, yes.

20        Q.    For purposes of the deposition today, it is

21   no longer Biggs; is that correct?

22        A.    That is correct.

23        Q.    And I'm going to refer to you as Ms. Johnson

24   throughout, okay?

25        A.    Thank you.

                                                    4

```
 1          Q.      Is that how you found out that he was

 2   involved with someone else?

 3          A.      Yes.

 4          Q.      And do you know approximately what month of

 5   2011 that occurred?

 6          A.      It was in March.

 7          Q.      The records that I just handed to you are

 8   relating to events dated March 22, 2011, and in the days

 9   following that.  These records are from after you found

10   out that information from your then husband; is that

11   correct?

12          A.      Yes.

13          Q.      Ms. Biggs, were you suicidal at that time?

14          A.      I was heartbroken.  Personally, I believe it

15   takes a great deal of courage to actually end your own

16   life.  I also believe that it requires a certain amount

17   of hopelessness.  I don't believe that I was suicidal,

18   but everybody kept suggesting it.

19          Q.      If you turn to page, what's marked on the

20   bottom right-hand corner as MCSO 00853.  And there's a

21   narrative line in the middle of the page and then where

22   it starts at the second paragraph.  I'm going to read you

23   a couple of statements there, and then ask you some

24   questions, okay?  It says 'Comments from dispatch read

25   Audrey received a text message from Kristine which read
```

28

```
 1     "let me die".'  Do you recall sending a text message to

 2     that effect to Audreay Powers?

 3          A.    I do not recall, however, the phrasing is

 4     'let me die.'  Leave me alone.  Not 'I'm going to kill

 5     myself'.

 6          Q.    How long have you known Audreay Powers?

 7          A.    I would say since 2001.

 8          Q.    So in 2011, she had known you for

 9     approximately ten years, at that time?

10          A.    Yes.

11          Q.    Do you think Audreay's concerns were --

12          A.    Oh, I'm sorry, can I make an amend?

13          Q.    Yes.

14          A.    I knew her since 2000, sorry.

15          Q.    So approximately 11 years --

16          A.    11 years.

17          Q.    -- at the time of these events.  Do you think

18     her concerns were unwarranted at the time?

19          A.    I think as my friend, and her concerns and

20     how she felt, I cannot say if they were unwarranted or

21     not, they were her feelings.

22          Q.    Turning to page 00859.  If you look midway

23     down the page, it says -- and it starts with 'while I was

24     standing outside the mobile home.'  Do you see that?

25          A.    Yes.
```

                                                              29

```
1         Q.      'While I was standing outside the mobile

2    home, east side, I looked west through a living room

3    window and observed a shotgun lying on the sofa, soft

4    case laying on the floor beneath the sofa.'  Was that

5    your shotgun?

6         A.      No.

7         Q.      Whose shotgun was that?

8         A.      That was my ex-husband's.

9         Q.      Your ex-husband wasn't home at this time,

10   correct?

11        A.      No.

12        Q.      Do you recall why the shotgun was laying out

13   on the sofa?

14        A.      The shotgun was laying on the sofa because

15   the address that I lived at, off of Highway 50, was out

16   in the middle of nowhere.  And I was not feeling secure,

17   I was not feeling safe.  I was there by myself.

18        Q.      Moving further down the page it says, 'while

19   on the east side of the mobile home, I observed four

20   empty bottles of Yukon Jack laying on the ground

21   scattered in the back yard.  It is unknown who drank the

22   alcohol or how long those bottles had been in the

23   backyard.'  Excuse me, 'these bottles have been in the

24   backyard.'

25        Do you believe you drank those bottles of alcohol?
```

30

1          A.     Over a period of a year.

2          Q.     There was also some discussion of the empty

3     bottles that appeared to have apple juice that were later

4     indicated to be moonshine.  Do you have any knowledge of

5     moonshine being in the house?

6          A.     No.

7          Q.     Were you aware, during these events, that

8     police officers were trying to check on your well-being?

9          A.     I did not wish to speak to anybody.  I was

10    aware of the phone calls.  I did not want to be texted by

11    anybody.  I wished to remain by myself.  And as far as

12    being aware of them being police officers, when they were

13    banging on my door, they woke me up from a sound sleep on

14    my couch, and I was terrified.  And I would like to make

15    note of the fact that even though terrified, I did not

16    grab for the shotgun.  I rolled off of the couch and

17    crawled across the floor down the hallway, and hid in my

18    closet with my dogs, because I was terrified.

19         Not once while they were banging on the doors or

20    the windows, did they announce that they were Mesa County

21    sheriffs.

22         Q.     Looking at page 00860.

23         A.     I'm looking at the time.

24         Q.     Looking at the time 00 -- so on 3/22/11,

25    about 2045 hours, I responded to a call.  Excuse me,

                                                          31

1    that's not a quote.  'The officers indicated they

2    responded to 4150 Highway 50, Mesa County, Colorado, to

3    assist Deputy Abeyta and Corporal Bridge on a possibly

4    suicidal female.'

5        And then looking down the page, it says 'at about

6    2107, I received a text message from Kristine's phone

7    number and the message read 'who is this?'  So 2107 is

8    approximately 9:07 p.m., is that correct?  Would you

9    agree?

10        A.    Yes.

11        Q.    'Kristine and I then exchanged several text

12    messages and they are as follows.'

13        'CB', who I believe, even though it's a C, they

14    meant Kristine Biggs at the time.

15        'CB:  Who is this?'

16        'HH' -- which is Corporal H Hansen -- 'sheriff's

17    office.  Can I talk to you?'

18        'CB:  May I talk to you in proper English?'

19        And then it goes on with a series of texts.  From

20    the indication that this was the sheriff's office --

21        A.    At 9:07.

22        Q.    P.m.

23        A.    And they came and knocked on my door at 12:05

24    a.m.

25        Q.    But in regards to the 9:07, did you

32

1     understand that it was someone from the sheriff's office

2     that was trying to communicate with you?

3          A.    At this point, I had been harassed with text

4     messages from my ex-husband's girlfriend, and as well,

5     somebody -- I don't know, I can't remember what it's

6     called exactly, but there was a thing you could do online

7     where you could text message somebody from a phone number

8     that you knew, that you recognized, but it wasn't them,

9     and I had been being harassed.  So, to be skeptical of it

10    being a sheriff, yes.  I can totally believe.

11         Q.    Are you aware, if you turn to page 00861, the

12    police officers conclude by saying, 'after the leave me

13    alone text message, it was decided not to push the issue

14    of entering the home without her cooperation, and we left

15    the scene.  As we were leaving, I received the last text

16    message at 2149 hours, CB:  Glad I could entertain you

17    tonight question?  Nothing further, end of report'.

18         A.    Again, I had been being harassed, severely.

19    In fact, my ex-husband's girlfriend, her most common

20    refrain when she would text me was, 'why don't you just

21    kill yourself and get it over with.  It will be better

22    for all of us.'

23         Q.    If you turn to page to 00867.  Again, I'm

24    going to read two portions and ask you some questions.

25    It says, 'I called Audrey who told me that she had a

                                                            33

1    friend in Whitewater, Kristina, who lives in Whitewater,

2    who had received text messages and photos from her

3    husband showing he was sleeping in bed with another

4    female.  Audrey told me that Kristina is supposed to be

5    drinking extremely heavy, and is using methamphetamines

6    and threaten that she would kill herself.'

7           Do you believe what Ms. Powers represented to the

8    police officers is incorrect or correct?

9           A.    Incorrect.

10          Q.    Why incorrect?

11          A.    Because I've never used methamphetamines.

12   And as far as me telling her I was going to kill myself,

13   once again, 'let me die' is not 'I'm going to kill

14   myself.'

15          Q.    The next paragraph it says, 'Audrey told me

16   that she'd been texting Kristina all day.  Audrey said

17   Kristina sent her pictures of her vehicles telling her

18   that she could have the vehicles and everything she owns

19   once she is gone.'

20          Do you believe you did or did not send that

21   information to Ms. Powers?

22          A.    I believe I did not.  If I referred to me

23   being gone, it would be dying of natural causes, not

24   taking my own life.

25          Q.    In a subsequent report, your ex-husband, Mr.

                                                          34

1    Biggs, indicates that you had kept, and it says 'her 380

2    pistol under her pillow with a round in the chamber and

3    the hammer back.'  Did you own a pistol previously?

4         A.    No.

5         Q.    Did your husband own a 380 pistol?

6         A.    He owned several pistols.

7         Q.    Do you believe that he was referring to one

8    of his pistols that you kept under your pillow?

9         A.    I can't answer that, because I don't know

10   what exactly he's talking about.

11        Q.    The last record I just want to look at in

12   these is on 00873.  And in the second paragraph it says,

13   'I called Audrey and spoke with her and gained the

14   following information.'  And it's stated Audra,

15   A-u-d-r-a.  For the record, I'm referring to Audreay

16   Powers.  'Audra said she had been receiving text messages

17   from Kristine, and she was worried about her.  Audra said

18   the messages said things like she was really cold, hadn't

19   eaten in days, is only drinking alcohol, has a fever, and

20   no energy.  Audra went on to say that Kristine called

21   herself a piece of --' and there's an expletive there --

22   'and said she was done with it, and that she would shoot

23   the police if they tried to contact her.'

24        It then goes on to say, in the second paragraph,

25   the last sentence, 'Audra also stated Kristine would

35

1   shoot to kill anyone who tried to contact her, most
2   specifically law enforcement.'
3       Do you recall making any threats to law enforcement
4   during your conversation or text messages with Audreay
5   Powers?
6       A.   No.
7       MS. SYKES:  Is there something else for her to
8   read?
9       MS. KYTE:  No.
10      (Whereupon a recess was taken.)
11      MS. KYTE:  If we can go back on the record.  So Ms.
12  Johnson, we took a short break, and you were able to
13  obtain the address of the Petco location that you
14  currently are employed; is that correct?
15      A.   Yes.
16      Q.   Would you mind reading into the record what
17  that address is?
18      A.   2765 Santa Rosa Avenue, Santa Rosa,
19  California 95404.
20      Q.   Were you able to find the address for Mr.
21  George Jones?
22      A.   I do not have it in my phone, but it was in
23  the discovery questions or interrogatories.
24      Q.   Okay.  Ms. Johnson, we have taken a short
25  break, and then we were going to actually look at another

                                                    36

1    identified?

2         A.    No.

3         Q.    Okay.  Given that the event at issue on

4    November 25, 2012, occurred three days after

5    Thanksgiving, which that year fell on November 22, 2012,

6    do you recall if you were with anyone or spent it in any

7    other home?

8         A.    No.

9         Q.    Do you recall either way?

10        A.    I didn't spend Thanksgiving with anybody but

11   my dog.

12        Q.    Had Mr. Jones and Mrs. Jones asked you to

13   leave, prior to you leaving?

14        A.    They had, yes.

15        Q.    Do you have any understanding as to why?

16        A.    We had spent time talking, and I had told

17   them that what I really needed to do was to get home, and

18   they agreed.

19        Q.    Do you have any distinct thing that is the

20   last thing you remember at this time, regarding the drive

21   on November 25, 2012?

22        A.    The clearest memory that I can recall, and

23   call my own, is stopping in Evanston, Wyoming and

24   re-securing my tarp, checking my load.

25        Q.    Ms. Johnson, as you sit here today, are you

                                                        60

1    aware that there were approximately 7 to 12 police

2    officers that were following you, or trying to get you to

3    stop on the evening of November 25, 2012?

4         A.    That is what I was told.

5         Q.    At no point during your drive were you ever

6    aware there was a police officer behind you; is that fair

7    to say?

8         A.    I do not remember.

9         Q.    Ms. Sandy Carnahan was previously deposed,

10   and she had discussed how you guys used to watch the show

11   Cops, I believe, and you used to chuckle or laugh about

12   people trying to get away from the police.  Do you recall

13   doing that?

14        A.    Yes, that's true.

15        Q.    As you sit here today, do you believe that

16   you can run or evade police generally?

17        A.    No.

18        Q.    Prior to November 25, 2012, as part of your

19   training in the military or army, have you ever been

20   trained to drive on circumstances with deflated tires?

21        A.    No.

22        Q.    Have you ever been trained in regards to

23   ramming or using a vehicle against another vehicle?

24        A.    No.

25        Q.    Ms. Johnson, prior to November 25, 2012, had

                                                        61

```
1          A.     No, I was happy.  I was going home.

2          Q.     Do you have any recollection after you were

3   shot, on either the later evening of November 25, 2012,

4   or into the morning of November 26, 2012?

5          A.     My next clear memory is waking up on a

6   hospital bed, with a neck brace, not knowing why I was

7   there, or what had happened to me.  I was in pain, and I

8   was afraid.

9      (Exhibit No. 28 was marked for identification.)

10  BY MS. KYTE:

11         Q.     And Ms. Johnson, I understand you likely have

12  not seen this either, but if you could turn to what's

13  been marked as MCSO 00553, page three of the report.  And

14  in the middle of the page it says 'alcohol blood' on the

15  left side.  Do you see that?  There's a list of different

16  values and says 'alcohol blood'?

17         A.     Yes.

18         Q.     If you follow that over it says 358, and then

19  there's a (c) and then an H.  Do you see that?

20         A.     Yes, I do.

21         Q.     And if you look below, I'll read something to

22  you.  It says, 'Notes'.  And the same (c) is there and it

23  states, 'To convert from ORMC blood alcohol units to

24  State of Utah blood alcohol units, one must divide by

25  1,000.'  And it says, 'for example ORMC 80 (mg/dL) equals
```

63

```
 1   State of Utah legal limit of 0.080', and there's a (g)
 2   percentage.)
 3        Were you aware that the Utah legal limit for blood
 4   alcohol units is 0.080?
 5        A.   I answered this question earlier.  I was not
 6   aware of the legal limit of alcohol allowed in a driver's
 7   blood.  I have not lived here since 2002.  At that time,
 8   it was not a consideration.  I did not drink and drive.
 9        Q.   Have you ever applied for a driver's license
10   where you've had to answer questions about legal limits
11   for drinking and driving in any state?
12        A.   Yes.  And I applied for a driver's license
13   for Utah in 1999.  At that time, I would like to state
14   again, I am sure I studied the questions to answer them
15   correctly.  But since it was not something that I worried
16   about, or was concerned with, I would not remember it.
17        Q.   Ms. Johnson, are you aware that based on this
18   calculation in later documents, it was indicated that you
19   had a blood alcohol unit level of 0.358 which is over
20   four times the legal limit in the State of Utah?
21        A.   I see that.
22        Q.   Were you aware of that before today?
23        A.   I knew that the blood alcohol was high.
24        Q.   Ms. Johnson, you were transported to Ogden
25   Regional Medical Center by the paramedic and EMTs that
```

64

1      A.     I don't remember the exact conversation.  And

2   if I were reading this as if it were a stranger, I would

3   cry for her, too.  I -- I don't recall how that

4   conversation went.

5      Q.     Okay.  Ms. Johnson, if you look at that first

6   page of the document, and there's some little internal

7   numbers that I'll be referring to.  There's a two at the

8   bottom corner.  Do you see that?  There's a statement

9   there at line 13 and 14 where you say, *"I had every*

10  *intention of trying to kill myself yesterday."*  Do you

11  remember making that statement?

12     A.     I do not.

13     Q.     In reading it, does it refresh your

14  recollection at all that you made that statement?

15     A.     No, and I'm looking at the date that he took

16  the interview, and it was days after.  I do not recall

17  saying that at all.

18     Q.     So, the date at the top of page two is

19  November 28, 2012.  So it was --

20     A.     Three days.

21     Q.     -- three days after the event.  In regards to

22  -- on page three, the small page three at the top,

23  there's a statement and I'm just going to read it and ask

24  you, where you said, "A" which is yourself answering, *"do*

25  *you ever get to the end of your rope?"*

                                                              67

```
 1    to be starting from.
 2          Below that line it says, "Suicidal thoughts, active
 3    thoughts W plan.'  Active thoughts with plan is usually
 4    what that refers to.
 5          Ms. Johnson, as you sit here today, do you
 6    recollect having any suicidal thoughts with an active
 7    plan when you were at Ogden Regional Medical Center?
 8          A.    No.
 9          Q.    Moving down that same page, it says,
10    'describe current suicidal thoughts/plans/means/intent,
11    "Death by cop" see below.'
12          Do you recall making any statements yourself to any
13    health care evaluators at Ogden Regional Medical Center
14    that you were attempting to commit suicide or death by
15    cop?
16          A.    No.
17          Q.    If you move down the page, you'll see it says
18    'see next page'.  It says 'past suicidal
19    behavior/attempt, actual attempt.'  Then it states,
20    'describe past suicidal thoughts/plans/means/intent.
21    Patient has had multiple attempts in the past, OD.
22    Warning signs of acute risk.  Threat/talk of self harm,
23    severe anxiety/agitation.  Additional warning signs,
24    guilty/grief, hopeless/feeling trapped/hopelessness.'
25          Do you recall indicating any of those feelings, or
```

75

1     stating that you'd had several -- or excuse me, multiple
2     suicide attempts in the past to any health care provider
3     at Ogden Regional Medical Center?
4          A.    No.
5          Q.    If you turn the page, I'm going to 00700 in
6     the bottom right-hand corner.  I'm going to read a
7     summary that continues onto the next page, and then ask
8     you some questions, okay?  The bottom right-hand corner,
9     and if I didn't mention the activity date at the top of
10    the page, it says 11/29/2012.  At the bottom right-hand
11    corner it says, 'summary of clinical presentation.'  For
12    the record, I'm going to reference, when I state
13    'patient' it says 'PT'.
14        'Patient is a 41-year old female, admitted to the
15    ICU after being shot in the eye by police following a
16    high speed car chase.  Patient has a long history of
17    depression, and suicide attempts, and has never had any
18    treatment for her psychiatric issues.  Patient states
19    that she was attempting death by cop when she repeatedly
20    rammed her car into a police vehicle, causing the deputy
21    to shoot the patient in the left eye, through the
22    patient's windshield.'  "I was going back to
23    California".  "I reached the end of my rope," "How many
24    people get shot in the head and don't succeed?" "I don't
25    want to live, I want to die".  Patient has a warrant out

76

Intermountain Court Reporters *** (801) 263-1396

1    for her arrest in Colorado, where she has been living,

2    for punching a state park ranger while intoxicated.

3    Patient is an alcoholic.  Last May was the last suicide

4    attempt by OD and alcohol.  Patient is currently

5    endorsing active suicidal thoughts and was tearful and

6    appeared hopeless during the assessment.  Patient is not

7    safe at a lower level of care.'

8         Ms. Johnson, as you sit here today, do you recall

9    making any of those statements to a health care provider

10   at Ogden Regional Medical Center?

11        A.    No.

12        Q.    Do you recall making any statements to a

13   health care provider, or otherwise, to the effect of what

14   I've just read, at Ogden Regional Medical Center?

15        A.    Anything that I said to them was what had

16   been told to me after I regained consciousness.  I do not

17   recall speaking about suicide.  I do recall them

18   believing that I attempted to take a police officer's

19   life, and that I was intent on trying to kill a police

20   officer.  And I remember them suggesting that perhaps

21   what I was trying to attempt was a suicide by cop.

22        Q.    You would agree that at least pursuant to

23   this record, it says 'patient states', which appears to

24   indicate that you said these words to a health care

25   provider at Ogden Regional Medical Center.  Would you