# EXHIBIT "B"

## "Deposition Of Deputy Christian Peay"

## (cited pages only)

UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH
NORTHERN DIVISION

---

| | |
|---|---|
| KRISTINE BIGGS JOHNSON, | ) |
| | )Case No. 1:14-cv-147 |
| Plaintiff, | ) |
| | )Judge Tena Campbell |
| vs. | ) |
| | ) |
| DANIEL SCOTT PEAY, a Morgan | ) |
| County Sheriff's Sergeant, | )Videotaped Deposition of: |
| MORGAN COUNTY, a Political | )**CHRISTIAN L. PEAY** |
| Subdivision; and JOHN and | ) |
| JANE DOES 1-10, | ) |
| | ) |
| Respondents. | ) |

---

December 2, 2015
10:30 a.m.


Location:  Sykes McAllister Law Offices
311 South State Street, Suite 240
Salt Lake City, Utah


Reporter:  Rashell Garcia

1

A P P E A R A N C E S

For the plaintiffs:           ROBERT B. SYKES
                              Attorney at Law
                              SYKES MCALLISTER LAW
                                   OFFICES, PLLC
                              311 So. State
                              Suite 240
                              Salt Lake City, UT 84111
                              (801) 533-0222
                              bob@sykesinjurylaw.com

For the defendants:           JULIA D. KYTE
                              Attorney at Law
                              STIRBA
                              215 South State, Suite 750
                              Salt Lake City, UT 84111
                              (801) 364-8300
                              jkyte@stirba.com

I N D E X

Witness                                             Page

        CHRISTIAN L. PEAY

Examination by Mr. Sykes                               4
Examination by Ms. Kyte                              57
Further Examination by Mr. Sykes                     76
Further Examination by Ms. Kyte                      78
Further Examination by Mr. Sykes                     79

## E X H I B I T S

| Number | Description | Page |
|--------|-------------|------|
| 44 | Police Interview of Christian Peay dated 11-26-12 | 60 |
| 45 | Biggs-Johnson v. Morgan County – Christian Peay Interview (disk) | 61 |
| 46 | Page from Facebook dated 11-26-12 | 67 |
| 47 | Biggs-Johnson v. Morgan County – Christian Peay Dash Cam Front of Vehicle | 70 |

```
 1   December 2, 2015                          10:30 a.m.
```

**P R O C E E D I N G S**

**CHRISTIAN L. PEAY,**

```
 4   called as a witness, by and on behalf of the plaintiffs,

 5   having been first duly sworn, was examined and testified as

 6   follows:
```

**EXAMINATION**

**BY MR. SYKES:**

```
 9        Q.    Do you mind taking your hat off or do you need it

10   on?

11        A.    It's up to you.

12        Q.    I'd rather have it off if it's okay, if you don't

13   mind.  All right.  That way I can see you.  Okay.

14              Will you state your full name and your address,

15   please?

16        A.    Christian L. Peay.  1902 North 800 West, Orem,

17   Utah, 84057.

18        Q.    Okay.  And what is your occupation?

19        A.    I work for AEPS, American Eagle Protective

20   Services.

21        Q.    What is that exactly?

22        A.    We have a government contract to do security at

23   the federal building, just down the road.

24        Q.    Do you work in federal court?

25        A.    Sometimes.
```

4

1   counter.  And 11:04, Kristine has backed up and Scott Peay

2   has stepped from this corner out a little bit toward the

3   vehicle.  Do you see that?

4        A.   Yes, I do.

5        Q.   Okay.  Now, when he gave his interview to Davis

6   County Attorney's Office two days later, he said he was not

7   in danger, he thought you were but he wasn't.

8             MS. KYTE:  Object to the form of the question.

9   The testimony speaks for itself.

10       Q.   Did he ever tell you that?

11       A.   No.

12       Q.   Did he ever tell you he thought he was in

13  danger?

14       A.   No.

15       Q.   Okay.  And then I'm going to play it forward from

16  11:04.  And you'll see here the vehicle, the suspect vehicle

17  comes forward.  It doesn't strike Dingman but it strikes you.

18  Tell me if you agree with that.  And just prior to 11:0 --

19  about 11:0 -- it's hard to control this exactly, but about

20  11:06 or 7, he fires the bullet.  Watch this now.  Do you see

21  that bullet?

22       A.   Yes.

23       Q.   Do you see where Scott is standing?

24       A.   I do.

25       Q.   Do you think at the time that that bullet was

1    fired, he was in imminent danger of death or serious bodily

2    injury?

3                MS. KYTE:   Object to the form of the question.

4        Q.    Scott.   In your opinion.

5        A.    I feel that Scott was not in danger at that

6    time.

7        Q.    Yeah.   Well you and the Davis County Attorney are

8    in agreement.   Okay, so, now I'm going to play this again.

9    I'd like to ask you -- now you're a police officer.   How long

10   had you been a police officer at the time?

11       A.    I'm not anymore.

12       Q.    How long were you at the time?

13       A.    Oh, starting in 2003.

14       Q.    2003.   So, by 2012, nine years, roughly, on the

15   force?

16       A.    Yeah.

17       Q.    Okay.   I'd like to ask you your estimate of the

18   speed of this vehicle as it comes forward.   Let me back up

19   here just a little bit.   Okay.   I'm going to play it from

20   11:00 on the counter to 11:08.   You tell me how fast it's

21   coming forward in your opinion, if you have an opinion.

22       A.    Could you replay that?

23       Q.    Huh?

24       A.    Could you replay that, please?

25       Q.    Sure.   Absolutely.

                                                              21

1          A.     Sorry, it's --

2          Q.     It's just so hard to get it right on the money.

3    Here, there we go.  At 10:55, I want to know from 11:00 to

4    11:06 --

5          A.     Okay.

6          Q.     Right now.  Here we go.

7          A.     Probably five to ten miles per hour, probably six

8    or seven, maybe, right around there.

9          Q.     Five, six, seven, maybe ten, you think?

10         A.     No more than ten.

11         Q.     Now, at the time that this hit, you've already

12   said, I think, you didn't think you were in imminent danger,

13   were you?

14         A.     No.

15                MS. KYTE:  Object to the form of the question.

16         Q.     This is Todd Hardman's camera.

17         A.     Whose?

18         Q.     It shows where you were.

19         A.     Who does he work for?

20         Q.     I think he's --

21                MS. KYTE:  South Ogden.

22         Q.     -- South Ogden, too, but I'm not sure.  He's been

23   deposed.  Now, this vehicle right here at 11:04 -- let's see,

24   4:03, directly ahead of Hardman's vehicle --

25         A.     That's me.

                                                              22

1    -- I'm going to go back to 4:11.  And we see the impact with

2    your car at -- your police vehicle at -- see that move

3    backward about 4:17?

4        A.    Yes.

5        Q.    Okay.  And it was just after that, I'll represent

6    to you, that the shot was fired.  Look where you're standing

7    here.  Do you see where you're standing?

8        A.    Yes.

9        Q.    Are you in imminent danger of death or serious

10   bodily injury at that point?

11       A.    No.

12       Q.    Okay.  All right.  And we're looking at, for the

13   record, 4:17 to 4:19; right?

14       A.    Yes, that's correct.

15       Q.    At any time that night before the shot was fired,

16   were you in imminent danger of death or serious bodily

17   injury?

18       A.    No.

19       Q.    Now, let me ask a few questions about the day

20   after this event.  Now this is the twenty --

21       A.    See, I can't remember which month it was.  I know

22   it was in wintertime.

23       Q.    Yes, it was November.  It was November 25, 2012,

24   Sunday night.

25       A.    Yeah, I remember it was a Sunday.

                                                              24

1      A.   No.

2      Q.   Did you ever hear that he made that claim until

3  he saw the video and then changed his mind and said, "I

4  wasn't in fear of my life but I was in fear of Christian's

5  life"?

6      A.   I heard a few days later that he thought that I

7  was being ran over.

8      Q.   You heard that?

9      A.   Yes.

10     Q.   Did you talk to anybody about that?

11     A.   I'm sure I did.  I mean it was kind of a big

12  thing.

13     Q.   Yeah.  Oh, yeah.  It's a small county and you

14  have a shooting, so I imagine that's a big thing.

15     A.   Yeah, I'm sure I did.

16     Q.   Do you remember who you talked to?

17     A.   Probably the other deputies, people in the

18  office.

19     Q.   Was it the general opinion of the other deputies

20  in the office that this shooting was not justified?

21          MS. KYTE:  Object to the form of the question.

22     A.   I don't know.

23     Q.   You don't know.  Was it the opinion of the

24  sheriff that it was not justified?

25     A.   I never asked --

```
 1     wasn't a hero for what he did.  You knew that?

 2               MS. KYTE:  Object to the form of the question.

 3          A.   I didn't say that.

 4          Q.   Is that your opinion though?

 5               MS. KYTE:  Same objection.

 6          A.   It's not my opinion.  I mean it's -- I do not

 7     know what Scott was thinking.  I know he was in a frame of

 8     mind.  We never talked about it.

 9          Q.   You never talked about it?

10          A.   No.

11          Q.   Tell me what happened after the shooting between

12     you and the department that led to your termination.

13          A.   Being forced to resigned?

14          Q.   Yes.

15          A.   Me and my drug dog, we made a lot of drug

16     arrests.  We made hundreds of drug arrests, seized lots of

17     drugs.  And I got called in the office by the sheriff

18     probably the following spring -- yeah -- and said that I was

19     banned from patrolling the interstate.

20          Q.   Is this six months or so after this or seven

21     months?

22          A.   I think it was in April when he called me in.

23          Q.   Okay.

24          A.   Because I was profiling vehicles, which is --

25     doesn't make any sense at all.  I mean it was -- everyone in
```

30

1    the office was kind of confused by that.

2         Q.    You what?

3         A.    Everyone in the office was kind of confused when

4    he banned me from profiling vehicles, which -- how do you

5    profile a car?  You don't pull over any black ones?  You

6    don't pull over any white ones?  I don't understand that, but

7    anyway --

8         Q.    So he banned you from patrolling the interstate

9    with your drug dog?

10        A.    Yes.

11        Q.    Because somebody had accused you of profiling

12   vehicles?

13        A.    No one accused me.  The sheriff thought I was.

14   He's been watching all my videos, I guess.

15        Q.    Okay.  All right.

16        A.    Then I got called in and said there was a

17   speeding complaint on me.  I was in route to a house on fire.

18   We don't know if there was anybody insides the house.  And I

19   was following another deputy.  They said I was speeding, but

20   the other deputy wasn't.

21        Q.    You were following him?

22        A.    Yeah, lights and siren to a house fire.  And,

23   luckily, there was no one in the house.

24        Q.    The Ogden Standard Examiner had an article on

25   you --

                                                            31

```
 1          A.     Oh, yeah.

 2          Q.     -- in April.

 3          A.     There was a lot of stuff that kind of went on.

 4          Q.     Yeah.  And the claim allegedly was that you were

 5   speeding 80 miles an hour down Main Street in Orem.

 6          A.     That's incorrect.  I've never gone that fast in

 7   town.

 8                 MS. KYTE:  Mr. Sykes, could we go off the record

 9   for a moment?  I think we need to go off the record.  And I'm

10   happy to talk to you about why.

11                 MR. SYKES:  Well I don't know that we need to,

12   but --

13                 MS. KYTE:  Well, I can stay on the record.

14                 MR. SYKES:  Let's go off the record for a

15   minute.

16                 (An off-the-record discussion was held.)

17          Q.     Back on the record.  You know, I don't want you

18   to be intimidated.

19          A.     I had to talk about all this stuff yesterday with

20   the FBI for my security clearance.

21          Q.     Okay.

22          A.     So, anyway --

23          Q.     Well, anyway --

24          A.     There was an article that Morgan County

25   Attorneys, who was -- is my neighbor and my LDS bishop, said
```

                                                        32

1    I routinely drove down through town like at 65 miles an hour.

2    That is incorrect.

3          Q.    That would be tough living in a small town

4    sometimes.

5          A.    It's not a good idea to patrol in the same county

6    you live in.

7          Q.    Yeah.  So, what lead you to termination?

8          A.    Well, I was called in and said I was speeding.

9    So they said, you're not allowed to travel more than 70 miles

10   an hour.  If you do, then you have to give a reason why.  So,

11   for the next month, there was a few accidents.  I mean, we

12   had accidents on the interstate, which we have to respond to

13   because the other troopers were down in Weber County.  And

14   there's injuries.  You go fast.  So --

15         Q.    Fire, you go fast?

16         A.    Yeah, exactly.  And, also, during this time, when

17   the sheriff banned me from the interstate, he said it would

18   be for a few months.  So, this is late summer.  I sent him an

19   e-mail saying, hey, am I still banned from patrolling the

20   interstate.  He never did respond.

21         Q.    They claim that you tried to get money out of

22   them for --

23         A.    I sued them.

24         Q.    -- the dog.

25         A.    I had an attorney.  Being a K-9 handler, there's

                                                              33

1    federal labor laws that --

2         Q.    They're supposed to pay you for taking care of

3    the dog?

4         A.    Yeah, compensation.  If you care for the dog at

5    your home, they're supposed to compensate you, and various

6    agencies have different amounts.  Highway Patrol, it's like

7    $200 dollars a month to take care of the dogs.  That's about

8    the average.

9              When I was first assigned K-9 in 2007, I told the

10   sheriff about this.  And he became very upset and said, don't

11   bring this up again or I'll take the dog away.  So I never

12   did because I love working dogs.

13        Q.    Sure.

14        A.    Then when all this crap --

15        Q.    Let me ask you about the dog.  As the dog guy in

16   Morgan County, the dog has to live with you because you have

17   to train them and become acquainted with the dog so the dog

18   obeys you; right?

19        A.    Well, yeah, and they don't have the facilities to

20   care for the dog and stuff.

21        Q.    Sure.  So what happened?

22        A.    It's common practice in Utah for the handler to

23   have the dog at home.

24        Q.    Sure.

25        A.    So, for six years, I didn't say anything about

                                                              34

1   it.  I kept quiet.  When I'd go to K-9 training on Tuesdays

2   with all the other handlers in Utah, they'd -- we joked about

3   it and stuff because they knew I was -- what they were doing

4   wasn't right.

5           So, when the restrictions started to happen, I

6   couldn't patrol the interstate and placed on administrative

7   leave, I brought it up to the chief deputy.

8       Q.    Why were you placed on administrative leave?

9       A.    This -- over supposedly speeding complaints.

10      Q.    Okay.

11      A.    Like I -- when they -- they would place the

12  restriction on me I couldn't go more than 70.  Anyway, I

13  responded to accidents, I responded to alarm at a bank and

14  other things where I had to go drive faster than 70.

15          And, anyway, like I was saying, I e-mailed the

16  sheriff to ask him if I was still restricted from patrolling

17  the interstate.  He never did respond.

18          And one night there was nothing going on in

19  Morgan County, which is like every night, so I went to the

20  rest area.  I ended up arresting somebody with drugs.  First

21  vehicle I came in contact with, the guy had meth, so I

22  arrested him.

23          And what chief deputy told me is that the sheriff

24  was upset that I went to the rest area and arrested an

25  individual for drugs.

                                                        35

1       Q.      That's the rest area between Old Farm Market

2   and --

3       A.      And the canyon, Weber Canyon, the eastbound rest

4   area.

5       Q.      Eastbound rest area, yeah.

6       A.      And what Chief Deputy Edwards told me, that the

7   sheriff was upset that I went to the rest area, and asked

8   that I be placed on administrative leave while they did an

9   investigation.

10          During the investigation, Chief Deputy Edwards

11  reviewed my dash cams throughout the year, and he came up

12  with like a list of six things he didn't agree with.  And

13  these were responding to accidents too fast, responding to a

14  bank alarm, verbiage in a report.  Just really ticky-tacky

15  stuff.

16      Q.      Uh-huh.

17      A.      And he'd call me to explain why I was going 90

18  miles an hour responding to an accident.  I'd tell him it

19  just came out as an injury accident.  And I was getting

20  upset.  And I said, "Well, what about the dog?  What about me

21  being compensated for a dog and stuff?"  And he just kind of

22  blew it off.

23          So after being on administrative leave for,

24  about, oh, five weeks, they called me in and said, here's the

25  deal:  You can either resign or we'll terminate you.  So I

                                                        36

1    resigned.

2         Q.    Okay.

3         A.    And shortly after that, I hired an attorney.  The

4    attorney did research and figured that they probably owned me

5    about $36,000 dollars in back pay for caring for their dog.

6         Q.    Did you get it?

7         A.    And we reached a settlement.

8         Q.    Okay.  Was it paid by Morgan County?

9         A.    Yes.

10        Q.    Then it can't be confidential, I assume.

11        A.    Part of the agreement was I'm not supposed to

12   disclose any information, and that was supposed to give me a

13   neutral job reference, which they never did so --

14        Q.    Can you tell me the amount or not?  I don't want

15   to get you in trouble, but if it's paid by a county, they

16   can't keep it secret.

17        A.    It was less than half of what they owed me.

18        Q.    Okay.  That's good enough.  Now let me ask you

19   this:  In your opinion, did the, I'll call it harassment of

20   you for allegedly speeding, this kind of -- the things you've

21   just mentioned, did that start to occur after the shooting of

22   November 25, 2012, or intensify?

23        A.    Yes.

24        Q.    Do you have any reason -- and I'm just going to

25   ask you -- pose a hypothetical to you.  You seem today to be

                                                              37

1      Q.    Okay.  Look at the second paragraph.  "At this

2   point" it begins and ends with "Crap, I'm caught."

3            Have you finished reading that?

4      A.    Yeah.

5      Q.    There's a line here in that second paragraph,

6   third line from the bottom, it says -- well, actually, the

7   fourth one, "Deputy Peay saw that the officer on his left

8   and right had their guns out and Sergeant Peay had his gun

9   out."  In the next sentence, "The driver of the vehicle," --

10  I assume that's Ms. Biggs -- "...looked right at Deputy Peay,

11  put the truck in gear, and gunned it at him and struck his

12  vehicle, and he heard a gun shot."

13           That's what you wrote.  That's what you told

14  somebody that night; right?

15     A.    I might have.

16     Q.    Does that sound --

17     A.    It's kind of accurate.

18     Q.    Yeah.  You say she looked at him.  There's

19  nothing here about, had a look of rage or anything like that.

20  You just say she looked at you.

21     A.    I know my report said, she -- Like she was

22  targeting me.  And in here I say that she looked at me.  But

23  I honestly don't recall her looking at me at this date today.

24  I don't remember it.

25     Q.    Look at exhibit -- look at Exhibit 11.  I'm

                                                        53

```
1    sorry, 12.  I apologize, 12.  It says here, it says,

2    Synopsis.  And I don't know who's writing this for sure.  The

3    last page of Exhibit 12, it doesn't have a name on it.

4                  MS. KYTE:  Is this starting MSCO 18 through --

5         Q.   Yes.

6                  MS. KYTE:  Okay.

7         A.   Are you talking about my report?

8         Q.   Where is your report?

9         A.   This is my report.

10        Q.   This is your report?

11        A.   It has the author, Christian Peay.

12        Q.   This is 12, is it?

13        A.   Yes, Exhibit 12.

14        Q.   Oh, yeah.  Christian Peay, yeah.  When did you

15   write this, that night or the next day?

16        A.   The next -- the following morning.

17        Q.   It says, "It struck two patrol vehicles and

18   almost struck two deputies."  Do you see that?

19        A.   Yeah, I -- in the synopsis there.

20        Q.   Next page is 00019.  At the very top synopsis, it

21   says, "Kristine Biggs attempted to run over police officers

22   and struck two police vehicles."  Is that how you remember it

23   or do you not remember that?

24        A.   I don't remember -- I remember very little, to be

25   honest.
```

54

1        Q.    Okay.

2                          **EXAMINATION**

3   **BY MS. KYTE**:

4        Q.    Hello, Mr. Peay.  I introduced myself earlier.

5   My name is Julia Kyte, and I'm here on behalf of Sergeant

6   Peay.  And I appreciate you being here today.  I recognize

7   that this is a very hard day for you.  And I appreciate you

8   being here.  I am not trying to ask you any insensitive

9   questions.  It is our one day to understand your

10  perspective.  And I'm really not trying to ask questions

11  about Morgan County, I'm just interested in the night of the

12  events.

13       A.    I understand.

14       Q.    Before I move forward to some of the questions,

15  would you agree with me that as you sit here today, probably

16  your interview, your report and your dash cam video probably

17  most accurately reflect what you were thinking at the time of

18  the events?

19             MR. SYKES:  Object, leading.

20       A.    See, I don't know if I should respond after an

21  objection or not.

22       Q.    You can go ahead and -- the attorneys are going

23  to make objections, but if you understand my question, you're

24  free to answer.

25       A.    I know it's not a court of law where the judge

                                                              57

1    decides but --

2         Q.    Right.  You're free to answer in a deposition.

3         A.    I probably wrote it how I thought, felt and saw

4    it happen when I wrote it.

5         Q.    So you would agree with that, fair?

6         A.    At the time, yes.

7         Q.    Just looking at the Exhibit 12, your report, if

8    you turn to that paragraph that you were looking at -- this

9    has already been marked as Exhibit 12, so I'm not going to

10   hand it to you again -- or, excuse me, mark it as an exhibit

11   again.

12        A.    You need a Coke.

13             MR. SYKES:  I do.  I don't like the diet.

14        Q.    What is marked as MCSO 0021, or page 6 of 7, do

15   you see where I'm -- what page I'm at?

16        A.    Yes.

17        Q.    I'm just going to read you two portions of your

18   report and then ask you a couple of questions, okay?

19             MR. SYKES:  Listen, before you do that, I

20   mentioned this to you before, but we have pages -- we don't

21   have 1 and 2.  We have 3, 4, 5, 6 and 7.  Do you have the

22   first pages of that?  Can you get it?

23             MS. KYTE:  We've received your deposition -- your

24   interrogatory request, so I'll look into that.

25             MR. SYKES:  All right.

                                                              58

1            MS. KYTE:  Today I have the same three that have

2   been marked as Exhibit 12.

3            MR. SYKES:  Okay.

4       Q.    (By Ms. Kyte)  In the bottom of the first

5   paragraph it says, "I exited my patrol truck and was standing

6   left of the driver's door.  I had my" --

7            MR. SYKES:  I'm sorry, what page are you on

8   again?

9       Q.    I'm on page MCSO 21, 6 of 7.

10           MR. SYKES:  Okay.

11      Q.    "I had my duty weapon pointed at the driver.

12  Sergeant Peay was still giving her commands to stop.  The

13  driver then backed up about ten feet.  She looked directly at

14  me and the expression on her face changed.  She looked as if

15  she was targeting me to run me over."  Did I read that

16  correctly?

17      A.    Yes.

18      Q.    And then moving down that next paragraph, it

19  says, "She then revved the engine, put the pickup in gear,

20  and traveled right at me and struck the left side of my front

21  bumper moving my patrol truck and came to a stop with our

22  vehicles touching."  Did I read that correctly?

23      A.    Yes, you did.

24      Q.    According to your report, at least, that you

25  wrote on the morning of November 26 of 2012, it appeared you

                                                          59

1   felt that the suspect was targeting you at the time she drove

2   forward; is that fair?

3           MR. SYKES:  Objection, leading.

4       Q.   According to your report.

5           MR. SYKES:  Object to the form of the question.

6       A.   That's what it states in my report.

7       Q.   You can put that aside for now.  It's my

8   understanding you were also interviewed in the early morning

9   hours a few hours after the incident; is that correct?

10      A.   Yes.

11      Q.   I'm going to mark as the exhibit -- this is a

12  transcript of your interview.  And I'm just going to ask you

13  some very specific questions.

14          (Deposition Exhibit No. 44 was marked.)

15      Q.   Mr. Peay, before I ask you questions, we have an

16  audio recording that we previously produced to plaintiff's

17  counsel.  I just want to play the first minute of it so you

18  can hear if you're -- if you can identify your voice.  You

19  can let me know if you hear it's you or not.

20      A.   Okay.

21      Q.   I have no intent of going through the whole thing

22  but...

23          (Briefly off the record.)

24      Q.   Mr. Peay, while this is thinking, perhaps I'll

25  ask you some questions about the transcript that we've

60

1  caught."  Do you remember those questions?

2      A.    I remember very little about this interview.

3      Q.    And, I apologize, that was an inartful question.

4  You were asked earlier in your deposition today by Mr. Sykes

5  about whether you may or may not have made that statement.

6  Do you recall the deposition -- the questions that Mr. Sykes

7  just asked you?

8      A.    Yes.

9      Q.    Okay.  Upon reviewing this transcript of your

10  interview recording, do you believe that it sounded like you

11  said in your interview you thought she might have been going,

12  "Oh, crap, I'm caught"?

13      A.    Yes, that's what I wrote.  That's what I said at

14  the time.

15      Q.    Okay.  Moving to the next top right right-hand

16  side, No. 7, I'm going to start reading at line 7, your

17  answer where you say, "Just right by my driver's door."  Can

18  you see that?

19      A.    Yes.

20      Q.    Okay.  "Just right by my driver's door.

21  (Inaudible) things out, I can't remember everything, it's

22  like major tunnel vision and stuff going on.  It was, like,

23  very surreal.  But when she put her vehicle in gear, she

24  looked at me, I swear, she had the strangest look on her

25  face.  It's like -- I thought she wanted to do a suicide by

65

1    cop, I really did.  It was the strangest look I've seen on

2    anyone's face.  It was weird.  That's what I remember more

3    than anything, the look on her face, just so weird."

4                    Did I read that correctly?

5         A.    Yes.

6                    MR. SYKES:  What line are you on now?  Page 7,

7    line 16?

8         Q.    I finished at 16.  So, is it fair to say that at

9    least three hours after the incident, you had thought she had

10   the strangest look on her face?

11        A.    That's what I said at the time.

12        Q.    And if you just look down to line 18, it says,

13   your answer, "She's determined to get out of there and run my

14   truck down.  And I was -- I don't know, I guess she could

15   have nailed me, I was standing right there."  Did I read that

16   correctly?

17        A.    Yes.

18        Q.    So at least as of three hours after the event, is

19   it fair to say that you recognized there was a potential she

20   could have hit you that night?

21        A.    I guess it's fair to say.  That's what I said to

22   an investigator but I do not recall.

23        Q.    If there was an invoice submitted -- and I

24   actually believe it's one of the exhibits presently --

25   indicating that there was over a thousand dollars worth of

                                                              66

1        Q.     Do you have a Facebook page, or did you in 2012?

2        A.     Yeah.  Yes.

3        Q.     In looking at this, I'm going to read it to you

4    and then ask you some questions.  "Hey family.  A very bad

5    thing happened tonight at work with me and Scott.  We got

6    into a car chase with a person.  At the end of the chase, the

7    driver tried to run me down.  Scott had to shoot the driver

8    hitting her in the head.  Please send some prayers Scott's

9    way and one or two my way.  It's a very difficult thing to

10   deal with.  The driver survived and I don't know why she ran

11   from us.  I know if Scott did not shoot her, I would have

12   been struck by her vehicle.  Thanks."

13            Do you recall writing this post on November 26,

14   2012?

15       A.     Vaguely, I remember posting it.

16       Q.     Mr. Peay, in reading this, it appears clear that

17   you thought well of your brother.  You love your brother.  Is

18   that fair?

19       A.     Yes.

20       Q.     And you know your brother loves you; right?

21            MR. SYKES:  I object to the form of the question.

22   These are not calculated to lead to the discovery of

23   admissible evidence.  And you're trying to prejudice the

24   witness.

25       A.     I don't know how he feels.

                                                              68

1      A.    Yes.

2      Q.    I'm going to move it up to right around the 37

3    minutes on the left side, and the 48:30 on the right side.

4    And then I'm going to ask you to listen to what happens and

5    identify who is talking.  Okay?

6            (An off-the-record discussion was held.)

7      Q.    So, as I move to --

8      A.    I need to text my wife, see if she's okay.  She

9    came with me.

10           MR. SYKES:  Is she outside?  Do you want us to

11   take a break?

12     A.    No, I'll just send her a text.  Let's just get

13   this done and over with.

14     Q.    It's currently at 36:54, but just, we're going to

15   play it.  It's at 37:20 which is the appropriate.  Let me

16   know when you're --

17     A.    Yeah, I'm ready.

18           (Tape-recording being played.)

19     Q.    So just at around 37:30, I believe someone says,

20   "Yes, she tried to ram our vehicles, ram me, run me down."

21   I'm going to play it again and I just want to understand --

22     A.    I heard it.

23     Q.    Do you agree that that's what someone said on

24   this recording?

25     A.    Yeah.

72

1   Q. Is that your voice?

2   A. Yes.

3   Q. Okay.  Thank you.  Mr. Peay, given that the

4 internal recording lists around 37 minutes and 30 seconds

5 into when your camera first started on, is it fair to say

6 that at least right after the incident, you felt that she was

7 trying to ram your vehicle or run you down?

8    MR. SYKES:  I object to the form of the question.

9 It's leading.  Plus, it doesn't take into account the

10 excitement of the moment which is out of context.

11   A. I don't know.  It was a very crazy thing.  And if

12 I said it, I probably felt it.  I don't know.  To this --

13 today, I don't recall that.

14   Q. Mr. Peay, if you turn to the Davis County

15 report -- and I believe you were referred to it earlier, but

16 I don't recall what exhibit it was.  Mr. Sykes, if you

17 wouldn't mind, I don't have the exhibit binder in front of

18 me.

19    MR. SYKES:  The Davis County findings?

20    MS. KYTE:  Attorney's report.

21    MR. SYKES:  Exhibit 9.

22    MS. KYTE:  Exhibit 9.  If you wouldn't mind

23 turning -- thank you, Exhibit 9.  And if you wouldn't mind

24 turning to the next page, and there is one sentence and then

25 there's a paragraph that Mr. Sykes didn't reference in

                      73

1   to a felony and a misdemeanor after these events?

2              MR. SYKES:  Objection, out of context,

3   improper --

4        A.    I don't recall what she pled to.  I know there

5   was a plea agreement.  I don't recall what charges she pled

6   guilty to.

7        Q.    Mr. Sykes, would you like me to ask further

8   clarifying questions on the issue?

9              MR. SYKES:  Well, you didn't disclose what it was

10  for, so it's out of context but --

11       Q.    Mr. Peay, were you aware that after these events

12  on January 7th, 2013, that Ms. Biggs-Johnson pled guilty to a

13  third degree felony for failure to respond to officer's

14  signal to stop, which would have been your signal to stop,

15  and a Class B misdemeanor for driving under the influence of

16  alcohol or drugs?

17       A.    Yeah, that's about right.  Like I said, it was

18  awhile ago and I just try not to think about it.

19       Q.    As we sit here today, you've indicated you don't

20  necessarily recall a lot of the events of that night; is that

21  fair?

22       A.    Yes.

23       Q.    As you sit here today, would you rely on your

24  prior reports and statements?

25       A.    Well, I would have to.  I don't -- I don't know

                                                              75

1    if me being very bitter towards Morgan County's

2    administration changed how I remember things or how I feel

3    about things.  I don't know.  I wish I would have never seen

4    that woman that night.

5         Q.    Thank you, Mr. Peay.  I have no further

6    questions.

7                           **EXAMINATION**

8    **BY MR. SYKES**:

9         Q.    Going back an hour ago or so when I asked you

10   questions, I showed you the actual video; correct?

11        A.    Yes.

12        Q.    And do you think that that video is in any way

13   inaccurate?

14        A.    No, of course not.

15        Q.    I mean it shows where you're standing; right?

16        A.    Yeah.

17        Q.    Didn't you answer some of those questions based

18   upon looking at the video?

19        A.    Yes.

20        Q.    Isn't that the best evidence of what happened?

21              MS. KYTE:  Object to the form of the question.

22        A.    It's probably better evidence than my statement.

23        Q.    Yeah.  Well your statement was made at a time

24   when you were quite excited; right?

25        A.    Yeah, I was very -- adrenalin was pumping.  It's

                                                            76

1    shows?

2           A.     I don't know.  I mean --

3           Q.     It shows what it shows; right?

4           A.     I think some bitterness I have towards Morgan

5    County might have influenced how I remember and think things.

6           Q.     But the video doesn't influence --

7           A.     No.

8           Q.     That's what happened; right?

9           A.     No.  I don't really have bitterness towards

10   Scott, I really don't.  It's just -- you've had to experience

11   what they put me through.

12          Q.     Sure.  Sure.

13          A.     So, the video, you know, I agree with you there.

14          Q.     Yeah.  That's not influenced by any bitterness

15   you have, is it?

16          A.     No.

17          Q.     That's just what happened; right?

18          A.     Yes.

19          Q.     Okay.  No further questions.  That's all.

20                         **FURTHER EXAMINATION**

21   **BY MS. KYTE:**

22          Q.     Mr. Peay --

23                 MR. SYKES:  Oh, you have more?

24          Q.     Just my last question.  Mr. Peay, you

25   understand as a police officer or a security officer that

                                                            78