# EXHIBIT "E"

## "Deposition Of Sergeant Scott Peay"

## (cited pages only)

UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH

NORTHERN DIVISION

| | | |
|---|---|---|
| KRISTINE BIGGS JOHNSON, | ) | |
| | ) | |
| Plaintiff, | ) | Civil No. 1:14-cv-147 |
| | ) | Judge Tena Campbell |
| vs. | ) | |
| | ) | **Deposition of:** |
| DANIEL SCOTT PEAY, a | ) | **DANIEL SCOTT PEAY** |
| Morgan County Sheriff's | ) | |
| Sergeant; MORGAN COUNTY, a | ) | |
| Political Subdivision; and | ) | |
| JOHN and JANE DOES 1-10, | ) | |
| | ) | |
| Defendants. | ) | |

**October 13, 2015**
**9:40 a.m.**

Location:  SYKES MCALLISTER LAW OFFICES
311 South State Street, Suite 240
Salt Lake City, Utah

*Reporter:  Melinda J. Andersen*
*Certified Shorthand Reporter and Notary Public*

*Johnson v. Peay et al. * 10/13/15 * Deposition of: DANIEL SCOTT PEAY*

1                      **A P P E A R A N C E S**

2   For the Plaintiff:              Robert B. Sykes
                                    SYKES MCALLISTER
3                                   311 South State Street
                                    Suite 240
4                                   Salt Lake City, UT  84111
                                    Telephone: (801)533-0222
5
    For the Defendants:             Peter Stirba
6                                   STIRBA & ASSOCIATES
                                    215 South State Street
7                                   Suite 750
                                    Salt Lake City, UT  84111
8                                   Telephone: (801)364-8300

9   Also present:                   William Lawrence

10                         -o0o-

11                        **I N D E X**

12  **Witness**                                        **Page**

13  **DANIEL SCOTT PEAY**
        Examination by Mr. Sykes                       3
14      Examination by Mr. Stirba                      92

15

16

17

18

19

20

21

22

23

24

25

                                                       2

1                      P R O C E E D I N G S

2                       DANIEL SCOTT PEAY,

3             called as a witness by and on behalf of

4             the Plaintiff, having been first duly sworn,

5             was examined and testified as follows:

6                         EXAMINATION

7    BY MR. SYKES:

8         Q.    Would you tell us your full name and your

9    business address?

10        A.    Daniel Scott Peay, 48 West Young Street,

11   Morgan, Utah.

12        Q.    It's a beautiful community by the way.

13        A.    Yes.

14        Q.    Tell me about your history and background.

15        A.    Well, are we talking employment?

16        Q.    Yes.  Let's start with high school.  Where did

17   you go to high school and when did you graduate?

18        A.    Pleasant Grove High and I graduated in 1981.

19        Q.    What did you do after that?

20        A.    I married my wife soon after that and I've been

21   working ever since.

22        Q.    So you married in '81 or '82?

23        A.    '81.

24        Q.    How many children do you have?

25        A.    Nine.

                                                        3

1      A.    Yeah.

2      Q.    Fair enough.  You had your weapon pointed at

3 her?

4      A.    Yes.

5      Q.    And you're out of danger?

6      A.    I am out of danger, yes, at that point.  You

7 can see just prior to that I had to back out of the way.  I

8 clearly felt she was coming towards me.

9      Q.    Let's go ahead and play this.  I don't think I

10 can play it in slow motion, but let me see.  Here at 11:07

11 on the counter I'm going to continue to play and try to

12 stop when the shot is fired.  We're at 11:08.  Do you agree

13 that the shot was just fired?

14      A.    Yes.

15      Q.    You saw the residue from your pistol?

16      A.    I saw the recoil from the gun.

17      Q.    The recoil from the gun.  You just fired at

18 her.  You might not have known it at the time, but you hit

19 her right in the head, didn't you?

20      A.    I did.

21      Q.    In the eye?

22      A.    Yes.

23      Q.    Took out her eye?

24      A.    Yes.

25      Q.    At this point as to what happened, what you

35

1      Q.    But can you tell me the substance of what you

2  told him?

3      A.    To the best of my recollection I told him about

4  the chase, about how it came to an end.  I told him about

5  how the person in the vehicle turned the vehicle around and

6  came at me, how she screamed in rage, how she rammed my

7  vehicle.  I told him how she looked over at my brother,

8  screamed, put it in gear, revved her engine up and went

9  after him.

10     Q.    That's what you told Kevin Edwards that night?

11     A.    I don't know if it was that night.  I don't

12  recall exactly what I told him that night.  But that would

13  have been the substance of what took place and what I

14  talked to him about.

15     Q.    Are you fairly confident that you told him that

16  she "went after Christian"?

17     A.    I couldn't -- I don't know what my words were

18  that I used.  It's been almost three years ago.

19          MR. STIRBA:  But he's talking about substance.

20          THE WITNESS:  Substance, yes.

21     Q.    Let's take a look at the exhibit here.  If you

22  could go to Exhibit 2 and if you would go to 258.  About

23  the middle it says deputy interview.  Do you see that?

24     A.    Yes.

25     Q.    Bold heading.  It says, I was contacted by

                                                         39

*Johnson v. Peay et al. * 10/13/15 * Deposition of: DANIEL SCOTT PEAY*

1    Julie Curtis.  This is page 258 of Exhibit 2.  I was

2    contacted by Julie Curtis who related Sergeant Peay was

3    ready to give us his statement.  Arrangements were made to

4    meet with him on Wednesday 11/28/12 at 10:00 a.m. at the

5    Syracuse Police Department.  Do you see that?

6         A.    Yes.

7         Q.    The interview was audio and video recorded and

8    has been transcribed.  It says, also present with Sergeant

9    Peay was his supporter and Chief Deputy, Kevin Edwards.  Do

10   you see that?

11        A.    Yes.

12        Q.    Turn to page 259.  It says here about ten lines

13   down, throughout the majority of the chase.  Do you see

14   that?

15        A.    No.  Okay.  Yes.

16        Q.    Speeds up to 75 miles per hour.

17        A.    Yes.

18        Q.    That was maybe just one brief time, right?

19        A.    I don't recall.  I would have to go back and

20   listen to the audio recording of the chase, but it seems to

21   me that it actually got up to 90 miles per hour.

22        Q.    In the middle, Sergeant Peay was assisted by

23   UHP who deployed spike strips at a location known as

24   Horseshoe Bend on I-84.

25        A.    Yes.

40

*Johnson v. Peay et al. * 10/13/15 * Deposition of: DANIEL SCOTT PEAY*

1      Q.    It says, the spikes were successful and the

2   front tires and driver's rear tire went flat.  Is that your

3   recollection?

4      A.    Yes, that is.

5      Q.    You're apparently telling him this, that's why

6   I ask.

7      A.    Yeah.

8      Q.    Then it says, the suspect vehicle continued to

9   travel west on I-84 at speeds ranging from 35 mph to 65

10  mph, correct?

11     A.    That sounds correct.

12     Q.    Can you go that fast on rims?

13     A.    She did.  She absolutely did.

14     Q.    Then it says, remarkably the driver was

15  maintaining control of the vehicle.  Is that true?

16     A.    Yes.  She did hit the center barrier after

17  having the tires flat, but she maintained control of it.

18     Q.    She actually stopped at a stop sign, didn't

19  she?

20     A.    I don't recall.

21     Q.    We'll read about it.  Two-thirds of the way

22  down you're talking about Adams Street Toll Road exit 85

23  and Cottonwood Drive.  Do you see that?  And then it says,

24  the suspect vehicle slowed down significantly and Sergeant

25  Peay notified assisting units he wanted to initiate a high

                                                          41

1      A.    Not necessarily.

2      Q.    Then it says, he said, "it was something that

3  really struck home to me and had an influence on how I

4  thought things were going to happen."  You don't recall

5  telling them that?

6      A.    I don't.

7      Q.    Then he said, "she had a look and expression of

8  rage on her face and at that second it was directed at me."

9      A.    Yes.

10     Q.    Are you telling us then that this expression of

11 rage, you could see that at night with lights shining

12 through her window and police lights going off?

13     A.    Yes.

14     Q.    And you could see that she had an expression of

15 rage on her face?

16     A.    Yes, I could.

17     Q.    You heard her revving the engine apparently.

18 Then it says four lines from the bottom, Sergeant Peay

19 further related, she wasn't pinned in and she could have

20 went up the road or stopped, but she was turning and coming

21 at us.  Do you see that?

22     A.    Yes.

23     Q.    Sergeant Peay said, "there was no question in

24 my mind when she came, that she was trying to hit me, that

25 it wasn't my truck she was trying to hit, she is looking at

43

1    me and coming after me and trying to hit me."

2          A.    Yes.

3          Q.    Did you tell them something like that that

4    night?

5          A.    Yes, I did.

6          Q.    You said earlier you were aware that you could

7    be prosecuted for aggravated assault, shooting somebody

8    unnecessarily?

9          A.    Yes.

10         Q.    Did you tell them that to try to throw them off

11   of your case a little bit?

12         A.    No, I didn't.  That was accurate.

13         Q.    Are you telling us then -- let me play this

14   video again.  Is this an accurate -- let me back up a

15   little bit.  We're back to --

16               MR. STIRBA:  Is this Dingmann again?

17         Q.    Dingmann again.  We are back to 10:33 and going

18   forward on that.  By the way, the actual time counter reads

19   at the bottom 22:15.  That's Dingmann's counter.  Here we

20   have 11:53 her vehicle coming forward and striking the car.

21   We talked about this earlier.  This is 10:58 on the

22   counter, on the internal counter of this event.

23         A.    Okay.

24         Q.    Are you telling me that what happened -- the

25   shot was fired, I think, 11:08 on the counter.  So we're

44

1    in a deposition.  You know that.

2            MR. STIRBA:  Well, no.  But you can't

3    misrepresent the thing to the witness either.  That's the

4    problem.

5            Q.   At 10:58 she strikes your car.  And are you

6    telling me that during this time period --- let's talk

7    about 10:55 even through 11:08 when you fired the shot,

8    that this sequence supports the proposition that she was

9    trying to hit you?

10           MR. STIRBA:  Objection, vague and ambiguous and

11   compound.  But go ahead.

12           THE WITNESS:  What I am saying is at this

13   moment right here and just preceding it, as you can see,

14   and it's clear from the statement here, she was focussed on

15   me and she tried to hit me.  She was looking at me.  I

16   could clearly see her through the windshield.  She was

17   screaming and revving her engine and she came at me.

18           Q.   Okay.  Let's go back here.  Going back to

19   10:49.  You're not out of your vehicle yet.  So it has to

20   be sometime between 10:49 on the counter and the time you

21   fired the shot, which is about 17 or 18 seconds later,

22   right?

23           A.   Yes.

24           Q.   Are you telling me this 17 or 18 seconds -- you

25   get out at 10:51, right?  You saw yourself get out?

46

*Johnson v. Peay et al. * 10/13/15 * Deposition of: DANIEL SCOTT PEAY*

1      A.    Yes.

2      Q.    Here you are at 10:57 and pointing your gun at

3  her and she strikes your car?

4      A.    Yes.

5      Q.    You're telling me that your impression of what

6  happened here is she was trying to hit you?

7      A.    When I looked up -- when I exited my vehicle

8  and I came around and was coming around the back of my

9  vehicle as you can see there, that is absolutely my

10 testimony.  I looked at her.  She was focussed on me.  We

11 made eye contact.  She had an expression of rage on her

12 face, she was revving her engine and she was looking

13 directly at me and she came at me.

14     Q.    Your view that you have expressed here that she

15 was trying to hit you --

16     A.    Yes.

17     Q.    -- is based upon making eye contact with her

18 and looking at the rage in her eyes directed toward you?

19     A.    That's part of it, yes.

20     Q.    Is there anything else?

21     A.    If I were to look at you right now and have an

22 expression of rage and come at you in an aggressive manner,

23 you would be able to see that.  And that's what I saw

24 there, is that she was coming at me in a very aggressive

25 manner.

47

1      Q.     That's what I'm asking.  The basis of your

2  statement that you made here on the record, the basis of

3  your statement is that you looked in her eyes and then she

4  appeared to steer the car at you?

5      A.     She was coming at me.

6      Q.     But a significant part of your belief on that

7  was making eye contact with her under these conditions?

8      A.     It was the expression of rage on her face as

9  she looked at me.

10      Q.     Did you later learn what she blood alcohol

11  level was?

12      A.     I've heard, but I have not read.

13      Q.     What have you heard?

14      A.     .4.

15      Q.     I was going to say .32, but we're in the same

16  ballpark there.  Do you think that a person that drunk is

17  capable of focussing on you as an officer, trying to hit

18  you?

19          MR. STIRBA:  Objection, calls for speculation,

20  conjecture.  But go ahead and answer.

21          THE WITNESS:  My answer to that would be that

22  clearly she was because I saw that, I firsthand saw that.

23  She looked at me.  She had rage directed at me and she came

24  at me.

25      Q.     Then on page 259, the top of page 260, he,

                                                              48

1      Q.    And Christian Peay's vehicle on the right?

2      A.    Yes.

3      Q.    Everybody is pulling forward, including

4    Christian and you.  She backs up.  Dingmann comes in and

5    fills in the hole.  Do you see that?

6      A.    Yes.

7      Q.    You're standing by the right rear of your

8    vehicle behind the point of impact.  Are you trying to tell

9    me that you were at risk of getting hit here?

10      A.    Absolutely I am.  You can see from that video

11    she was probably inches from where my leg is.  And also she

12    is hitting my truck which is pushing towards me.  I don't

13    know if my truck made contact with me or not.  That would

14    be why I sidestepped was to avoid that.

15      Q.    How fast do you think she was going?

16      A.    Fast enough to cause damage to my vehicle.

17      Q.    You can have that at one mile an hour, can't

18    you?

19      A.    You can.  And you can crush bones at one mile

20    an hour.

21      Q.    Do you have any idea how fast she was going at

22    this point?

23      A.    I don't.

24      Q.    More or less than 50 miles an hour?

25      A.    It was less.

56

1      Q.    More or less than 10 miles an hour?

2      A.    Less.

3      Q.    More or less than 5 miles an hour?

4      A.    I don't know.

5      Q.    So you're telling us under oath, under oath

6   that you felt at 10:55 in the Dingmann video that you felt

7   yourself at risk of getting hit?

8      A.    Yes.

9      Q.    All right.  You say you had to step out of the

10   way to avoid getting hit on page 249.  Then it says, the

11   driver again put the vehicle in reverse, backed up, then

12   put the vehicle back in drive and accelerated straight

13   toward Deputy Peay.

14      A.    Yes.

15      Q.    That's what you told somebody?

16      A.    Yes.

17      Q.    Let's see if this is what you're talking about

18   here.  Let's continue on.  She backs up.  We're at 11:03.

19   It looks to me like she is maybe six feet from you.  Fair

20   statement?

21      A.    Could be.

22      Q.    And a little further from the Dingmann vehicle.

23   And then she comes forward.  It looks like she is inching

24   forward.  Here we are at 11:08 and you fire the shot.  Are

25   you telling me that this language here that this person

                                                        57

1    recorded is accurate?

2          MR. STIRBA:  Wait a second.  Excuse me, Bob.

3    You sort of went through a whole litany of information and

4    now I think you're asking a question.

5          MR. SYKES:  I'm asking a question.

6          MR. STIRBA:  It's a compound question and I'm

7    not sure where we are.  Could you start all over again

8    please?

9          Q.    Look at page 249.  It says, the driver again

10   put the vehicle in reverse, backed up, then put the vehicle

11   back in drive and accelerated straight toward Deputy Peay.

12   You think that's an accurate statement of what happened

13   here?

14         A.    It's accurate, yes.  Absolutely it's accurate.

15         Q.    She accelerated toward Deputy Peay.

16         A.    Yes, she did.

17         Q.    Aren't you off to the side?

18         A.    I'm not Deputy Peay.  I'm Sergeant Peay.  We're

19   talking about Deputy Peay that is directly in front of her

20   vehicle right there.

21         Q.    You think Deputy Peay is directly in front of

22   this vehicle?

23         A.    Yeah, I know he is.

24         Q.    I have another video you know.

25         A.    Yes.

                                                          58

1    Q.    As the vehicle struck Deputy Peay's vehicle

2  Sergeant Peay fired one round from his 40 caliber Glock.

3  You think that's an accurate statement of what happened?

4    A.    Yes.

5    Q.    Did you tell Officer Hough that Kristine Biggs

6  accelerated toward you and then you fired?

7    A.    I don't recall that, no.

8    Q.    If Officer Hough somewhere said or recorded

9  that you told him that you fired because she accelerated

10  towards you, would that be in error?

11         MR. STIRBA:  Once again let me make the

12  objection.  It's an improper question.  He doesn't have to

13  comment on somebody else's statement.

14    Q.    Go ahead and answer please.

15         MR. STIRBA:  Let me finish please.  Go ahead

16  and answer.

17         THE WITNESS:  I can't comment just because I

18  don't know what Hough told you.  I can't testify to what he

19  told you.

20    Q.    You don't have to know.

21    A.    And I don't recall what I told Hough.  I've

22  already told you that.  I actually -- if Hough was in this

23  room I would not recognize him.

24    Q.    Let me state it again.

25    A.    Okay.

59

1       Q.    If you told Officer Hough that Kristine Biggs

2  accelerated toward you and so you fired, would that be

3  accurate or inaccurate of what you told him?

4       A.    That is not accurate.

5       Q.    Is it true that she was stopped when you fired?

6       A.    Yeah, she probably was.  I fired at the moment

7  of impact.

8       Q.    She stopped for maybe a second.  Let me back

9  that up again.  11:08 she appears to be stopped and then

10 there is the firing at 11:08 on the counter.  Why did you

11 feel a need to shoot her when she was stopped?

12      A.    When she went forward -- between the point

13 where she came at me and hit my vehicle and she backed up,

14 sometime between that time when she backed up and started

15 coming forward again I saw Christian out of my peripheral

16 vision and he was to my right.  He was just to the side of

17 Dingmann's vehicle right here.  She took her focus off me

18 and looked directly over at him and she screamed, revved

19 her engine and went forward.  And as she hit right here,

20 Christian dropped out of my view.  I didn't know if he was

21 under her vehicle, if she had hit him, or if she was

22 pinning him between the vehicles.  And I fired to stop her

23 from injuring my brother.

24      Q.    But when you fired she stopped?

25      A.    She did.

60

*Johnson v. Peay et al. * 10/13/15 * Deposition of: DANIEL SCOTT PEAY*

1      Q.    And if you look you could have clearly seen

2  Christian, could you not?

3      A.    No, I couldn't clearly seen him because he had

4  already -- he was out of my view.  I just testified to

5  that.

6           MR. SYKES:  It was Hardman, wasn't it?

7           MR. STIRBA:  Yes, I think that was the other

8  one that is an exhibit in the previous depositions.

9      Q.    This was the other exhibit, the Hardman video.

10 Here we go.  This is at 4:06.  Christian Peay gets out at

11 4:10.  This is not synced by the way.  Do you agree looking

12 at this he is in no danger?

13     A.    From -- I can't look at this and say that.

14 Yeah, he was in danger because obviously he was backing up

15 trying not to get hit, which would match my testimony that

16 he went out of my view right there.  I just didn't see that

17 it was him backing up.

18           MR. STIRBA:  Let the record reflect that we're

19 looking at the Hardman video which was a prior marked

20 exhibit to some depositions.  It's stopped now -- what is

21 the counter?

22           MR. SYKES:  4:18.

23           MR. STIRBA:  At 4:18.

24     Q.    And I think that is Exhibit 15 -- no, wait a

25 minute.  What exhibit is that?  You agree, however, looking

                                                          61

1     Q.   It says on B, a deputy may use deadly force to

2  stop a fleeing subject.  Do you think she was a fleeing

3  subject?

4     A.   She had been fleeing, but she was coming at us.

5  She wasn't fleeing anymore, she was attacking us.

6     Q.   When the deputy has probable cause to believe

7  that the person has committed or attempts to commit a

8  felony involving the infliction or threatened infliction of

9  serious bodily injury or death.  Do you think she qualified

10  that day for that?

11     A.   Yes, she did.

12     Q.   Do you know if they prosecuted or dismissed the

13  charges of aggravated assault?

14     A.   I don't know.

15     Q.   The deputy reasonably believe there is an

16  eminent risk of serious bodily injury or death to any other

17  person if the subject is not immediately apprehended.  Do

18  you see that policy?

19     A.   Yes.

20     Q.   The Davis County attorney found that you did

21  not qualify for the use of deadly force, right?

22     A.   I can't -- that's what he said.  It said in his

23  opinion.

24     Q.   And you disagree with that?

25     A.   I do.

1      Q.   Let's turn back to Exhibit 1.  While you're

2  getting there, you remember doing the interview I assume

3  with Ms. James and Mr. Herndon at the Syracuse Police

4  Department that day, didn't you?

5      A.   I did an interview, yes.

6      Q.   Turn to internal page 18 and MCSO 279.

7      A.   379?

8      Q.   279.  Actually turn to 277 first.  You say on

9  line 540 you saw other officers getting out of cars.  And

10  you say on line 540, so, they, I knew they were out of

11  their cars, I knew Christian had gotten out of his car, and

12  it really wasn't up until the point, that, that I felt like

13  I had to shoot, that my television -- I think you mean

14  tunnel vision, don't you?

15      A.   It is tunnel vision.

16      Q.   It's a typo, right?

17      A.   It is.

18      Q.   -- really started coming in.  What are you

19  talking about when you say tunnel vision?

20      A.   After I saw Christian off to my right side and

21  as she came to him and the stress increased, my eyesight

22  came in a little bit and I was focussed on her completely

23  and I couldn't see my brother anymore.  I wasn't seeing to

24  the side as much as I was to the front.

25      Q.   This is something they teach you in POST,

                                                      76

1      A.    He was in danger, absolutely.

2      Q.    If you're behind two police vehicles that are

3  stopped and parked, she is coming at you 1 to 5 miles an

4  hour, and the gap is small, there is no way he is going to

5  get hit, is there?

6          MR. STIRBA:   I'm going to object, calls for

7  speculation, conjecture on his part.   Go ahead.

8          THE WITNESS:   I know that she hit both of those

9  vehicles and she hit Christian's so hard that she broke the

10  grill guard that is front that we use to push cars, that

11  protect vehicles.   She broke that and pushed in the grill

12  of his truck and moved his truck back.   She hit with a

13  tremendous amount of force.   That force could have easily

14  disabled or killed him.

15      Q.    Then turn to page 279, line 599.   Herndon asked

16  you, how close do you think she came.   Earlier on 595 he

17  said, and she did not ever strike you with the vehicle.

18  You said, no, no.   He says okay.   And you said, I know she

19  came very close, but no she didn't.   Herndon, how close do

20  you think she came.   Answer, I remember thinking as I come

21  around the side, that she looked at me when she come and

22  hit, I was surprised that I didn't get hit.   And I don't

23  know if it was inches, I don't know if it was a foot, or if

24  I just, I, in my mind I was gonna get hit, and I was trying

25  to move out of the way of it, but I didn't get hit.

78

1          You think it might have been inches or a foot

2   you were away?

3          A.    It's clear from that that was my recollection,

4   yes.

5          Q.    At the time?

6          A.    Yes.

7          Q.    Do you recognize now that you were pretty far

8   off?

9          A.    No, I wasn't pretty far off.  If you look at

10  that it --

11         Q.    Like five or six feet?

12         MR. STIRBA:  Wait, wait, wait.  Let him finish.

13         THE WITNESS:  The time we're talking about here

14  was when she came at me.  We're not talking about the

15  second incident when she went after Christian.  When she

16  came at me and hit my vehicle, she was within inches or a

17  foot.

18         Q.    Then 604, Herndon, when do you think that

19  Christian was in danger.  Answer, when she focussed on him,

20  and uh, put it in gear and came, in my mind she was going

21  after him with that truck, and uh, there was no question in

22  my mind that was what she was doing, and I actually had a

23  concern that I had fired too late.  You said that?

24         A.    Yes, I did.

25         Q.    Let's take a quick look here.  Looking at the

79

1    Dingmann video at 10:49 counter number.  Let's me back up

2    here.  Let's go to 10:49.  You're out of the car at 10:52,

3    strikes at 10:56.  After she strikes the vehicle -- let me

4    just back up a hair here.  When that vehicle strikes here,

5    looking at 10:55, it looks to me like it's a lot further

6    away than inches or a foot.

7             MR. STIRBA:  That mischaracterizes what we've

8    just seen.  It's not when she struck the vehicle.

9         Q.    Isn't that a lot further away than inches or a

10   foot as we're looking at 10:55?

11            MR. STIRBA:  I'm going to object again it

12   mischaracterizes what we just saw on the video.

13        Q.    Isn't that further away than inches or a foot?

14        A.    Yeah, that is because she hasn't struck my

15   vehicle yet.  You can see as you played it forward right

16   there, as she strikes the vehicle you can see me bend

17   backwards at the waist and move my feet and legs backwards

18   to avoid being hit.  And right there where you just paused

19   it, yes, I'm within inches or a foot of her car.

20        Q.    We're at 10:55, a little further at 10:55 than

21   we were.  And you're leaning forward --

22        A.    Uh-huh, and my legs are backwards.

23        Q.    -- and you're telling me that you are inches or

24   a foot away from her vehicle?

25        A.    Uh-huh, yes.

                                                              80

1      Q.    It could be just inches?

2      A.    It could be, yes.

3      Q.    You go back just a fraction after she hits you.

4  It looks to me like you're about four feet?

5      A.    Well, I took a step back there.  You can say

6  that's four feet.  It doesn't look like four feet to me.

7      Q.    How far does it look to you right now?

8      A.    It looks like a foot.

9      Q.    A foot?

10     A.    Yes.

11     Q.    Even though she hasn't hardly moved, you walk

12  forward at that point toward the car?

13     A.    I did.

14     Q.    Is that out of fear?  You're walking -- you're

15  afraid you're going to get hit so you walk forward toward

16  the car?

17     A.    Her vehicle is in reverse, so obviously if it's

18  in reverse now she can't go forward.  But I came out of

19  cover because I did everything I could do to get her to

20  stop.  I was trying to yell at her.  I was yelling

21  commands.  I was trying to communicate with her.  I was

22  doing everything I could to stop her and I came out of

23  cover to do that.

24     Q.    But if you're afraid of getting hit -- and

25  correct me, I don't want to be argumentative because I'll

81

1    Q.    So you're telling me as you are standing here

2  at 11:06 you're not sure whether you can see what would be

3  the driver's side front corner?

4    A.    I don't recall if I saw it or not.

5    Q.    If you could see it, isn't it true that

6  Christian Peay ain't there?

7         MR. STIRBA:  That's a hypothetical, calls for

8  speculation.

9    Q.    Looking at the video here.  He's not there, is

10  he?

11    A.    He's not in that video, but he's out there.

12         MR. STIRBA:  He's in the Hardman video.

13    Q.    You can't see him in this video at all, can

14  you?

15    A.    No.

16    Q.    If that car comes straight back to the camera,

17  Christian isn't going to get hit, is he?

18    A.    Not if she comes straight back, but that's not

19  what she was doing.  She turned her wheels.  She was going

20  -- as you see right there, she did turn her wheels and she

21  went directly toward Christian.

22    Q.    Now she stops and she stopped here for about a

23  second, right?

24    A.    No, she doesn't stop.  She rammed the vehicle

25  and she keeps --

85

1      Q.    And then you open fire?

2            MR. STIRBA:  Wait a minute.  Let him finish.

3            THE WITNESS:  She rams the vehicle and she is

4  still accelerating.  Her tires are spinning.  She is

5  churning up the asphalt and she is still moving.  She is

6  pushing against that vehicle.

7      Q.    11:07, do you agree she stopped for an instant?

8      A.    No.

9      Q.    You don't?

10     A.    Not at 11:07.  She hasn't made contact yet.

11     Q.    She stopped for an instant at 11:08?

12     A.    She's made contact and this car stopped her,

13  but she is still accelerating and pushing against the car.

14           MR. SYKES:  Let's take a short break and I'll

15  talk to my expert witness here and we'll be right back.

16           (Off the record.)

17     Q.    Let's do a little bit more here.  What was your

18  state of mind when you got out of the car?  What were you

19  thinking?  What emotions were going through you?

20           MR. STIRBA:  I'm going to object, it's

21  compound.  You want thinking or emotions?

22           MR. SYKES:  Both.

23           MR. STIRBA:  Answer them one at a time.

24           THE WITNESS:  Well, I don't know if I recall a

25  hundred percent what I was thinking or feeling.  I know as

86

1    Q.    I understand your claims.  Do you agree with me

2  that you would not be justified at point B in using deadly

3  force that you could have, but did not use at point A?

4    A.    I'm trying to understand your question I guess.

5    Q.    I'm saying what happened that caused the threat

6  at point A where you could have used deadly force, that's

7  passed now in the hypothetical.  You're now at point B,

8  seven or ten seconds later.  What happened at point A

9  doesn't justify using deadly force at point B if the threat

10  to you is no longer there, right?

11    A.    That's correct, but obviously it influences

12  that.  If that person -- in her case she is using her

13  vehicle as a weapon.  She still is using that weapon.  She

14  just isn't using it on me anymore.  She uses it against a

15  fellow deputy.

16    Q.    But at point A Deputy Christian Peay was not at

17  risk, right?

18    A.    No, he wasn't.

19    Q.    He was at risk at maybe point B?

20    A.    Right.

21    Q.    But you were allegedly, according to you, at

22  risk at point A, but you didn't shoot?

23    A.    Right.

24    Q.    So you can't shoot her seven seconds later

25  because you were at risk seven seconds before, right?

89