ROBERT B. SYKES (#3180)
bob@sykesinjurylaw.com
ALYSON C. McALLISTER (#9886)
alyson@sykesinjurylaw.com
RACHEL L. SYKES (#11778)
rachel@sykesinjurylaw.com
**SYKES McALLISTER LAW OFFICES, PLLC**
311 South State Street, Suite 240
Salt Lake City, Utah 84111
Telephone (801) 533-0222
Facsimile (801) 533-8081

RICHARD T. WILLIAMS (#9115)
rich@arplegal.com
**ALLEN PACE LAW, P.C.**
2550 Washington Blvd., Suite 300
Ogden, Utah 84401
Telephone (801) 393-9600
Facsimile (801) 399-4194

*Attorneys for Plaintiff*

# UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH

## NORTHERN DIVISION

| | |
|---|---|
| KRISTINE BIGGS JOHNSON, | **PLAINTIFF'S <u>COMBINED REPLY</u> MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT ON LIABILITY AGAINST DEFENDANT PEAY, AND <u>RESPONSE IN OPPOSITION</u> TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT** |
| Plaintiff, | |
| vs. | |
| DANIEL SCOTT PEAY, a Morgan County Sheriff's Sergeant, MORGAN COUNTY, a Political Subdivision; and JOHN and JANE DOES 1-10, | |
| Defendants. | Civil No. 1:14-cv-147-TC |
| | Judge Tena Campbell |

# TABLE OF CONTENTS

I.  INTRODUCTION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  iv

II. PLAINTIFF'S REPLIES TO DEFENDANTS' CLAIMS DISPUTING PLAINTIFF'S UNDISPUTED MATERIAL FACTS. . . . . . . . . . . . . . . . . . . . . v
    A.  The Main Issue: Effect of an Uncontested Video.. . . . . . . . . . . . . . . . v
    B.  The *Scott v. Harris* Precedent.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . v
    C.  Elements. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . vi
    D.  Undisputed Facts. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . vii
    E.  No Genuine Issues of Material Facts. . . . . . . . . . . . . . . . . . . . . . . . viii

III. PLAINTIFF'S DENIALS OF DEFENDANTS' "ADDITIONAL UNDISPUTED MATERIAL FACTS". . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . xxv
    A.  Immaterial to Issues in this Case.. . . . . . . . . . . . . . . . . . . . . . . . . . xxv
    B.  Denials Based on Contrary Video Evidence... . . . . . . . . . . . . . . . . xxvi
    C.  Denials Based on Subjective Belief.. . . . . . . . . . . . . . . . . . . . . . . . . xxvi
    D.  Denials Based on Motive to Deny. . . . . . . . . . . . . . . . . . . . . . . . . . xxvii
    E.  Denials Based on Voluntary Exposure to Increased Danger. . . . . . . xxvii
    F.  Denials of Remaining Additional Facts.. . . . . . . . . . . . . . . . . . . . . . xxix

IV. ARGUMENT.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

    POINT I ~ <u>Video Evidence Compels Summary Judgment for Plaintiff</u> ~ PLAINTIFF IS ENTITLED TO SUMMARY JUDGMENT BECAUSE VIDEO EVIDENCE DEMONSTRATES THAT SGT. SCOTT PEAY USED CONSTITUTIONALLY EXCESSIVE DEADLY FORCE WHEN HE SHOT OUT KRISTINE BIGGS' EYE.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1
    A.  What Is Undisputed.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1
    B.  What Is Clearly Established. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
        (1)  Severity of the Crime.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3
        (2)  Immediate Threat.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3
        (3)  Actively Resisting Arrest. . . . . . . . . . . . . . . . . . . . . . . . . . . . 4
    C.  The Definitive Nature of *Scott v. Harris*. . . . . . . . . . . . . . . . . . . . . 4
    D.  *Scott v. Harris* Determines This Case. . . . . . . . . . . . . . . . . . . . . . . 5
    E.  *Scott v. Harris* in the Tenth Circuit. . . . . . . . . . . . . . . . . . . . . . . . . 6
    F.  Other Federal Case Support for *Scott v. Harris*. . . . . . . . . . . . . . . . 10
    G.  Immediate Threat of Serious Physical Harm. . . . . . . . . . . . . . . . . . 18
    H.  Without Regard to Underlying Intent or Motivation.. . . . . . . . . . . . 18
    I.  Severity of the Crime at Issue. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

J.       Danger at the Precise Moment.. . . . . . . . . . . . . . . . . . . . . . . . . . . 19
K.      Officer's Own Reckless or Deliberate Conduct.. . . . . . . . . . . . . . . . 20

POINT II ~ <u>Denial of Defendants' Motion for Summary Judgment Is Required</u>~
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT SHOULD BE
DENIED BECAUSE (A) VIDEO EVIDENCE DISPROVES THEIR CLAIMS ;
(B) DEFENDANTS IMPROPERLY RELY ON SUBJECTIVE EVIDENCE; (C)
DEFENDANTS HAVE A MOTIVE TO DENY; AND (D) CHRISTIAN PEAY
WAS INDISPUTABLY NOT IN DANGER; AND (E) THE LAW WAS
CLEARLY ESTABLISHED.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20
A.      Video Evidence Disproves Defense Claims.. . . . . . . . . . . . . . . . . . . . 20
B.      Improper Reliance on Subjective Evidence.. . . . . . . . . . . . . . . . . . . . 21
C.      Defendants' Motive to Deny.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22
D.      Christian Peay Indisputably Not in Danger.. . . . . . . . . . . . . . . . . . . 24
E.      The Law Was Clearly Established.. . . . . . . . . . . . . . . . . . . . . . . . . . . 25
         No Evidentiary Support. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26
         Clearly Established.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

**NOTE:**      Since this brief combines Plaintiff's Memorandum in Opposition to Defendants' Cross Motion for Summary Judgment, which is allowed to have 25 pages, along with Plaintiff's Reply Memorandum in Support of her MSJ, which is allowed 10 pages, the 28 pages of Argument herein is less than the combined allowed 35 pages. Therefore, no Motion for Leave to file an overlength Memorandum was submitted.

Plaintiff submits this Combined <u>Reply</u> Memorandum in support of her Motion for Summary Judgment, in response to Defendants' opposition (Doc. 48), and in opposition to Defendants' Motion for Summary Judgment, as follows (Docs. 49 and 51):

## I. <u>INTRODUCTION</u>

Plaintiff disagrees with the unsupported and improper claims made in paragraphs 2, 3, 4, and 5 of Defendants' "Introduction."  In this regard, Plaintiff will support her disagreements, with references to the record, in the appropriate section of this Reply Memorandum.

Further, Plaintiff objects to the first two paragraphs and the first sentence of the third paragraph in Defendants' "Background" (allegations of a "criminal history in three states," assaulting a police officer, domestic violence, etc.)  These inclusions are entirely irrelevant to any issues before the Court on the Motions.  Such information was not known to Sgt. Peay or any other officer during the incident in question.  As these sophisticated defense lawyers well know, such allegations can play no part in this Court's consideration of the instant Motions.  This Court should not condone tawdry attempts to improperly blacken a litigant's character.

## II.  PLAINTIFF'S REPLIES TO DEFENDANTS' CLAIMS DISPUTING PLAINTIFF'S UNDISPUTED MATERIAL FACTS

A.    **The Main Issue: Effect of an Uncontested Video**.  "Who are you going to believe, me or your own eyes?," Chico Marx in *Duck Soup* (a 1933 Marx Brothers movie)[1].  By analogy in this case, should the Court accept two (2) uncontested dash-cam videos that show excessive deadly force and a constitutional violation?  Or should the Court accept a plethora of legerdemain (including excuses, prevarications, and rationalizations) offered by Defendants as to why the "Court's eyes" (the videos) should be disregarded and not be believed?  U.S. Supreme Court precedent, and a host of Tenth Circuit cases, say that the Court is obligated to believe the videos.

B.    **The *Scott v. Harris* Precedent**.  The United States Supreme Court, in the landmark case of *Scott v. Harris*, 550 U.S. 372 (2007), stepped squarely into this controversy in a summary judgment case similar in principle to the one now before Your Honor.  And *Scott v. Harris* gave us an important principle that resolves this case on summary judgment in favor of Plaintiff.  *Scott v. Harris* basically said that a party cannot create questions of fact to defeat summary judgment by swearing to falsehoods that are contradicted by obvious video evidence.

In *Scott,* a fleeing plaintiff was seriously injured when an officer performed a pit maneuver, which caused the plaintiff, who had led an exceptionally dangerous car

---

[1] A commonly used variation of this is ""Who are you going to believe, me or your lying eyes?" attributed to comedian Richard Pryor in *Live on Sunset Strip,* 1982.

chase, to crash and become a paraplegic. The plaintiff provided affidavits that purported to create questions of fact, so the lower court denied the defendant's motion for summary judgment. The Eleventh Circuit affirmed. Thankfully, this was appealed to the U.S. Supreme Court, which held:

> When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment. . . . The Court of Appeals should not have relied on such visible fiction; it *should have viewed the facts in the light depicted by the videotape*.

*Scott*, 550 U.S. at 380-81 (emphasis added).

Since *Scott v. Harris* was handed down in 2007, it has been cited thousands of times in district and circuit court decisions for the proposition at issue in this case. That proposition is: may a party create artificial or fallacious questions of fact to defeat summary judgment, when the other side is 100% supported by video evidence?

Basically, all of the substantive facts cited by Plaintiff in her opening Memorandum (Doc. 37) are based upon the video evidence. No significant statement of fact by Plaintiff is based on anything but the videos.

Contrariwise, Defendants' alleged facts are entirely based upon subjective matters or claims that are belied by the relevant videos. This should be a simple decision for the Court, because the videos in this case are so telling.

     **C.**    <u>**Elements**</u>.  Defendants begin their Response with a restatement of the legal elements provided by Plaintiff. Defendants' elements (2) and (4) are simple

re-wordings of elements listed in Plaintiff's Motion. Defendants' elements (1) and (3) are factors that are *not at issue* in this case. It is clear and undisputed that at the time of this incident that Sgt. Peay was acting in his capacity as a deputy sheriff. There is also no question that Peay's firing of his weapon caused the serious injury to Plaintiff. Plaintiff's elements provide authorities to the Court to assist it in reaching a decision on the matters that are at issue in this case.

**D.** **Undisputed Facts.** Defendants have claimed that a number of the facts listed in Plaintiff's Motion are disputed. Some of these are immaterial, minor discrepancies that do not impact the merit of Plaintiff's Motion. These are comprised of Defendants' responses to Facts 1, 5, 6, 8, 10, 11, and 15.

In other instances, however, Plaintiff has proffered numerous facts that are cited to and observable on the dash-cam videos provided to the Court, which Defendants claim are "disputed." In support of their claims of such "disputes," Defendants typically cite to deposition testimony that was elicited roughly three years after the incident in question. This is exactly the situation contemplated in *Scott v. Harris*, where the U.S. Supreme Court instructed the lower courts:

> ...[w]hen the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts .... ***Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'*** [T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact. ***When opposing parties tell two different***

*stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment. . . . <u>The Court of Appeals should not have relied on such visible fiction; it should have viewed the facts in the light depicted by the videotape</u>.*

*Scott v. Harris,* 550 U.S. 372, 380-1 (internal citations, punctuation omitted, emphasis and <u>double</u> emphasis added).  Here, Defendants tell a story "blatantly contradicted by the [videotape] record," which "no reasonably jury could believe."  We ask the Court to reject "such visible fiction" when ruling on this Motion for Summary Judgment.  This Court "should . . . view[] the facts in the light depicted by the videotape." *Id.*

      E.    <u>No Genuine Issues of Material Facts</u>.  The following facts disputed by Defendants do not present "genuine issues of material fact" when viewed "in the light depicted by the videotape," or they are otherwise contradicted or discredited by the very person providing the testimony.

<u>Fact 12</u>

     **Plaintiff's Fact:**    *At this point [as Officer Dingman pulled his vehicle forward into the gap between the vehicles of Sgt. Peay and Deputy Peay] four police vehicles were positioned such that Ms. Johnson was blocked from moving to the west. See Exhibit 5, Officer Hardman dash-cam, 22:05:58* (Bracketed text added for clarity).

     **Defendants' Response:**    *Disputed. Officer Dingman testified that Ms. Johnson was not "completely blocked" from proceeding west, as she could have gone around the police vehicles on the shoulder. (Deposition of Jeffrey Dingman ("Dingman Dep.") 26:10–18; see Hardman dash-cam video, Pl.'s Ex. 5 at 22:05:40–22:06:15.)*

     **Plaintiff's Reply:**  Defendants base their dispute of this fact on Officer Dingman's deposition testimony, which Defendants paraphrase as "she could have gone around the police vehicles on the shoulder."  In follow-up, Dingman admitted:

Q. Weren't they positioned at various spots to prevent escape to the west?
A. I don't know exactly where their vehicles were positioned.

Dingman Depo. 27:3-6. In other words, Dingman's testimony that Defendants have offered to dispute Fact 12 is speculation, and therefore inadmissible as genuine evidence pursuant to F.R.E. 602, 701(a) and F.R.Civ.P. 56(c)(1)(B). Further, the respective videos show that Plaintiff was effectively blocked.

## Fact 13

**Plaintiff's Fact:** Ms. Johnson got her truck pointing west-bound, but she was entirely blocked from escaping in the west-bound direction on Cottonwood Drive. Exh. 4, 22:15:31.
**Defendants' Response:** Disputed. Officer Dingman testified that Ms. Johnson was not "completely blocked" from proceeding west, as she could have gone around the police vehicles on the shoulder. (Dingman Dep. 26:10–18; see Hardman dash-cam video, Pl.'s Ex. 5 at 22:05:40–22:06:15.)

**Plaintiff's Reply:** Same Response as Fact 12.

## Fact 16

**Plaintiff's Fact:** As Ms. Johnson pulled forward at about 2 or 3 mph, she bumped into the passenger side of Sgt. Peay's truck, and then stopped. Exh. 4, 22:15:31.
**Defendants' Response:** Disputed. A vehicle crash report estimated that Plaintiff's vehicle was traveling approximately 15 mph at the time of impact with Sergeant Peay's truck. (Deposition of Eric Prescott ("Prescott Dep.") 28:5–25; see Vehicle Crash Report, MCSO_00318–19.) Sergeant Peay and Deputy Peay estimated it was traveling between 5 and 10 miles per hour. (Deposition of Sergeant Scott Peay ("Sergeant Peay Dep.") 56:15–57:4; Deputy Peay Dep. 21:17–22:10.) Plaintiff's vehicle struck Sergeant Peay's truck not just on the passenger side, but only "inches or a foot" from Sergeant Peay, who had to back up to avoid being hit. (Sergeant Peay Dep. 56:7–14, 78:15–80:25.)

**Plaintiff's Reply:** Defendants offer alleged evidence that Plaintiff's vehicle, during her three-point turn, pulled forward at significantly greater than 3 mph. However, Plaintiff's turning maneuver is clearly visible on the dash-cam video, as cited

in Plaintiff's Motion. The Court can see for itself and make a reasonable estimate of the speed in question. Whoever estimated 15 mph made a gross overestimate that would amount to about 22 feet per second, which is clearly contradicted by the video.

Further, as evidence for this alleged dispute, Defendants asked Eric Prescott to read from a "Vehicle Crash Report" that he did not create nor provide information for. Prescott has no personal knowledge of how the figure in the crash report was arrived at. Prescott admitted that he had only been asked to *diagram* the vehicles, but not to do a *reconstruction* of the accident, which might have provided a better estimate of the speed of Plaintiff's vehicle as it impacted Sgt. Peay's vehicle:

> A. I can't tell you exactly how fast he [sic] was going. If that's what you want is a hard number, I can't tell you exactly.
> Q. I wanted an estimate.
> * * *
> A. If you want a hard number, then --
> Q. All right.
> A. -- someone can request to do a --
> MR. SYKES: No further questions.
> A. -- reconstruction, and I'll do that.

Prescott Depo. 40:7-19. Prescott, a nine-year veteran with the UHP, inexplicably refused to estimate the speed of Plaintiff's vehicle as it struck Sgt. Peay's truck using the real-time action on the video. Plaintiff believes such refusal to be a blatant example of the "code of silence" where law enforcement officers feel some misguided duty not to cause another officer any trouble, even if that means abandoning the truth. This will not

be the last time this code of silence appears in the record or referenced in this Reply, and it will be further discussed in Footnote 2.

## Fact 17

**Plaintiff's Fact:** *When Ms. Johnson bumped into the side of Sgt. Peay's truck, Sgt. Peay was positioned behind his truck, near the back bumper and right rear taillight, with his gun aimed at Ms. Johnson. Exh. 4, 22:15:31.*

**Defendants' Response:** *Disputed. Sergeant Peay was moving towards Ms. Johnson's vehicle on foot and was at the rear right corner of his truck, only "inches or a foot" from Ms. Johnson's truck when she rammed Sergeant Peay's truck. (Sergeant Peay Dep. 56:7–14, 78:15–80:25.)*

**Plaintiff's Reply:** The movements and positioning of Sgt. Peay described in this fact are clear from the video cited in Plaintiff's Motion, and contradict "Defendants' Response." Peay's location is easily checked by watching the video. Manifestly, he is not in imminent danger and not "inches or a foot" from Ms. Johnson's truck, since he is shielded by his own vehicle.

## Fact 18

**Plaintiff's Fact:** *Unable to proceed, Ms. Johnson backed up about 6 feet, preparing to turn away from Sgt. Peay's truck. Exh. 4, 22:15:37.*

**Defendants' Response:** *Disputed. Sergeant Peay testified that after Ms. Johnson backed up, she came forward and he "had to back out of the way" because he "felt she was coming towards [him]," (Sergeant Peay Dep. 35:2–8), until she turned and "went directly toward Christian." (Sergeant Peay Dep. 85:18–21; see id. at 57:9–58:16.) Deputy Peay stated Ms. Johnson "backed up about ten feet" and then she "looked directly at me and the expression on her face changed. She looked as if she was targeting me to run me over." (Deputy Peay Dep. 59:11–17; see Deputy Peay's Incident Report, MCSO_00021.)*

**Plaintiff's Reply:** Here, Defendants do not actually dispute Plaintiff's expressed fact, but rather they supply a subjective narrative of their own, based on Sgt.

Peay's own deposition testimony. Defendants' response proceeds well beyond the simple fact expressed by Plaintiff. We will address Defendants' responses claiming disputed facts as they respond to the facts expressed by Plaintiff. Further, Defendants' reliance on the deposition testimony of Defendant Peay expressed three years after the incident in order to controvert the video should not be permitted.

Further, Defendants' cherry-picked quotations from the deposition testimony of Deputy Christian Peay are both misleading and controverted by the video. Christian Peay wrote "thin blue line," incorrect statements[2] the night of the shooting, which are completely inaccurate, as shown by the video. Defense counsel had Christian read these false statements into the record at his deposition, and now characterizes them as a "question of fact" shown in a deposition. Deputy Peay's uncontroverted oral testimony at deposition states that <u>neither he nor his brother</u>, Sgt. Peay, was in imminent danger of death or serious bodily injury when Sgt. Peay fired his weapon. *See* Plaintiff's Fact 32 in the Motion (Doc. 37). This is absolutely proven by the videos.

---

[2] As used herein, "the thin blue line" refers to the police. Officers are known to make deceptive or false statements to back up a fellow officer. As stated in *Police Chief* magazine, March 2016, "not only should there be a policy defining improper, intentional, deceptive misconduct, but there should be also a clear definition of deceptive conduct that is accepted by an agency. ***In police work, deceptive conduct in some areas is not only condoned, but also encouraged or even required.***" *Id*, p.3 (emphasis added).

### Fact 19

**Plaintiff's Fact:**     *As she did so, Sgt. Peay stepped forward, directly in front of Ms. Johnson's truck, and then moved off to the side of Ms. Johnson's vehicle. Exh. 4, 22:15:35 – 22:15:42.*

**Defendants' Response:**     *Disputed. As Ms. Johnson backed up her vehicle, Sergeant Peay stepped forward, and as Ms. Johnson pulled forward again toward Sergeant Peay, he "had to back out of the way" because he "felt she was coming towards [him]." (Sergeant Peay Dep. 35:2–8.)*

**Plaintiff's Reply:**   As cited in Plaintiff's Motion, the video shows Sgt. Peay deliberately walking out from behind the protection of his own and another police vehicle, and directly in front of Plaintiff's vehicle.  Plaintiff's Fact 19 expresses a simple fact that is verifiable on the video.  Defendants' Response paraphrases Plaintiff's Fact, but adds what Sgt. Peay allegedly subjectively "felt." This does not "dispute" Plaintiff's expressed fact.

### Fact 20

**Plaintiff's Fact:**     *Ms. Johnson then began to pull forward, turning her steering wheel and her truck away from Sgt. Peay and his truck. Exh. 4, 22:15:42.*

**Defendants' Response:**     *Disputed. As Ms. Johnson pulled forward again toward Sergeant Peay, he "had to back out of the way" because he "felt she was coming towards [him]," (Sergeant Peay Dep. 35:2–8, 78:15–79:17), until she turned and "went directly toward Christian." (Sergeant Peay Dep. 85:18–21; see id. at 57:9–58:16.)*

**Plaintiff's Reply:**   The video cited in Plaintiff's Fact 20 confirms the accuracy of Plaintiff's statement of fact.  Defendants' response appears to "dispute" some fact that was not expressed.  In other words, Defendants have not properly provided evidence that disputes Fact 20.  Further, Sgt. Peay's subjective feelings that Ms. Johnson was purposely "coming towards him" or purposely going "directly toward Christian" do

not establish the claim that Ms. Johnson was targeting either of these officers or attempting to use her vehicle as a weapon against them. Ms. Johnson's robotic motions and very slow speed suggest otherwise.

### Fact 21

**Plaintiff's Fact:**     Sgt. Peay had stepped off to the passenger side of Johnson's truck, making sure he was not hit as Ms. Johnson pulled forward. Exh. 4, 22:15:43.

**Defendants' Response:**     Disputed. As Ms. Johnson pulled forward again toward Sergeant Peay, he "had to back out of the way" because he "felt she was coming towards [him]." (Sergeant Peay Dep. 35:2–8, 78:15–79:17.)

**Plaintiff's Reply:**     Defendants have essentially reworded Plaintiff's Fact 21. Such paraphrasing does not contradict the video and does not create a genuine issue of material fact. Further, what Sgt. Peay subjectively "felt" in the circumstance is not the standard with which to determine his liability or lack thereof. It is whether his actions were objectively reasonable in the circumstance.

### Fact 22

**Plaintiff's Fact:**     Beginning at Fact 16, when Ms. Johnson bumped into the side of his truck, Sgt. Peay never took his eyes off Ms. Johnson until he fired his weapon at her. Exh. 4, 22:15:31 – 22:15:44.

**Defendants' Response:**     Disputed. Sergeant Peay testified that he experienced tunnel vision during the incident: "After I saw Christian off to my right side and as she came to him and the stress increased, my eyesight came in a little bit and I was focused on her completely and I couldn't see my brother anymore. I wasn't seeing to the side as much as I was to the front." (Sergeant Peay Dep. 76:8–24.)

**Plaintiff's Reply:**     This fact is confirmed by the video. Defendants' response stating that Sgt. Peay "experienced tunnel vision during the incident" is subjective, and it confirms Plaintiff's Fact 22 rather than disputes it. As quoted in

Defendants' response, Sgt. Peay "couldn't see my brother anymore." Plaintiff contends that an objectively reasonable officer in the circumstance would not have imagined, without any basis, that Deputy Peay had carelessly walked out in front of his own vehicle and in the path of Plaintiff's vehicle approaching at 2-3 mph so as to be sandwiched between them.

### Fact 23

**Plaintiff's Fact:** *As Ms. Johnson pulled forward, as described in Fact 20, while she was traveling about 3 mph, she bumped into Deputy Christian Peay's stationary vehicle. Exh. 4, 22:15:44.*

**Defendants' Response:** *Disputed. A vehicle crash report estimated that Plaintiff's vehicle was traveling approximately 15 mph at the time of impact with Deputy Peay's truck. (Prescott Dep. 28:5–25; see Vehicle Crash Report, MCSO_00318–19.) Sergeant Peay and Deputy Peay estimated it was traveling between 5 and 10 miles per hour when it rammed Deputy Peay's truck. (Sergeant Peay Dep. 56:15–57:4; Deputy Peay Dep. 21:17–22:10.)*

**Plaintiff's Reply:** Again, the Court is well able to estimate from the real-time video Plaintiff's speed upon impact with the front of Deputy Peay's vehicle. There is no evidence how the 15 mph estimate was made that appears in the crash report, and 15 mph is controverted by the video. It was probably a "thin blue line" assertion (see Footnote 2, above), or inserted offhandedly, since the video shows nothing remotely close to such a speed. Based on the video, Defendants' response does not raise a *genuine* issue of material fact.

## Fact 24

**Plaintiff's Fact:**    After she bumped Christian Peay's vehicle, forward progress of her truck ceased.  Exh. 4, 22:15:44.

**Defendants' Response:**    Disputed. Sergeant Peay testified: "She rams the vehicle and she is still accelerating. Her tires are spinning. She is churning up the asphalt and she is still moving. She is pushing against that vehicle." (Sergeant Peay Dep. 85:18–86:13.)

**Plaintiff's Reply:**    In light of the video evidence, Sgt. Peay's deposition testimony here is clearly false, and it does not raise a genuine issue of material fact. Sgt. Peay fired his weapon when Ms. Johnson was stopped, a fraction of a second after the impact with Deputy Peay's truck.  Having been shot in the head, Plaintiff thereafter slumped down in the front seat.  The video shows her truck had stopped, and Sgt. Peay's claim that "***she is still accelerating. Her tires are spinning.  She is churning up the asphalt and she is still moving.  She is pushing against that vehicle***" S. Peay Depo. 86:3-6. (emphasis added) is manifestly false, as evident on the video at the time cited.  After viewing the video evidence, no reasonable jury could believe such claims. And, as is the case with all of Defendants' "visible" falsehoods, such fabrications do not create a disputed fact pursuant to *Scott v. Harris*.

## Fact 25

**Plaintiff's Fact:**    It was at this point that Sgt. Peay fired his weapon, the bullet entering Ms. Johnson's left eye and exiting her left temple. Exh. 4, 22:15:44; Exh. 7, Ms. Johnson's medical record.

**Defendants' Response:**    Disputed. Sergeant Peay testified that he fired at approximately the moment of impact between Ms. Johnson's truck and Deputy Peay's truck because "as she hit right here, Christian dropped out of my view. I didn't know if he was under her vehicle, if she had hit him, or if she was pinning him between the vehicles. And I fired to stop her from injuring my brother." (Sergeant Peay Dep. 59:1–4, 60:5–23.)

**Plaintiff's Reply:** Defendants' response confirms the fact expressed in Plaintiff's Fact 25. Defendants' ensuing argument about <u>why</u> Sgt. Peay fired his weapon at this point is subjective, extraneous, and cannot justify Defendants' claim that this is a disputed fact. The question is whether the actions he took were objectively reasonable in the circumstance and in light of the video.

## Fact 26

*Plaintiff's Fact:* *The above facts and allegations, as well as the facts provided below, are supported and confirmed in the dash-cam videos from Officer Dingman's and Officer Hardman's vehicles. Exhs. 4, 5.*
*Defendants' Response:* *Disputed. Please see individual responses to each factual assertion.*

**Plaintiff's Reply:** Plaintiff's Motion for Summary Judgment on Liability Against Sgt. Peay rests on whether the Court's own viewing of the videotape evidence agrees that Plaintiff's facts are supported and confirmed thereby, as contemplated by *Scott v. Harris* and its Tenth Circuit progeny. As detailed above and below, because of the video, Defendants' individual responses to Plaintiff's factual assertions fail to raise genuine issues of material fact.

## Fact 28

*Plaintiff's Fact:* *A small fraction of a second after Ms. Johnson bumped Deputy Peay's vehicle, Sgt. Peay fired his weapon through the windshield of Ms. Johnson's truck, the bullet striking her in the head. Exh. 4, 22:15:44; Exh. 5, 22:06:12. Exhibit 7, Ms. Johnson's medical record. See also Fact 25, supra.*
*Defendants' Response:* *Disputed. Sergeant Peay testified that he fired at approximately the moment of impact between Ms. Johnson's truck and Deputy Peay's truck because "as she hit right here, Christian dropped out of my view. I didn't know if he was under her vehicle,*

*if she had hit him, or if she was pinning him between the vehicles. And I fired to stop her from injuring my brother."* (Sergeant Peay Dep. 59:1–4, 60:5–23.)

**Plaintiff's Reply:** Defendants' response confirms the fact expressed in Plaintiff's Fact 28. Defendants' ensuing argument about <u>why</u> Sgt. Peay fired his weapon at this point is subjective, extraneous, and cannot justify Defendants' claim that this is a disputed fact. The question is whether the actions he took were objectively reasonable in the circumstance..

## Fact 29

***Plaintiff's Fact:*** *When he fired his weapon at Ms. Johnson's head, Sgt. Peay was in no immediate danger of serious bodily injury or death. Exh. 4, 22:15:31 – 22:15:44.*
***Defendants' Response:*** *Disputed. This is a conclusory and argumentative statement, not a statement of fact.*

**Plaintiff's Reply:** Plaintiff's fact is not argumentative, but is based solely on the cited video. Sgt. Peay was in no immediate danger of serious bodily injury or death. No reasonable juror could conclude otherwise.

## Fact 30

***Plaintiff's Fact:*** *When Sgt. Peay fired his weapon at Ms. Johnson's head, no other officer or person was in immediate danger of serious bodily injury or death (by being struck by Ms. Johnson's truck or through any other means). Exh. 4, 22:15:44; Exh. 5, 22:06:12.*
***Defendants' Response:*** *Disputed. This is a conclusory and argumentative statement, not a statement of fact. Deputy Peay believed that "she could have nailed me, I was standing right there," (Deputy Peay Dep. 66:12–22; Police Interview of Christian Peay ("Deputy Peay Interview") 7:18–20), and that "if Scott did not shoot her, I would have been struck by her vehicle." (Deputy Peay Dep. 68:1–15; MCSO_00926; see Deputy Peay Dep. 72:19–73:13.) Sergeant Peay feared for the safety of Deputy Peay and the other officers because Ms. Johnson was not backing down. (Interview with Sergeant Daniel Scott Peay ("Sergeant Peay Interview") 17:7–19:25.) Officers Dingman and Hardman likewise testified that they believed that Ms. Johnson's conduct placed Sergeant Peay, Deputy Peay, and the other officers on the scene in danger.*

(*Dingman Dep.* 28:8–30:18, 35:11–15; *Deposition of Todd Hardman* ("*Hardman Dep.*") 15:9–17:25.)

**Plaintiff's Reply:** Plaintiff's Fact 30 is a statement of fact based on evidence visible on the dash-cam videos cited. This fact is further supported by Christian Peay's deposition testimony cited below. Plaintiff's response to Defendants' citations purported to support disputed facts are presented in order as follows:

1. "Deputy Peay Dep. 66:12-22." The quotation "she could have nailed me, I was standing right there" is attributed to Christian Peay's deposition, but it is not Christian Peay speaking. It is defense counsel reading from the 2012 "Deputy Peay Interview," which is Defendants' next citation. *See* Item 2 below.

2. "Deputy Peay Interview, 7:18-20." Defendants' quotation ("she could have nailed me, I was standing right there") is misleading, taken out of context, and clearly false based on the dash-cam videos cited in Plaintiff's Fact 30. Contrary to the apparent certainty of the surgically selected quotation submitted by Defendants, Deputy Peay actually stated in 2012 "***I don't know, I guess*** she could have nailed me, I was standing right there." Defs' Exh.G, C. Peay Interview, 7:19-20 (emphasis added). In any case, the videos cited by Plaintiff show Deputy Peay alongside and well behind the front of his truck, which stopped Plaintiff's forward progress upon impact. He is shown to be in no danger of being "nailed" by Plaintiff's vehicle, regardless of his interview statement to Detective Glen of the North Salt Lake Police Department hours after the incident. Also see Footnote 2, above.

3. "<u>Deputy Peay Dep. 68:1-15</u>." Again, the quotation cited to Christian Peay's deposition ("if Scott did not shoot her, I would have been struck by her vehicle") is not spoken by Christian Peay in 2016; it is defense counsel reading from a 2012 entry on *Christian's Facebook page* posted the day after the incident. When asked if that was a fair representation of how Christian "felt personally" when the Facebook entry was posted, Christian replied as follows:

> Q. Is it fair to say that at least as of November 26, 2012, you felt personally that if Scott had not of taken the action he did, you would have been struck by her vehicle?
> MR. SYKES: Objection, leading.
> A. *I don't know.*

C. Peay Depo. 69:1-6 (emphasis added). Such ambiguous testimony, based on a 2012 posting on Facebook, and directly contrary to the videos, does not create a genuine issue of material fact under *Scott v. Harris* that can defeat Plaintiff's MSJ. Such evidence is also directly contrary to Christian Peay's (actual) deposition testimony quoted in Plaintiff's Motion, Doc. 37, Fact 32, p.10 of 17 ("I feel that Scott was not in danger at that time." . . . "Q. At any time that night before the shot was fired, were you in imminent danger of death or serious bodily injury? A. No."). Christian's testimony quoted above is confirmed by the video evidence.

4. "<u>MCSO_00926</u>." Defendants' reference to "MCSO_00926" is apparently in error since the page contains no relevant information. Pages subsequent to the cited page consist of Christian Peay's Incident Report. While Christian's Report

includes several statements that are contradicted by the video evidence, it does not include the statement attributed to this reference.

5. "Deputy Peay Dep. 72:19-73:13." The content of the audio of Christian's statement at the scene and captured on the dash-cam video is contradicted by the video evidence. Nevertheless, such audio does not support the claim "if Scott did not shoot her, I would have been struck by her vehicle," as represented.

6. "Sgt. Peay Interview 17:7-19:25." This citation refers to a long 2012 narrative expressing Sgt. Peay's subjective fears, self-serving comments, and other alleged factual claims that are contradicted by the video evidence. This narrative is devoid of any genuine material fact that is not contradicted by the video evidence supplied in Plaintiff's Fact 30. Further, Sgt. Peay's subjective reporting of this incident in 2012 is irrelevant to the determination of Plaintiff's Motion, which turns on the objective reasonableness of his use of deadly force, as shown by the videos.

7. "Dingman Dep. 28:8-30:18, 35:11-15. Officer Dingman's testimony on this point is inventive, to say the least. He is clearly quite loose and speculative with his statements involving "imminent danger." Such "true blue support" for his fellow law enforcement officer is a perfect example of the objectively false claims on summary judgment to which *Scott v. Harris* applies. Dingman claims his own life was in imminent danger ("Sure"), which is belied by the videos. *See* Plaintiff's Fact 30. While determining the credibility of witnesses is reserved for the jury, *Scott* instructs that the

Court should not accept such fictional testimony that is visibly contradicted by the video evidence. *Scott,* 550 U.S. at 380.

8. "Hardman Dep. 15:9-17:25." Hardman testified that Sgt. Peay's use of deadly force "seems reasonable to me." Hardman is a fellow law enforcement officer. When Hardman was informed that the Davis County Attorney determined that the shooting was "unjustified," Hardman replied "Well I think they erred." Hardman Depo. 20:1-3. Hardman admitted, however, that unlike the Davis County Attorney's Office, he had not analyzed all the videos nor read the witness statements nor produced a report specifying his findings. Hardman Depo. 21:12-19. Hardman's opinion is offered in stark disagreement with the thorough investigation of the Davis County Attorney's Office. It is also contradicted by the video evidence that shows that *no officer was in* *imminent* danger of serious bodily injury or death when Sgt. Peay fired his weapon.

### Fact 31

*Plaintiff's Fact:* In particular, when Sgt. Peay fired his weapon at Ms. Johnson's head, Deputy Christian Peay was not in immediate danger of serious bodily injury or death by being struck or pinned by Ms. Johnson's truck (or through any other means). Exh. 5, 22:06:11.

*Defendants' Response:* Disputed. This is a conclusory and argumentative statement, not a statement of fact. Both Sergeant Peay and Deputy Peay stated right after the incident that they believed they and/or other officers were in danger of serious bodily injury or death. (Sergeant Peay Dep. 39:3–9, 60:12–23, 78:8–14; see Deputy Peay Dep. 26:6–9 ("he thought that I was being ran over."); see Sergeant Peay Interview 18:17–19:9 ("I was very concerned that I had waited too long and that my brother had been hit."); Deputy Peay Dep. 57:14–58:6, 66:12–22, 68:3–15, 72:19–73:1.)

**Plaintiff's Reply:** See Plaintiff's Reply to Fact 30, above. The video evidence confirms Plaintiff's Fact 31. The Peay brothers' subjective thoughts and beliefs are not relevant to the determination of the instant Motion. What is relevant is whether an objectively reasonable officer in a similar circumstance would have had reason to believe that he or another officer or person was in imminent danger. Any imagined future danger is insufficient to justify deadly force. The fact that Sgt. Peay's brother was on the scene does not automatically equate to the brother objectively being in imminent danger, and Sgt. Peay had no genuine basis for making this unreasonable conclusion. The basis for Sgt. Peay's justification for his use of deadly force – that he feared for his brother – is not objectively reasonable according to the videos, and Sgt. Peay had no objectively reasonable basis for such paranoia.

## Fact 32

   *Plaintiff's Fact:*   *After viewing the videos, Christian Peay testified at his deposition that neither he, nor Sgt. Peay, were in any danger, as demonstrated in the following exchanges:*

> *Q. . . . . about 11:06 or 7, he fires the bullet. Watch this now. Do you see that bullet?*
> *A. Yes.*
> *Q. Do you see where Scott is standing?*
> *A. I do.*
> *Q. Do you think at the time that that bullet was fired, he was in imminent danger of death or serious bodily injury?*
> *\* \* \**
> *A. I feel that Scott was not in danger at that time.*
> *Exhibit 9, C. Peay Depo. 20:19–21:6 (emphasis added)*

> *Q. At any time that night before the shot was fired, were you in imminent danger of death or serious bodily injury?*
> *A. No.*
> *Id., 24:15–18.*
> **Defendants' Response:** *Disputed. This is a conclusory and argumentative statement, not a statement of fact. Deputy Peay also testified that his report and statements made closer to the time of the incident would more accurately reflect his beliefs at the time, (Deputy Peay Dep. 57:14–58:6, 75:19–76:3), which included that "she could have nailed me, I was standing right there," (Deputy Peay Dep. 66:12–22, Deputy Peay Interview 7:18–20), and that "if Scott did not shoot her, I would have been struck by her vehicle." (Deputy Peay Dep. 68:3–15; Deputy Peay Facebook post, MCSO_00926; see Deputy Peay Dep. 72:19–73:13.)*

**Plaintiff's Reply:** This is certainly a statement of fact of Christian Peay's testimony. Plaintiff incorporates here the discussion in the Fact 30 Reply, Items 1, 2, and 3, pertaining to the quotations attributed to Deputy Peay, which are so clearly contradicted by the video evidence, such that no reasonable jury could believe them. *See also* Plaintiff's Reply to Fact 30, above.

## Fact 33

**Plaintiff's Fact:** *This officer-involved shooting was evaluated by the Davis County Attorney's Office and determined to be unjustified. See Exhibit 8, Rawlings 1/22/13 letter to Sheriff Breshears. Among other things, Mr. Rawlings wrote "An objective and impartial analysis concludes that the use of potentially lethal force in shooting Kristine Johnson was not necessitated by the facts." Id., p.1.*

**Defendants' Response:** *Disputed. Mr. Rawlings' conclusion is not a statement of fact. Defendants object to the use of Mr. Rawlings' opinion because it is an inadmissible legal conclusion. See Specht v. Jensen, 853 F.2d 805, 807–10 (10th Cir. 1988) (legal conclusion of ultimate issue of violation of constitutional right in § 1983 case was inadmissible). Moreover, it is irrelevant to the reasonableness analysis under a qualified immunity standard.*

**Plaintiff's Reply:** It is certainly a fact that Mr. Rawlings investigated this incident, and he produced the letter to Sheriff Breshears, as Fact 33 states. *Specht v. Jensen* is distinguishable from the situation here because, unlike *Specht,* Mr. Rawlings is

not an expert witness retained by Plaintiff, but rather an impartial reviewer who was asked to conduct an objective investigation into this incident. Defendant has presented no applicable authority that would cause Mr. Rawlings' letter to be ruled inadmissible. *See also* Plaintiff's Reply to Fact 30, above.

### III.  PLAINTIFF'S DENIALS OF DEFENDANTS' "ADDITIONAL UNDISPUTED MATERIAL FACTS"

The following subpoints A-E constitute general, categorical denials of Defendants' "additional undisputed" facts (Defendants' Opposition, pp.16-20), as well as denials of specific facts:

### A.  Immaterial to Issues in this Case.

Defendants' Facts 1 - 6 and 23 are **undisputed** (for this Combined Reply and Response only). They are not material to the central issue of Plaintiff's Motion, which is whether Sgt. Peay's use of deadly force was justified under the constitutional standard that governs a free citizen's claim that law enforcement officials used excessive force, i.e., "whether the suspect poses an ***immediate threat to the safety*** of the officers or others." *Graham v. Connor*, 490 U.S. 386, 396 (1989) (emphasis added). None of these facts add any justification to Sgt. Peay's use of deadly force at the time he fired his weapon.

## B.    Denials Based on Contrary Video Evidence.

Many of Defendants' additional undisputed facts are denied because they conflict with the undisputed video evidence. *Scott v. Harris,* 550 U.S. at 380-81 (the Court of Appeals "should have viewed the facts in the light depicted by the videotape").

## C.    Denials Based on Subjective Belief.

Numerous other "additional facts" offered by Defendants describe Sgt. Peay's or his brother Christian's alleged **subjective thoughts** and beliefs. *See* Defendants' Additional Undisputed Facts 7, 8, 9, 10, 15, 16, 19, and 21. Plaintiff **disputes** all such "facts" because they are essentially subjective beliefs with a motive to deny the truth. We do not dispute that such subjective beliefs have been put forward, but we dispute that they are genuine, especially when they are directly contradicted by the video evidence.

Sgt. Peay's **subjective beliefs** are patently unreasonable in light of what is depicted by the dash-cam videos. The use of force by law enforcement officials in the course of making an arrest is properly analyzed under the Fourth Amendment's "**objective reasonableness**" standard. *Graham*, 490 U.S. at 388. For example, was it objectively reasonable for Sgt. Peay to conclude that "it wasn't my truck she was trying to hit, she was looking at me and coming after me and trying to hit me" (Defs' Fact 9)? At such a slow speed, as shown by the video? Even though she turned her steering wheel away from him? Such claims are neither "objective," nor supported by what is visible

on the dash-cam videos, or by any other evidence.  Was Sgt. Peay's use of deadly force justified based on the alleged expression of rage on Ms. Johnson's face (Defs' Facts 7, 10, 15, 16)?  Could Ms. Johnson actually have "nailed" Christian Peay because he was "standing right there" (Defs' Fact 19)?  When he was protected by two vehicles?  These so-called "undisputed material facts" are fabrications or exaggerations put forward for obvious reasons.

### D.  Denials Based on Motive to Deny.

Both Sgt. Peay and his brother, Christian Peay (in 2012), had (or have) **motive to deny, lie or exaggerate,** for obvious reasons.  Upon firing his weapon, Sgt. Peay would have quickly realized that no officer had actually been in danger of being struck by Ms. Johnson's vehicle.  He knew that would put him at risk of having used unjustified deadly force, which would put him personally, and his department and county, in a very tough spot should Mr. Johnson decide to sue.

None of the alleged subjective facts declared by the Peay brothers are corroborated by any other witness or the video evidence.  As well-versed deputies, they were/are very well aware of what claims would justify their actions, even if such claims are exaggerations or fabrications of what actually happened.

### E.  Denials Based on Voluntary Exposure to Increased Danger.

Much evidence supports these denials.  First of all, Plaintiff's maneuvering during the three-point turn is all at a very slow speed.  Second, as Plaintiff is pulling

forward toward Sgt. Peay's truck, Sgt. Peay, now on foot, approaches the front of Plaintiff's truck just as quickly as Plaintiff's truck approaches him. There was no objective danger to Sgt. Peay, but even if there was, it was due to his own actions of unnecessarily putting himself in harm's way. As reconfirmed by the Tenth Circuit just a few weeks ago, Officers cannot intentionally but unnecessarily place themselves in a dangerous position in order to justify using deadly force. *Pauly v. White,* – F.3d –, 2016 WL 502830, at *7 (10th Cir. 2016) ("we have held that '[t]he reasonableness of the use of force depends not only on whether the officers were in danger at the precise moment that they used force, ***but also on whether the officers' own 'reckless or deliberate conduct*** during the seizure unreasonably created the need to use such force,'" (emphasis added) quoting from *Jiron,* 392 F.3d at 415, which quotes from *Sevier v. City of Lawrence, Kan.,* 60 F.3d 695-699 (10th Cir. 1995)).

If in fact Sgt. Peay leaves the safety of the police vehicles that are preventing Ms. Johnson's forward motion, and unadvisedly walks up to within a foot or two of the front of Plaintiff's truck as she continues to maneuver, he has put himself in harm's way. As Plaintiff backs up her vehicle, Peay continues walking forward, unnecessarily placing himself in even greater alleged "danger." He steps to the side of Plaintiff's path, out of harm's way, before she pulls forward again. He is thus personally out of danger of being hit. He was clearly not worried about his safety. The video

shows that the wheels on Plaintiff's truck (just the rims are left) are turning *away* from Sgt. Peay as she pulls forward.

Based on the irrelevancy and questionable veracity of the Peay brothers' subjective thoughts, and how they are contradicted, or alternatively, not supported, by the video evidence, Plaintiff has a clear basis for pointing to the unreasonableness or the contrived nature of such claimed justifications for using deadly force.

F.    **Denials of Remaining Additional Facts**.

Defendants' Additional Facts not discussed above are addressed as follows:

### Defs' Fact 7

*Sergeant Peay came around the rear of his vehicle and realized Ms. Johnson "had a look of rage on her face . . . . directed at me," which influenced how he thought things would transpire. (Sergeant Peay Interview 17:16–18:10; Sergeant Peay Dep. 35:2–8, 43:2–16, 46:14–48:9.)*

**Response:    Disputed.**   See III. B, C and D above.  This alleged "look of rage on her face" allegedly was only seen by Sgt. Peay and his brother, both of whom have (or had) a motive to deny or exaggerate.  It is a subjective perception.  It is also very difficult to imagine that Sgt. Peay could have perceived the alleged look of rage on someone's face during the 10 o'clock hour in late November with sirens blaring and pulsating strobe lights of 6-10 police vehicles illuminating the area.

### Defs' Fact 8

*Sergeant Peay believed Ms. Johnson "was turning around and was going to use the truck as a weapon" because "she wasn't pinned in, she could have went up the road or stopped, but rather she was turning and coming at us." (Sergeant Peay Dep. 43:17–44:5; see id. at 48:13–19*

*("She was clearly using her vehicle as a weapon to come at me."); id. at 75:4–5 ("She wasn't fleeing anymore, she was attacking us."); id. at 89:12–15 ("she is using her vehicle as a weapon"); Sergeant Peay Interview 17:16–18:10.)*

        **Response:**    **Disputed.** Plaintiff admits that Sgt. Peay made these self-

serving, subjective statements, but deny their accuracy. See III. B, C and D above.

## Defs' Fact 9

*Sergeant Peay said about Ms. Johnson driving her vehicle towards him: "there was no question in my mind when she came, that she was trying to hit me, that it wasn't my truck she was trying to hit, she was looking at me and coming after me and trying to hit me." (Sergeant Peay Dep. 43:23–44:5; Sergeant Peay Interview 17:16–18:10.)*

        **Response:**    **Disputed.** See III. B, C and D above. Plaintiff admits that

Sgt. Peay made the self-serving subjective statements, but they are certainly disputed.

## Defs' Fact 10

*Sergeant Peay also testified: "she was focused on me and she tried to hit me. She was looking at me. I could clearly see her through the windshield. She was screaming and revving her engine and she came at me . . . . She had an expression of rage on her face . . . ." (Sergeant Peay Dep. 46:14–48:9.)*

        **Response:**    **Disputed.** See III. B, C and D above. Plaintiff admits that

Sgt. Peay made the self-serving subjective statements, but they are certainly disputed.

## Defs' Fact 11

*Ms. Johnson's car came "within inches or a foot" of Sergeant Peay, pushing his truck towards him, but Sergeant Peay was able to "bend backwards at the waist and move [his] feet and legs backwards to avoid being hit." (Sergeant Peay Dep. 56:7–14, 78:15–80:25.)*

        **Response:**    **Disputed.** This alleged fact is blatantly untrue. It is

contradicted by the video evidence, which shows what happened with unquestioned

accuracy. Sgt. Peay strides up within a foot or two of Plaintiff's vehicle, not the other way around.

### Defs' Fact 12

*Ms. Johnson backed up again and Sergeant Peay "tried to communicate with her yelling for her to stop and get out of her truck . . . ." (Sergeant Peay Dep. 81:17–23; Sergeant Peay Interview 17:16–18:10.)*

**Response:** **Disputed.** The Dingman video confirms that at least one siren was wailing during this time, which would make such "communication" ineffective.

Sgt. Peay's claim is also contradicted by his interview testimony, where he stated:

> I had, instructed Christian to be the contact person with her prior to this coming to the end. I said if you can, you are the one that is gonna give commands. And he acknowledged that, and that's how we intended for that to, to happen, but it obviously didn't go as planned.

Sgt. Peay interview, p.8. Defendants' reference to that interview at "17:16-18:10" is in error. No such statement is present on those pages.

### Defs' Fact 13

*Deputy Peay also saw that when Ms. Johnson turned around on Cottonwood Drive she "struck Sgt. Peay's Patrol vehicle and nearly hit[] Sgt. Peay" who "was outside of his vehicle and standing on the right side of it at the time giving the driver commands to stop." (MCSO_00021.)*

**Response:** **Disputed.** The video evidence contradicts Deputy Peay's claim that Plaintiff's vehicle "nearly hit Sgt. Peay."

### Defs' Fact 14

*Deputy Peay exited his patrol truck as "Sgt. Peay was still giving her commands to stop." (MCSO_00021.)*

**Response:** **Disputed.** See Response to Defs' Fact 12.

### Defs' Fact 17

Ms. Johnson then drove "right at" Deputy Peay, striking "the left side of [his] front bumper," with enough force to move his patrol vehicle. (MCSO_00021; see Deputy Peay Interview 17:14–16.)

**Response:** **Disputed.** As shown on the videos, Deputy Peay was well behind the front bumper of his truck and not in danger of being struck by Plaintiff's vehicle. It is also a subjective presumption that Ms. Johnson was purposefully driving "right at" Deputy Peay.

### Defs' Fact 18

As Ms. Johnson drove forward into Deputy Peay's vehicle, Deputy Peay stepped back to avoid being hit. (See Hardman dash-cam video, Pl.'s Ex. 5 at 22:06:00–22:06:15; Sergeant Peay Dep. 61:14–17.)

**Response:** **Disputed.** This alleged fact is contradicted by the video evidence. While Deputy Peay did step back, he was never in danger of being hit because even before he stepped back, he was shielded by his truck and the other vehicle to his left. Additionally, Sgt. Peay's alleged perception, "stepped back to avoid being hit," is subjective, and therefore irrelevant.

### Defs' Fact 20

Sergeant Peay, who was experiencing tunnel vision, could not see Deputy Peay as Ms. Johnson rammed Deputy Peay's truck. (Sergeant Peay Dep. 76:8–24.)

**Response:** **Disputed.** If Sgt. Peay indeed could not see his brother, which is doubtful based on the video, it is only *because his brother was well out of the way*

of being struck by Plaintiff's vehicle. Based on the positioning of the actors and vehicles shown on Hardman's video, Sgt. Peay would have been able to see his brother if Christian had been careless enough to step between his truck and Plaintiff's oncoming vehicle. Christian was not so careless, nor would any reasonable officer be so careless. Sgt. Peay's justification that he feared for his brother's life is unreasonable in the circumstance. Additionally, Sgt. Peay's alleged "tunnel vision" is subjective to the officer, not objective, and therefore irrelevant on summary judgment.

### Defs' Fact 22

*After the shot was fired, Ms. Johnson's truck stopped. (Sergeant Peay Dep. 60:24–25.)*

**Response: Disputed.** This does not tell the whole story. The video evidence shows that Ms. Johnson's truck had stopped just before Sgt. Peay fired his weapon. See Plaintiff's Fact 24 and her Reply to Defendants' Response thereto.

### Defs' Fact 24

*Ms. Johnson admitted shortly after the incident that "she was attempting death by cop when she repeatedly rammed her car into a police vehicle," and that she "had every intention of trying to kill [her]self . . . ." (Johnson Dep. 67:5–20, 75:12–77:21; Ms. Johnson Interview 2:13–17; Ms. Johnson Medical Records, ORMC 245–247.)*

**Response: Disputed.** This grossly and blatantly misrepresents Ms. Johnson's testimony. These quotations are defense counsel reading from some document that is not identified on the cited pages. Ms. Johnson clearly denied any

recollection of such statements. She had no recollection of the incident. She clarified how such "false admissions" came to be recorded:

> MS. JOHNSON: Anything that I said to them was what had been told to me after I regained consciousness. I do not recall speaking about suicide. I do recall them believing that I attempted to take a police officer's life, and that I was intent on trying to kill a police officer. And I remember them suggesting that perhaps what I was trying to attempt was a suicide by cop.

Johnson Depo. 77:15-21.

### Defs' Fact 25

*Deputy Peay admitted during his deposition that he was "very bitter" towards the Morgan County Sheriff's Office on account of his alleged forced resignation in 2013 for matters unrelated to this incident with Ms. Johnson, and that his bitterness might have influenced how he now remembers these events. (Deputy Peay Dep. 75:19–76:4, 78:4–5; see id. at 30:11–37:1.)*

**Response: Admitted.** This fact is a good reflection of Deputy Peay's honesty in 2016. Such honesty should go to support the veracity of his deposition testimony, which was taken under oath.

## IV.  ARGUMENT

## POINT I

### ~ Video Evidence Compels Summary Judgment for Plaintiff ~

**PLAINTIFF IS ENTITLED TO SUMMARY JUDGMENT BECAUSE VIDEO EVIDENCE DEMONSTRATES THAT SGT. SCOTT PEAY USED CONSTITUTIONALLY EXCESSIVE DEADLY FORCE WHEN HE SHOT OUT KRISTINE BIGGS' EYE.**

If Plaintiff's version of the events is "blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007).  In *Scott,* the Defendant deputy was the party moving for summary judgment, and it was the Plaintiff's version of the events that was blatantly contradicted by the video record.  In the case at bar, it is the opposite.  Plaintiff is the moving party, and Defendants' version of events is blatantly contradicted by the video record, as detailed above.  But *Scott* applies both ways.  It allows both a Defendant and Plaintiff to obtain summary judgment based on video evidence.  *Woodcock v. City of Bowling Green, Kentucky, et al.,* __F.Supp.3d__ (W.D.KY 2-24-2016) (2016 WL 742922).

A. **What Is Undisputed**.  Defendants quibble and engage in pettifoggery over undisputed issues. They actually suggest that Plaintiff's Motion for Summary Judgment should be denied because Plaintiff did not prove with undisputed facts that which both sides agree is undisputed.  That would surely place form over substance.

There is simply no dispute about key elements of a § 1983 action. For example, there is no dispute that Sgt. Peay was acting under the color of law. He was a uniformed deputy sheriff on duty when he shot out Kristine Biggs' eye. There is also no dispute that Sgt. Peay's use of deadly force proximately caused the loss of Plaintiff's eye, with its associated injuries, due to a gunshot to the head. It makes little sense to kill trees and waste effort to provide pages of argument on that which is truly undisputed by both sides.

      **B.**    <u>**What Is Clearly Established**</u>. Defendants also pettifog with respect to "clearly established." "Plaintiff completely fails to even address, let alone prove, that the law was clearly established." Defs' Opp., p.34 of 39. This is incorrect. At page iii, in Plaintiff's "Elements" in her Motion, Plaintiff quoted and cited to two United States Supreme Court decisions that are clearly on point: *Tennessee v. Garner*, 471 U.S. 1, 11 (1985) ("Where the suspect poses no immediate threat to the officer and no threat to others, the harm resulting from failing to apprehend him does not justify the use of deadly force") and *Graham v. Connor*, 490 U.S. 386, 396 (1989) ("whether the suspect poses an immediate threat to the safety of the officers or others"). These important, well-established precedents clearly existed at the time of the 2012 incident in question, and Plaintiff's briefing on the instant Motion goes to prove that Sgt. Peay violated this clearly established law. Defendants' "clearly established" argument under section II(B) at page 34 of 39 does not argue that the law was <u>not</u> clearly established; rather it

proceeds to argue that Sgt. Peay's use of deadly force was reasonable. The facts of this case, visible on the dash-cam videos, dictate otherwise.

It was further clearly established in November 2012 that a police officer cannot use unnecessary or excessive deadly force, like shooting a motorist, absent the *Graham* factors.

> [There are] three, non-exclusive factors relevant to [an] excessive force inquiry: [1] the ***severity of the crime*** at issue, [2] whether the suspect poses an ***immediate threat*** to the safety of the officers or others, and [3] whether he is ***actively resisting arrest*** or attempting to evade arrest by flight. *Fisher v. City of Las Cruces,* 584 F.3d 888, 894 (10th Cir.2009) (citing *Graham*) (internal quotation marks and citations omitted). Whether a use of force was reasonable is an objective inquiry, without regard to a police officer's intent or motivation. See *id.*

*Lundstrom v. Romero,* 616 F.3d 1108, 1126 (10th Cir. 2010) (emphasis added, bracketed text in original).

(1) **Severity of the Crime**. Ms. Johnson's initial "crime" was a traffic infraction. It was nighttime, and she did not have her running lights on. After Deputy Peay attempted to pull her over, she could be said to have been driving recklessly, and she was later found to have been driving under the influence of alcohol. Surely such crimes do not instill a predisposition that deadly force might be needed to ensure such a criminal doesn't get away. She was being pulled over because she did not have her vehicle's lights on.

(2) **Immediate Threat**. Plaintiff has argued and presented abundant evidence regarding the lack of any immediate threat in this incident. *See* Plaintiff's Facts

16, 17, 20, 21, 29, 30, 31, 32, and Plaintiff's Replies to Defendants' Responses thereto. The video clearly shows the low speed impacts and all officers behind cars and not in danger.

(3)     **Actively Resisting Arrest**. The essence of Ms. Johnson's violations at the time the force was used was the refusal to follow the officers' orders, and two extremely low-speed collisions, which are obvious on the video. *See also* Point I(F) herein *supra*.

C.     **The Definitive Nature of *Scott v. Harris*.** *Scott v. Harris,* 550 U.S. 372 (2007) is definitive and determinative in this case. It compels both the granting of Plaintiff's MSJ and denial of Defendants' MSJ. If the law is, as Plaintiff's counsel sincerely believes, that district courts <u>must</u> rely on video evidence and disregard alleged questions of fact that contradict the video evidence, then Plaintiff is certainly entitled to summary judgment in this case. The video evidence absolutely establishes that the deadly force in this case was excessive and did not comport with *Tennessee v. Garner* or *Graham v. Connor* and their Tenth Circuit progeny.

*Scott v. Harris* changed the legal landscape for determining summary judgment motions. The U.S. Supreme Court decided to relegate to a judicial trash heap artificial reasons to deny summary judgment where the opposing party offers evidence that is flatly contradicted by video. Defendants here are asking this Court to essentially disregard the U.S. Supreme Court.

Scott v. Harris has been followed in a wide variety of cases since it was handed down in 2007. Voluminous legal precedent, including many cases from the Tenth Circuit, have used *Scott* both to grant and deny motions for summary judgment on qualified immunity. This trend is salutary.

        **D.**    ***Scott v. Harris* Determines This Case**. *Scott v. Harris* determines the outcome of this case, favoring (1) the granting of Plaintiff's MSJ; and (2) denying Defendants' MSJ. This was made clear in *Harper v. Rose*, 2012 WL 1150463 (D.Utah 2012), a decision authored by Judge Tena Campbell. There, a motorist alleged that police officers used excessive force when he was repeatedly tased at a traffic stop during an arrest. *Id* at 1. The *entire stop was captured* by one officer's dash-cam, and to some degree, by other officers' dash-cams. In deciding that no reasonable jury could believe that Deputy Rose was entitled to qualified immunity, the Court referred to the video approximately 24 times. For example, under the Court's Section 2 Analysis, it stated "based on a review of the Rose video and the Purcell video, which together capture a significant portion of the incident." Your Honor then held:

> If a videotape of the incident is in the record, ***anything depicted in the video that contradicts and makes unbelievable the plaintiff's characterization of the incident overrides the conflicting testimony***. *See Scott v. Harris,* 550 U.S. 372, 380 (2007) (noting that "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by [a videotape in] the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment").

*Harper* at 4 (emphasis added). *See also, Jones v. Norton,* 3 F.Supp.3d 1170, 1187 (D.Utah 2014), FN47 ("Anything depicted on a videotape of the incident that contradicts and makes unbelievable . . . [a party's] characterization of the incident overrides conflicting testimony" (parenthetical added), citing *Scott v. Harris*; affirmed, *Jones v. Norton,* 809 F.3d 504 (10th Cir. 2015)). These same principles apply here. If the video "contradicts and makes unbelievable" Defendants' "characterization of the incident," the video overrides the Defendants' characterizations.

       E. ***Scott v. Harris* in the Tenth Circuit**. The Tenth Circuit has repeatedly upheld *Scott v. Harris* and ruled that video that contradicts either party's version of the facts must override other evidence on summary judgment. For example, in *Estate of Booker v. Gomez,* 745 F.3d 405 (10th Cir. 2014), a pre-trial detainee was horribly abused in the booking process in a Denver jail. *Id*. at 409-10. Defendants denied much of what the video confirmed, but the video was relied on repeatedly to resolve factual questions in upholding the denial of qualified immunity. *Id.* at 410, 414-416. For example, it confirmed that Mr. Booker was *not resisting*, as the officers claimed. *Id.* at 424. "The video evidence suggests Mr. Booker was limp and unconscious when the Defendants carried him into the holding cell. Deposition testimony from the Defendants, on the other hand, varies considerably and suggests that Mr. Booker was still struggling after they carried him into the holding cell." *Id.* at 431. The video rules.

In *Valencia v. DeLuca,* 612 Fed.Appx 512 (10th Cir. 2015), most of a traffic stop and arrest was recorded by the dash-cams of several police officers. The trial court granted the defendants summary judgment and the plaintiff appealed. The court noted that although it was compelled to construe the evidence in the light most favorable to the plaintiff Valencia, "we, like the district court, ***must view the facts in the light depicted by the video recording.*** *Scott v. Harris*, 550 U.S. 372, 381, . . . . ***We therefore cannot adopt a party's version of the facts where there is clear contrary video evidence.***" *Valencia*, 612 Fed.Appx at 514 (emphasis added; internal punctuation and citations omitted). In the *Biggs* case, the Court should adopt Plaintiff's version of the facts because of the "clear ... video evidence."

In *Thomas v. Durastanti,* 607 F.3d 655 (10th Cir. 2010), an arrestee brought a *Bivens* action against a BATF agent who shot him, alleging excessive force. The agent filed an appeal from his denial of summary judgment on the grounds of qualified immunity. The Tenth Circuit noted "we rely upon facts established by a video capturing much of the event together with Plaintiff's version of the remaining facts." *Thomas,* 607 F.3d at 658. The court then stated the appropriate standard determining the relevant facts under *Scott v. Harris. Id.* at 659. The court noted that it usually must adopt the Plaintiff's version of the facts, but <u>not</u> "to the extent there is ***clear contrary video evidence*** of the incident at issue." *Thomas,* 607 F.3d at 659 (emphasis added). "We rely on that video evidence here . . . ." *Id.*

It is interesting to note that the *Thomas* case involved allegations of the reckless driving of a car that actually hit an agent, a car that pulled into a gas station 10 seconds ahead of a state trooper and two ATF agents. ATF agents in plainclothes approached the Thomas car with guns drawn. Thomas feared a robbery. *Id.* at 661. As the car started to drive away, it narrowly missed one of the officers, who "had to move out of the way of the Lincoln." *Id.* The defendant, Durastanti, was concerned that the agent that was nearly missed was in distress, and "the Lincoln was coming directly at him." *Id.* Durastanti fired several shots at the driver, but the car continued out of the parking lot, "hitting agent Durastanti, who rolled off the hood, landed on his feet, turned around, and then fired two more shots at the back of the Lincoln" as it proceeded down the street. *Id.* A chase ensued. The driver pled guilty to two counts of assaulting a federal officer and admitted that "he had driven at the agents as he drove out the convenience store parking lot." *Id.* In other words, the objective facts as shown by the video in *Thomas* show conclusively that the agent was entitled to qualified immunity. In *Biggs Johnson*, the facts shown by the video conclusively support excessive force being used.

In *White v. Martin,* 425 Fed.Appx. 736 (10th Cir. 2011), a trooper's dash-cam video captured most, but not all, of a traffic stop for a misdemeanor, where excessive force was allegedly applied to an ambulance worker. The district court *denied* a qualified immunity motion to the state trooper, which was *upheld* by the Tenth Circuit.

*Id.* at 737-38. "The videos depict much of the encounter, but they leave open questions about the degree of Mr. White's resistance to arrest and the timing and extent of force levied by Trooper Martin. The video evidence in this case stands in contrast to *Scott v. Harris*...." *Id.* at 743. The Tenth Circuit then noted that "[u]nlike *Scott,* where the Supreme Court determined that the material facts were not in dispute... the district court here determined there is a genuine issue of material fact as to whether Trooper Martin exercised unreasonable excessive force." *Id.* Based on the video that could be viewed, and viewing the facts in the light most favorable to the Plaintiff, who was opposing summary judgment, the court found the officer's conduct "objectively unreasonable under *Graham v. Connor*," and upheld the denial of summary judgment. *Id.* However, it is pretty clear that had the video captured all of the relevant facts, as it did in the instant case, summary judgment would probably have been appropriate for the plaintiff.

In *Becker v. Bateman,* 709 F.3d 1019 (10th Cir. 2013), a detainee brought an action against a police chief when the detainee sustained a severe traumatic brain injury in a confrontation during a traffic stop. Most of the stop was recorded by the officer's dash-cam. *Becker,* 709 F.3d at 1021. The court noted that "the question of objective reasonableness is *not* for the jury to decide where the facts are uncontroverted." *Id.* at 1025, quoting *Mecham v. Frazier,* 500 F.3d 1200, 1204 (10th Cir. 2007). Biggs Johnson contends that because of the video, "the facts are uncontroverted" with respect

to the unreasonableness of this shooting. Where, however, relevant facts are controverted, notwithstanding the dash-cam video, then summary judgment is not appropriate for the Defendant. *Becker,* 709 F.3d at 1025.

        **F.**    **Other Federal Case Support for *Scott v. Harris***. Plaintiff has looked at dozens of cases throughout the country over the past nine years addressing *Scott v. Harris* and videotape. Many of those cases are summarized in this Memorandum. There is universal agreement on the principle that where a videotape shows all or a sufficient number of the relevant facts, it takes precedence over denials, affidavits, and other evidence to the contrary. Most of these cases, of course, are cases where the defendant officer seeks summary judgment on the basis of qualified immunity.

        The cases upholding the videotape over other evidence go both ways, sometimes compelling the denial of the officer's qualified immunity MSJ, and sometimes compelling the granting of it. We have not been able to locate very many cases where the plaintiff has used the videotape offensively, i.e., in order to induce the court *to grant the plaintiff summary judgment.* However, we have found one significant case handed down on February 24, 2016, doing just that. We commend to the Court the case of *Woodcock v. City of Bowling Green, Kentucky, et al.,* __F.Supp.3d__ (W.D.KY 2-24-2016) (2016 WL 742922). The court's opinion in that case begins with an unusual statement that we believe also applies in this case:

        This action arises from the tragic shooting of Gregory Harrison by Bowling Green police officer Keith Casada. ***The Court has great respect and***

> **admiration for the Bowling Green Police Department** and law enforcement generally. It is a difficult and dangerous job we ask them to do, and most times, they do it exceedingly well. In this case, **there is nothing sinister or evil about Officer Casada.** He simply used more force than was reasonable at the time he decided to use force.

*Woodcock,* at 1 (emphasis added). This same exact language probably describes Sgt. Scott Peay. He is undoubtedly a good officer, as discovery did not disclose anything bad or sinister about the man. "He simply used more force than was reasonable at the time he decided to use force." *Id.* As a result, in *Woodcock,* the court *granted the plaintiff's summary judgment* against Officer Casada for the fatal shooting of Gregory Harrison.

There are many similarities between *Woodcock* and *Biggs Johnson.* In *Woodcock,* Harrison had called 911 and reported that he was going to beat up or kill his brother, that he was on the way to a certain bridge, and "if they [the police] want me, kill me," before disconnecting. *Id.* at 2. Casada was one of the officers dispatched. Harrison was obviously impaired by alcohol, and he threatened to kill his family and his brother, on multiple occasions. *Id.* at 3.

Multiple officers came to the scene. Because the shooting and the preceding events "were recorded by a camera affixed to Sergeant Donitka Kay's police car. . . the underlying facts of the case are largely undisputed." *Id.* at 2. Likewise, in *Biggs Johnson,* the relevant events were recorded by dash-cams, so the underlying facts in *Biggs Johnson* are "largely undisputed."

The court then proceeded to give a detailed description of the events recorded by the dash-cams. *Id.,* 5-11. The court noted several inconsistencies between the facts testified by Casada in his deposition and what is shown on the dash-cam video. *Id.* at 9, see particularly FN7, where Casada reported seeing what he believed to be the butt of a gun in Harrison's clothing, but "this is inconsistent with the dash-cam video and police radio." *Id.*

Harrison did not obey several police orders to show his left hand or to sit down. *Id.* at 9. This is comparable to allegations that Defendants gave Biggs Johnson certain orders, which she did not follow.

The *Woodcock* court then addresses the § 1983 claim of excessive deadly force against Casada, who shot and killed Harrison. The court begins this discussion by noting the holding in *Scott v. Harris*, including the very important point that when material facts are not in dispute because of video evidence, the use of force "is a pure question of law." *Id.* at 7. The trial court noted various Sixth Circuit decisions that instruct "us to determine as a matter of law whether the events depicted on the video, taken in the light most favorable to the [Plaintiff], show the Officers' conduct was objectively reasonable." *Id.* at 7 (citations omitted). Based upon consideration of the *Graham* factors, and "from the perspective of a reasonable officer on the scene and not using hindsight, ***the court concludes that the use of deadly force in this case was not objectively reasonable***." *Id.* at 20 (emphasis added).

The court then considers the *Graham* factors, one of which is the *severity of the crime*, which in this case, weighed against the officer. At most, Harrison was guilty of a misdemeanor offense or offenses, which "lacked the severity justified the use of lethal force." *Id.* at 9. The court then discussed some of the charges, such as public intoxication (a misdemeanor), disorderly conduct (a misdemeanor), and terroristic threatening (a misdemeanor).

All of these *Graham* factors, similarly, weigh in favor of Plaintiff's MSJ in *Biggs*. Plaintiff was guilty, at most, of misdemeanors. These could have included failure to stay in her lane, speeding, failure to pull over, striking of a police vehicle at low speed, etc. Defendants try to describe these as serious offenses and felonies, but the video belies these claims. Driving under the influence is usually a misdemeanor in Utah, handled by the Justice Courts.

*Woodcock* then addresses actively *resisting arrest* or *attempting to evade* arrest by flight, which are other *Graham* factors. *Id.* at 10. "The court finds that it, too, weighs against Casada." *Id.* The court points out that "Harrison's level of resistance is relevant to the constitutional inquiry." *Id.* In *Woodcock*, "the crux of the resistance was the refusal to follow officers' commands rather than actively attacking or threatening officers of others." *Id.* Similarly, in *Biggs Johnson*, we have the same "crux." It is not even certain that Biggs heard any commands from the officers, but the essence of her violations at the time the force was used was the refusal to follow the officers' orders, and two extremely

low-speed collisions, which are obvious on the video. Any resistance or attempt to evade is truly minor.

The *Woodcock* court next addressed the third *Graham* factor as to whether there was probable cause to believe that Harrison posed "an imminent threat of serious physical harm to officers or to others." *Id.* at 11. The court characterized this factor as "the crux of the case." *Id.* It also noted that the reasonableness of the use of deadly force is measured "at a particular time based upon an objective assessment of the ***danger a suspect poses at that moment***." *Id.* (emphasis added)*,* citing a Sixth Circuit case. This is similar to Tenth Circuit law in *Pauly,* – F.3d at 7, 13. The *Woodcock* court then noted that based on the video, there was no objective evidence that under the totality of the circumstances, Harrison presented an imminent threat of serious physical harm to the officers or to others. *Id.* This is so even though Harrison had called the police department twice that night, and told the department that he had a gun, and that he threatened to kill various people. *Id.*

The officer pointed out, as do the Defendants in the *Biggs* case, that this is a "dynamic scene," created by Harrison's repeated refusals to follow police orders. *Id.* The officers cited a Sixth Circuit case, *Pollard v. City of Columbus,* 780 F.3d 395 (6th Cir. 2015) involving a rape suspect who led the officers on a vehicular pursuit before going the wrong way on a road and ramming a semi-trailer head-on. *Id.* The suspect, after he was cornered, clasped his hands into a shooting posture and pointed them at officers,

after which he was shot. *Id.*. In contrast, the court then pointed out that there was no warrant issued for Harrison's arrest, let alone for violent offenses. *Id.* at 12. The same was true for Biggs. There was also no clear die-before-surrender mentality, as exhibited by the decedent in *Pollard.*

Defendants there, as here, also raised the common defense that officers are faced with split-second decisions that unfold quickly. The court responded by pointing out that the officers in this case had 12 minutes, as shown by the video, to assess the situation, before Casada fired the fatal bullet.

Applied to the facts of *Biggs Johnson,* the Court should make similar evaluations and decisions. Biggs did not involve a split-second decision issue. Officers, particularly Defendant Scott Peay, had followed Biggs for many miles. She had not done anything particularly harmful or dangerous.

Just before the fatal shot was fired, in a period of about 90-120 seconds, Biggs is observed to be doing a three-point turn, which she completes fairly well, after which she makes minimal contact with Sgt. Peay's police vehicle. Sgt. Peay is out of the way, protected by his and other police vehicles during this 2-4 mph "crash."[3]

---

[3] The speed of the vehicle can be easily calculated. A vehicle going 1 mph travels 1.49 feet per second (5280 feet ÷ 3600 seconds [one hour]). The Court can easily estimate the distance Ms. Johnson's vehicle travels and measure the time taken to cover that distance (or note the timecode on the video). We calculate the speed at impact with Sgt. Peay's vehicle at 2-3 mph. Biggs then backs up approximately 8 feet and comes forward in 3 seconds before impacting Deputy Peay's vehicle, indicating an average speed of approximately 2 mph for that impact.

Basically, Sgt. Peay had plenty of time to assess the situation. He clearly was not in danger, and does not claim to have been at this point. S. Peay Depo. 27:14-16. But he claims that he shot Ms. Biggs because he believed his brother was in danger. However, due to Sgt. Peay's location, and being out of the way of the Biggs vehicle, he had plenty of time to look and find out where his brother was. This is all evidenced by the video.

There is no requirement here to examine subjective evidence like Sgt. Peay's alleged tunnel vision. Plaintiff's Facts and Replies to Defendants' Responses indicate the true circumstances. There was no need for split-second decisions, or any kind of sudden escalation of events, or any kind of a serious threat to any of the officers at the time of the deadly force. *Id.* at 12. Biggs was clearly unarmed, her car was running on three rims, and there were many alternatives to the use of deadly force.

The *Woodcock* court then examines the issue of the officer being in danger and rejects it because of the video. *Id.* at 15. During the 12 minutes of this event, Officer Casada claimed that he thought Harrison might have a gun. Yet, he asked his fellow officer "to abandon her position of cover on the passenger side of her cruiser and go around to the driver's side of her cruiser" to manually adjust the searchlight. *Id.* at 12. The court held that "however, an officer exposing herself by abandoning her cover right after that statement and nothing happening decreases the reasonableness of the perception of imminent action." *Id.*

The court further noted that Officer Casada claimed that Harrison had gotten close enough to him and Officer Kay that he believed Harrison "presented a risk of death or serious bodily harm to him, if Harrison had a handgun." *Id.* at 13. The court responded that "Casada's subjective perception of a threat, of course, are [sic] not pertinent to the objectively reasonableness inquiry," citing *Graham*. *Id.*

The *Woodcock* court then addresses whether or not a warning was given, and notes that "it is unclear whether Harrison understood these warnings because he was intoxicated." *Id.* The same applies to Biggs Johnson. There were multiple sirens blaring, strobe lights flashing, and windows closed in November. It is quite unclear whether or not Biggs could have even heard any kind of a warning given, particularly because she was also quite intoxicated. Her blood alcohol level was reported to be exceedingly high at admission by Ogden Regional Medical Center.

The *Woodcock* court next addresses the "suspect's mental state." *Id.* It notes that mental state is one factor that must be taken into account, to the extent that it could be known. Defendants in *Biggs* try to claim that Biggs' mental state was at issue. *See* Defs' Add'l Fact 23. Clearly, however, such a point, even if true, is totally irrelevant because the officers could not have known it. Defs' Add'l Fact 23.

The court concludes its discussion of the above issues by noting that it has considered the pertinent factors, but finds that the danger presented by Harrison "was not so grave as to justify the use of deadly force." *Id.* at 15. A reasonable officer in

Casada's position would not have had probable cause to believe that Harrison presented an imminent threat of serious harm to the officers or to others at the time he was shot. The court found that "Casada's use of deadly force was objectively unreasonable and therefore violated the Fourth Amendment." *Id.* at 15. Likewise, based on the video, Sgt. Scott Peay's conduct was objectively unreasonable, as the danger presented by Biggs was "not so grave as to justify the use of deadly force." *Id.*

At the end of the day, the court granted plaintiff's motion for summary judgment on liability based upon the video evidence. This Court should do the same in *Biggs Johnson.*

**G.** **Immediate Threat of Serious Physical Harm**. When determining whether the use of deadly force was reasonable, "we have held that an officer's use of that force is reasonable only if a reasonable officer in Defendants' position would have had probable cause to believe that there was a threat of serious physical harm to themselves or others." *Pauly v. White,* __F.3d__ at 13, 16, quoting *Thomson v. Salt Lake Cnty.,* 584 F.3d 1304, 1313 (10th Cir. 2009) (internal punctuation and citations omitted.) The videos in *Biggs* demonstrate that there was no threat of death or serious physical harm to Deputy Peay or anyone else.

**H.** **Without Regard to Underlying Intent or Motivation**. In excessive force cases, the Tenth Circuit asks "whether the officers' actions are objectively reasonable in light of the facts and circumstances confronting them, ***without regard to***

*their underlying intent or motivation*." *Pauly,* __F.3d at 6, 12 (emphasis added; citations omitted). This means all of Defendants' facts that rely on Sgt. or Deputy Peay's subjective perceptions must be rejected. *See* Part III(C) above.

      **I.**    <u>**Severity of the Crime at Issue**</u>. The Tenth Circuit's balancing test requires careful attention to the facts and circumstances of each case, "including the *severity* of the crime at issue, whether the suspect poses an ***immediate threat*** to the safety of the officers or others, and whether he is ***actively resisting arrest or attempting to evade arrest*** by flight." *Pauly,* __F.3d at 6 (emphasis added; citations omitted); *Graham v. Connor,* 490 U.S. 386, 396 (1989). This means in *Biggs* that the videos support lack of severity and immediate threat. The possible charges were objectively minor. The videos also confirm no real attempt to resist or evade. Such "attempts" were minor, ineffectual, and showed no chance of success. The videos prove it.

      **J.**    <u>**Danger at the Precise Moment**</u>. The Tenth Circuit determines the reasonableness of the force is based "on whether the officers were in danger at the precise moment that they used the force." *Pauly,* __F.3d at 7, 19. Furthermore, the Tenth Circuit has held in the past that "we do not believe it would be reasonable for an officer to shoot any motorist who ran a red light or swerved through lanes, simply because reckless driving poses some threat of physical harm to a bystander who might be down the road." *Id,* citing *Cordova v. Aragon,* 569 F.3d 1183, 1190 (10th Cir. 2009). The videos show that at the precise moment of the shooting, there is essentially no "danger."

The Biggs vehicle is substantially disabled, surrounded or blocked, and moving very slowly.

**K.** **Officer's Own Reckless or Deliberate Conduct.** Additionally, the Tenth Circuit looks to "whether the officers' *own reckless or deliberate conduct* during the seizure unreasonably created the need to use such force." *Pauly,* __F.3d at 7 (emphasis added; internal punctuation and citations omitted). If there was indeed a danger, as alleged by Sgt. Peay in 2012, it was caused by his "own reckless and deliberate" acts in moving outside of the protective perimeter of the wall of police cars shown on the video.

## POINT II

### ~ Denial of Defendants' Motion for Summary Judgment Is Required ~

**DEFENDANTS' MOTION FOR SUMMARY JUDGMENT SHOULD BE DENIED BECAUSE (A) VIDEO EVIDENCE DISPROVES THEIR CLAIMS ; (B) DEFENDANTS IMPROPERLY RELY ON SUBJECTIVE EVIDENCE; (C) DEFENDANTS HAVE A MOTIVE TO DENY; AND (D) CHRISTIAN PEAY WAS INDISPUTABLY NOT IN DANGER; AND (E) THE LAW WAS CLEARLY ESTABLISHED.**

**A.** **Video Evidence Disproves Defense Claims.**

Many Tenth Circuit cases have denied officers' motions for summary judgment because video evidence contradicts their claims about their own abusive conduct. *See*, for example, *Estate of Booker v. Gomez,* 745 F.3d 405, 415 (10th Cir. 2014). ("In fact, the video, which shows Mr. Booker motionless on the floor while the deputies subdue him, contradicts the Defendants' assertion that Mr. Booker consistently resisted them.") The teaching of Tenth Circuit and other cases, as explained in Point I of the

Argument above, is simply that motions for summary judgment on qualified immunity will be denied where video evidence supports the reasonable conclusion that excessive force was used. In *Biggs*, even if the Court denies Plaintiff's MSJ, to deny Defendants' MSJ, it must only find that a reasonable jury could believe that no one was in danger, particularly Deputy Peay. Therefore, the shooting of Kristine Biggs Johnson in the head was unnecessary excessive force. Accordingly, the defense MSJ should be denied.

## B. Improper Reliance on Subjective Evidence.

Tenth Circuit cases have made it very clear that in excessive force cases, the objective reasonableness of the officer's actions is decided in light of the facts and circumstances confronting them, "without regard to their underlying intent or motivation." *Pauly,* __F.3d at 6. *See also Thomson v. Salt Lake Cnty.,* 584 F.3d 1304, 1313 (10th Cir. 2009) (quoting *Graham*, 490 U.S. at 397). As explained above (*see* Part III(C)), Defendants rely almost entirely on subjective interpretations or presentations of fact. These subjective recountings of the events of November 25, 2012 are always contradicted by the video evidence.

One of the clearest examples of this is Defendants' Fact 21, where Sgt. Peay recounts such things as "she [Biggs] took her focus off me and looked directly over at him and she screamed." To believe this "fact," we would have to believe that Sgt. Peay can somehow divine a person's focus in the dead of night with all of the car windows closed, sirens wailing, and strobe lights pulsating.

Another example is Defendants' Fact 15, where Deputy Peay allegedly says in 2012 that Biggs "looked directly at me and the expression on her face changed. She looked as if she was targeting me to run me over." Yet, in reality, the facts show clearly Ms. Biggs Johnson doing a three-point turn, backing up slowly, coming forward slowly, twice, and making minimal contact with the police vehicles.

This Court is not required to accept these subjective statements to either defeat Plaintiff's or support Defendants' MSJs.

## C.    Defendants' Motive to Deny.

Summary judgment is never appropriate where credibility is at issue. Many years ago, Judge Learned Hand of the Second Circuit noted the importance of demeanor and credibility evidence:

> It is true that the carriage, behavior, bearing, manner and appearance of the witness - in short, his "demeanor" - is a part of the evidence. The words used are by no means all that we rely on in making up our minds about the truth of a question that arises in our ordinary affairs, and it is abundantly settled that a jury is as little confined to them as we are. They may, and indeed should, take into consideration the whole nexus of sense impressions which they get from a witness. . . . ***Moreover, such evidence may satisfy the tribunal, not only that the witness' testimony is not true, but that the truth is the opposite of his story;*** for the denial of one, who has a ***<u>motive to deny</u>,*** may be uttered with such hesitation, discomfort, arrogance or defiance, as to give assurance that he is fabricating, and that, if he is, there is no alternative but to assume the truth of what he denies. (emphasis added)

*Dyer v. MacDougall,* 201 F.2d 265, 268-9 (2nd Cir. 1952) (emphasis and <u>double</u> emphasis added). *Dyer* was cited with approval by the United States Supreme Court in

*NLRB v. Walton Manufacturing Co.,* 369 U.S. 404, 408, 82 S. Ct. 853, 855 (1962), and

by the Tenth Circuit in *Aylett v. Secretary of Housing and Urban Development*, 54 F.3d

1560, 1566 (10th Cir. 1995). The policy behind these rules of law is fairness:

> Courts have been reluctant to deprive the non-moving party of the opportunity of testing the credibility of the movant or his witnesses in open court in this context. As explained by one commentator, "there is a justifiable judicial fear of the injustice which could result from the judgment based on affidavits asserting facts that are, because of their nature, incapable of being effectively controverted."

Wright & Miller, Vol. 10A Federal Practice and Procedure, Section 2726, pp. 120-21

(1983).

Where knowledge of the critical facts or events at issue in a case is largely

or exclusively within the control of the movant, then

> Where an issue as to a material fact **cannot be resolved without observation of the demeanor of witnesses** in order to evaluate the credibility, summary judgment is not appropriate.

Quoted in Wright & Miller, *supra*, p.115 (emphasis added).

A large number of Defendants' "Additional Undisputed Material Facts" fall

into the category of credibility concerns. For example, No. 7 claims that Sgt. Peay came

around his vehicle and "realized that Biggs had a look of rage on her face," and this

"influenced how he thought things would transpire." No. 8 claims that Sgt. Peay

"believed" that Biggs was turning around to "use the truck as a weapon," and she was

clearly using this "weapon" to "come at me." There is simply no one who can validate

those kind of claims, and Sgt. Peay clearly has a motive to deny or lie, because he is

being sued. Because of this, such statements should be treated with distrust by the Court.

Another good example of motive to deny facts is Defendants' No. 11. This fact claims that Biggs' car came "within inches or a foot" of Sgt. Peay, but that he was able to "bend backwards at the waist and move his feet and legs backward to avoid being hit." Yet, that fact is completely disproved by the Dingman video.

In summary on this point, most of these alleged undisputed facts have a significant element that is within the exclusive subjective knowledge of Scott Peay (or in some cases Christian Peay). They should not form the basis of a summary judgment motion.

## D.    Christian Peay Indisputably Not in Danger.

Probably the strongest reason for denying Defendants' MSJ is that, as a matter of fact, as shown by the video, Christian Peay was never in danger. The video shows him protected by the police vehicles. The video also shows that Sgt. Scott Peay – and he admits it – was also never in danger.

The question then becomes whether an objectively reasonable officer in Scott Peay's position, under all the circumstances of the case, would believe that his brother was in immediate danger of death or serious bodily injury. Once again, we have only Scott Peay's subjective belief, who claims he was experiencing "tunnel vision." *See*

Response to Defendants' Additional Fact 20. Objectively, Christian Peay was in no danger.

Looked at another way, was Scott Peay's subjective believe reasonable under the circumstances, which is the way it is argued by Defendants. But how could it be? Christian Peay, as a matter of fact, and law, is in no danger. In order to get where Defendants want to take us, we have to credit Scott Peay's subjective beliefs, that no one can really test as an undisputed fact. Defendants cite no case that so holds, but there are numerous cases that hold the opposite.

Plaintiff submit that it is a bad policy to credit subjective beliefs uttered by someone with a motive to deny, as an undisputed fact, in order to grant summary judgment. Such a holding would completely upend a half Century of summary judgment law, and make it almost impossible to defeat an officer's motion for summary judgment. Such motions would always be based on subjective facts that the Court would have to hold as undisputed, which would be a gross fiction.

E. **The Law Was Clearly Established**.

Defendants' four-page Amended Cross-Motion for Summary Judgment is based exclusively on the allegation that Sgt. Peay "did not violate clearly established law." Defs' Cross-Motion, Doc. 51, pp.2 and 4. Defendants do not support with evidence in the record their occasional allegations that no constitutional violation occurred. Rather, they argue that there is no clearly established precedent that put Sgt.

Peay on notice that his actions in this instance were in violation of the Fourth Amendment. This sole allegation is expressed in Defendants' Motion's Introduction and its Conclusion. As discussed below, this argument is inaccurate and unavailing.

**No Evidentiary Support**. Without support from the record, Defendants' argument injects the ancillary allegation that Sgt. Peay's actions were reasonable, citing a number of distinguishable cases (where officers' or others' lives were actually in danger), but in the end, such claims are merely conclusory, with no evidentiary support provided. For example:

> Here, Sergeant Peay is entitled to qualified immunity because Plaintiff posed a serious threat to the officers at the scene and the public on November 25, 2012.

Defs' Cross-MSJ, Doc. 51, p.4. However, Defendants do not point to any particular act where Plaintiff caused a "serious threat to the officers at the scene," presumably because they cannot find any evidence that Plaintiff's actions constituted an immediate, serious threat to any officer at the scene. Defendants mention that "an officer may use deadly force when a vehicle poses a threat of death or serious bodily harm to the officer himself, other law enforcement officers, or other third-parties." *Id.* But as Plaintiff has shown in detail in her Motion for Summary Judgment, with reference to the video and documentary record, and which Plaintiff incorporates here by reference, Ms. Johnson did not pose an immediate threat to any officer at the time Sgt. Peay shot her in the head.

**Clearly Established**.　　　Defendants specifically refer to and incorporate pages 30-33 of their Opposition to Plaintiff's Motion for Summary Judgment.  That section also argues that Sgt. Peay should be found to be qualifiedly immune because his actions in this specific circumstance were allegedly not "clearly established" to be violative of the Constitution.

Such argument is mistaken.  As Justice Stevens noted in his dissent in *Brosseau*:

> The constitutional limits on the use of deadly force have been clearly established for almost two decades.

*Brosseau v. Haugen*, 543 U.S. 194, 202 (2004).  Further, the constitutional limits on the use of deadly force are clear, consistent, and unambiguous:

> Where the suspect poses **no immediate threat** to the officer and no threat to others, the harm resulting from failing to apprehend him **does not justify the use of deadly force** to do so.

*Tennessee v. Garner*, 471 U.S. 1, 11 (1985) (emphasis added).  Plaintiff's Motion for Summary Judgment has established that this canon is exactly the clearly established precedent to which Sgt. Peay failed to adhere.  Legal precedent has decidedly limited the use of deadly force to situations where there is an "immediate" or "imminent" threat to the officer or others.  It is quite well established.  The recent Tenth Circuit case of *Pauly* has expressed this even more clearly, citing to *Medina, Bella*, and *Meeks*:

> And ultimately, "[t]he primary focus of our inquiry ... remains on **whether the officer was in danger <u>at the exact moment</u> of the threat of force**." *Medina v. Cram*, 252 F.3d 1124, 1132 (10th Cir.2001) (citing *Bella v. Chamberlain*,

24 F.3d 1251, 1256 & n. 7 (10th Cir .1994); *Wilson v. Meeks*, 52 F.3d 1547, 1554 (10th Cir.1995)).

*Pauly v. White,* – F.3d – , 2016 WL 502830, at *13 (10th Cir. 2016) (emphasis and <u>double</u> emphasis added). In other words, an officer's fear that a suspect might possibly harm someone at some indeterminate point in the future is insufficient to justify the use of deadly force.

## CONCLUSION

The substantive facts cited by Plaintiff are based upon the video evidence. Contrariwise, Defendants' alleged facts are generally based upon subjective and self-serving claims that are contradicted by the relevant videos. Pursuant to *Scott v. Harris,* Defendants' alleged facts must be rejected where they are contradicted by the video evidence. This leaves no genuine factual disputes that would derail Plaintiff's Motion for Summary Judgment on Liability Against Sgt. Peay. Plaintiff has shown that unnecessary excessive deadly force was used by Sgt. Peay, in violation of Plaintiff's Fourth Amendment rights, and that it has long been clearly established by the U.S. Supreme Court and the Tenth Circuit that such use of deadly force was in violation of the Fourth Amendment. Plaintiff's Motion should be granted.

Defendants' Amended Cross-Motion for Summary Judgment is without merit. The applicable law with respect to the use of deadly force was clearly established at the time of this incident. Defendants have presented no record evidence to support

their claims that Sgt. Peay's use of deadly force was objectively reasonable.  Defendants'

Cross-Motion should be denied.

DATED this 9th day of March, 2016.

**SYKES McALLISTER LAW OFFICES, PLLC**

*/s/ Robert B. Sykes*

ROBERT B. SYKES
ALYSON C. McALLISTER
RACHEL L. SYKES
*Attorneys for Plaintiffs*