IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH

NORTHERN DIVISION

| | |
|---|---|
| KRISTINE BIGGS JOHNSON,<br><br>Plaintiff,<br><br>vs.<br><br>DANIEL PEAY and MORGAN COUNTY,<br>Defendants. | ORDER<br><br>AND<br><br>MEMORANDUM DECISION<br><br>Case No. 1:14-cv-147-TC |

In this excessive force case, Plaintiff Kristine Biggs Johnson, who was shot in the left eye by Defendant Daniel Peay after a long police chase (Daniel Peay is a sergeant with the Morgan County Sheriff's Office), seeks judgment under 42 U.S.C. § 1983 against Sergeant Peay. She has filed a Motion for Summary Judgment on Liability Against Defendant Peay.[1] Sergeant Peay filed a Cross-Motion for Summary Judgment[2] seeking qualified immunity from liability for the shooting.

Ms. Johnson also filed a Motion for Sanctions Against Defendants for Spoliation of Evidence.[3] In that motion, she contends that the Defendants should be sanctioned for failure to produce an internal document memorializing the decision that Sergeant Peay did not violate county policies.

---

[1](Docket No. 37.)

[2](Docket No. 51.)

[3](Docket No. 46.)

For the reasons set forth below, the court finds that Sergeant Peay is entitled to qualified immunity.  The court also finds that sanctions are not appropriate because alternative evidence communicating the content of the internal report is available to Ms. Johnson.

**FACTUAL BACKGROUND**

**Videotape Evidence**

As a preliminary matter, the court must address the nature of the evidence.  The chase and the shooting were captured on videotape taken from cameras mounted on the officers' patrol car dashboards ("dash-cams").  Three videos, taken by the dash-cams of Officers Christian Peay, Dingman, and Hardman, form a large part of the record.  (See Exs. 2, 4, & 5 attached to Pl.'s Mot. Summ. J. against Def. Peay, Docket No. 39.)  Ms. Johnson contends that footage from the videotapes provides everything the court needs to know to grant summary judgment to her.  (See Pl.'s Mot. Summ. J. against Def. Peay at iv-v.)  The court disagrees.  The court must rely on more than just the videotape evidence because the videos do not show everything that is relevant to the court's analysis.

Under Scott v. Harris, 550 U.S. 372 (2007), no genuine dispute of fact exists for anything that is clearly discernable in a videotape of the events at issue, even if sworn testimony in the record contradicts what the video shows.  Id. at 378, 380-81.  But to the extent the videos "did not capture everything," the court must look to other evidence in the record, including deposition testimony.  Thomas v. Durastanti, 607 F.3d 655, 659 (10th Cir. 2010).  The court must view the non-videotape evidence in a light most favorable to Ms. Johnson.  Brosseau v. Haugen, 543 U.S. 194, 195 (2004).

The dash-cam videos do not show all relevant facts.  For instance, one cannot see Ms.

Johnson's face clearly, much less her facial expressions. Her face is a blur on the screen. Yet her facial expression (a look of rage, as Sergeant Peay characterizes it) and the scream that Sergeant Peay witnessed seconds before he shot Ms. Johnson are part of the circumstances the court must analyze to determine whether a reasonable officer would have known, given the circumstances he faced at the time he fired the gun, that what he was doing was contrary to clearly established law.[4] Accordingly, the court will consider other evidence to supplement the videos.

**The Incident**[5]

Around 10:00 p.m. on November 25, 2012, Morgan County Deputy Sheriff Christian Peay (Deputy Peay), who was on duty as he drove down Interstate 84 in Morgan County, saw a white pickup truck driving the opposite way with its headlights off. He notified his brother, Sergeant Peay, who was also on duty in that area. The two of them attempted to pull the truck over using lights and sirens. The pickup truck, which was loaded in the back with items covered loosely by a tarp, did not pull over. Instead, the driver of the truck—Ms. Johnson—took police officers on an approximately thirty minute chase through three counties.

During the chase, the police officers (the group of officers eventually grew to seven) followed the truck with lights flashing and sirens blaring. Sergeant Peay and Deputy Peay led the pursuit, following closely behind the truck. The chase occurred mostly on I-84 with speeds

---

[4]Ms. Johnson objects to any consideration of Sergeant Peay's personal account of the events. As the court discusses below, a portion of Sergeant Peay's account is necessary and appropriate evidence to consider.

[5]The court has reviewed the record, including the videotape evidence submitted by the parties, and finds that there is no genuine dispute of material fact.

reaching up to 90 miles per hour on a highway where the speed limit was 70 miles per hour. The drivers encountered little to no traffic during the chase.

About twenty minutes into the chase, officers from Morgan County Sheriff's Department tried to stop the truck by placing spikes in its path along the road. The spikes did not completely disable the truck and the truck continued to drive, albeit in an erratic manner. The tires began falling off the rims. Something flew out of the back of the truck and almost struck Deputy Peay's patrol car. At one point the truck drifted far onto the right shoulder and then across two lanes to bump against the cement barrier in the middle of the divided highway. For at least eight more minutes, the truck drove on three tire rims and one tire.

Eventually, the driver of the truck drove down an exit ramp, slowed down, turned right (east) onto Cottonwood Drive, and continued east at a slower speed. When the truck slowed down, Sergeant Peay ordered the pursuing officers to prepare for a "high risk felony stop." (See Sergeant Peay Interview 16:4-12, attached as Ex. H to Defs.' Opp'n, Docket No. 48-9.) Two minutes later, Ms. Johnson turned left onto the opposite shoulder of the road and temporarily came to a stop. As she did so, Sergeant Peay blocked her from the left. Deputy Peay pulled to a stop to the right of the truck. Officer Jeffrey Dingman, one of the officers who had joined in the pursuit, pulled his car up between Sergeant Peay and Deputy Peay to fill the gap. The officers' cars blocked westbound travel on Cottonwood Drive, but the eastbound road was still open.[6]

---

[6]Defendants assert that Ms. Johnson could have escaped not only by continuing east on Cottonwood Drive, but by going around them on the shoulder to the west. Although that scenario was a possibility, as Officer Jeffrey Dingman relates in his deposition (see Ex. C to Defs.' Opp'n at 26), the videos suggest that it was an unlikely one. On one side of the road, she was blocked by Sergeant Peay's truck as well as a fence and landscaping on adjacent property. (See Dingman Video at 10:38-10:48, Docket No. 37-4 (Ex. 4 to Pl.'s Mot. Summ. J.).) On the other side of the road, Deputy Peay was parked adjacent to the shoulder, and Officer Hardman's

Ms. Johnson immediately backed up. At that time Sergeant Peay and Deputy Peay were getting out of their cars.

Sergeant Peay hurried toward the truck with his gun drawn and ordered her to stop and get out of the truck. (Given the number of sirens, it is unlikely that Ms. Johnson heard the commands. But the presence of police officers was very clear.) She then drove forward and rammed her truck into his patrol car with such force that Sergeant Peay's car jerked as it was hit. Sergeant Peay backed away. As Ms. Johnson backed up a second time (about half a car's length), Sergeant Peay stepped forward a few feet. According to Sergeant Peay, Ms. Johnson had "an expression of rage" on her face and screamed something as she looked in the direction that Sergeant Peay believed his brother was standing. Sergeant Peay said she was revving her engine. Ms. Johnson then turned her wheel and deliberately headed toward Deputy Peay's and Officer Dingman's cars. As she drove her truck toward Deputy Peay's car, Deputy Peay dropped out of Sergeant Peay's line of sight. Sergeant Peay was experiencing tunnel vision. During that time, Sergeant Peay believed (incorrectly) that Deputy Peay was in front of his car. Sergeant Peay quickly backed away to stay out of the truck's path. Ms. Johnson rammed into Deputy Peay's car with an even stronger force, as is evident from watching the car jolt back.[7] Just as she rammed

car (parked behind Deputy Peay's car) was exactly adjacent to, if not partly on, the shoulder. Also, a traffic sign was posted in the shoulder of the road. (See id. at 10:40-10:55; Hardman Video at 3:50-4:20, Docket No. 37-5 (Ex. 5 to Pl.'s Mot. Summ. J.).) Regardless, whether she had an escape route to the west is not material because Cottonwood Drive in the eastbound direction was not blocked.

[7]The parties dispute the speed of Ms. Johnson's truck when she was maneuvering around the officers' cars on Cottonwood Drive. Determining the exact speed is not necessary here. What is important is the fact that she was driving a large pickup truck in close proximity to the officers and that the force with which she hit both of the cars was sufficient to jolt or move the cars. If the same force were applied to an unprotected human being, the possibility for serious

into Deputy Peay's car, Sergeant Peay fired his gun. The truck finally stopped. Sergeant Peay had shot Ms. Johnson in the left eye.

Seven seconds elapsed between the time Ms. Johnson backed up from Sergeant Peay's car and the time she rammed into Deputy Peay's car. (See Dingman Video at 11:01-11:08, Docket No. 37-4 (Ex. 4 to Pl.'s Mot. Summ. J).) Sergeant Peay testified during his deposition that he fired his gun when the truck hit Deputy Peay's car because, "as she hit right here, Christian dropped out of my view. I didn't know if he was under her vehicle, if she had hit him, or if she was pinning him between the vehicles. And I fired to stop her from injuring my brother." (Dep. of Sergeant Scott Peay at 60:19-23.)

## ANALYSIS

### Cross Motions for Summary Judgment on 42 U.S.C. § 1983 Claim

Ms. Johnson now seeks summary judgment against Sergeant Peay on the ground that his use of deadly force was excessive and violated her Fourth Amendment rights. In his cross-motion, Sergeant Peay asks the court to grant him qualified immunity from liability under 42 U.S.C. § 1983.

A court must grant summary judgment when the moving party "shows that there is no genuine dispute as to any material fact" and that party "is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Summary judgment should not be granted "if the dispute about a material fact is 'genuine,' that is, when the evidence is such that a reasonable jury could return a

---

physical harm would be high. As the Tenth Circuit Court of Appeals noted in the excessive force case of Thomas v. Durastanti, 607 F.3d 655 (10th Cir. 2010), "Even given a dispute about whether the Lincoln was accelerating, it goes without saying that an officer in close quarters is no match for a two-ton vehicle." Id. at 665.

verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986),

quoted with approval in Birch v. Polaris Indus., Inc., 812 F.3d 1238, 1251 (10th Cir. 2015). A

factual dispute is genuine when "there is sufficient evidence on each side so that a rational trier

of fact could resolve the issue either way." Adler v. Wal-Mart Stores, Inc., 144 F.3d 664, 670

(10th Cir. 1998). The court must draw all reasonable inferences from the record in favor of the

nonmovant. Id.

Qualified immunity is "'an immunity from suit rather than a mere defense to liability[.]'"

Pearson v. Callahan, 555 U.S. 223, 231 (2009) (quoting Mitchell v. Forsyth, 472 U.S. 511, 526

(1985)). "Qualified immunity shields an officer from suit when she makes a decision that, even

if constitutionally deficient, reasonably misapprehends the law governing the circumstances she

confronted." Brosseau, 543 U.S. at 198 (2004) (citing Saucier v. Katz, 533 U.S. 194, 206

(2001)).

To determine whether to grant qualified immunity, courts apply the two-part test set forth

in Saucier. Under that test, the court first determines whether the officer violated the plaintiff's

constitutional rights (in this case, the right to be free from excessive force). If the court finds a

violation, the court analyzes whether the right was clearly established at the time of the officer's

conduct. Brosseau, 543 U.S. at 195. After issuing Saucier, the United States Supreme Court

held that "the Saucier protocol should not be regarded as mandatory in all cases" and that the

court has discretion, in appropriate circumstances, to analyze the prongs in a different order.

Pearson v. Callahan, 555 U.S. 223, 236 (2009).

1.    Whether Sergeant Peay Used Excessive Force

The Supreme Court, in two cases, articulated some guiding principles to consider when

analyzing an excessive force case. In <u>Tennessee v. Garner</u>, 471 U.S. 1 (1985), the Court said that "[w]here the officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others, it is not constitutionally unreasonable to prevent escape by using deadly force." <u>Id.</u> at 11. In <u>Graham v. Connor</u>, 490 U.S. 386 (1989), the court looked at the severity of the crime, whether the suspect posed an immediate threat to the safety of officers or others, and whether the suspect was actively resisting arrest or fleeing to avoid arrest. <u>Id.</u> at 396. Those are not rigid or exclusive guidelines. In more recent decisions, the Court has approached excessive force cases by simply looking at the facts of the case under the Fourth Amendment's reasonableness inquiry. In other words, the analysis is not cabined by a framework of specific factors. Rather, the question is whether officer's actions were reasonable under all of the circumstances. <u>Plumhoff v. Rickard</u>, 134 S. Ct. 2012, 2020 (2014); <u>Scott v. Harris</u>, 550 U.S. 372, 382-83 (2007) (pointing out that <u>Graham v. Connor</u> "was simply an application of the Fourth Amendment's 'reasonableness' test to the use of a particular type of force in a particular situation" and that regardless of whether the officer's "actions constituted application of 'deadly force,' <u>all that matters is whether [the officer's] actions were reasonable</u>.") (emphasis added).

To determine whether Sergeant Peay's actions were reasonable, the court must view the events from the perspective of a reasonable officer on the scene under the totality of the circumstances. <u>Graham</u>, 490 U.S. at 396; <u>Pauly v. White</u>, 814 F.3d 1060, 1071 (10th Cir. 2016). The court may not consider the officer's underlying intent or motivation. <u>Graham</u>, 490 U.S. at 397 ("An officer's evil intentions will not make a Fourth Amendment violation out of an objectively reasonable use of force; nor will an officer's good intentions make an objectively

8

unreasonable use of force constitutional.").

Ms. Johnson highlights this objective test as she objects to evidence of Sergeant Peay's account of the chase and the shooting.[8]  The objective test, she says, precludes any evidence of Sergeant Peay's "subjective beliefs," including, for example, his statement that "it wasn't my truck she was trying to hit, she was looking at me and coming after me and trying to hit me." (See Pl.'s Reply at xxvi (quoting Defs.' Opp'n at 17 (Fact 9)), Docket No. 58.)[9]

But some of Sergeant Peay's neutral observations are proper evidence.  Courts in other excessive force cases have considered an officer's statements recounting the incident.  For example, in Brosseau, the Court considered the officer's explanation that she shot the fleeing suspect "because she was 'fearful for the other officers on foot who [she] believed were in the immediate area, [and] for the occupied vehicles in [the suspect's] path and for any other citizens who might be in the area.'"  Brosseau, 543 U.S. at 197.  In Thomas, the Tenth Circuit relied on the officer's testimony that "he was concerned that [the other agent] was in distress, that the [car] was coming directly at him and his objective was to stop the [car]."  607 F.3d at 661.  In that case, the Tenth Circuit considered the officer's "reasonable perceptions[.]" Id. at 666 (emphasis

_____

[8]Ms. Johnson also urges the court to disregard the statements of Sergeant Peay and Deputy Peay because they have "motive to deny, lie or exaggerate[.]" (Pl.'s Reply at xxvii, Docket No. 58.)  But the court may not do so because at the summary judgment stage, the court may not consider the credibility of witnesses whose sworn testimony is submitted as evidence. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986).

[9]For the same reason, she takes issue with Deputy Peay's statement in his interview that Ms. Johnson "could have nailed me, I was standing right there," and that "if [Sergeant Peay] did not shoot her, I would have been struck by her vehicle." (See Reply at xxvi (quoting Defs.' Opp'n at 19 (Fact 19)).)  But the court will not consider Deputy Peay's statement for a different reason: the court must focus on the perspective of a reasonable officer in Sergeant Peay's position at that time, not Deputy Peay's position.

added).

Keeping these standards in mind, the court considers whether Sergeant Peay reasonably believed that Ms. Johnson posed an immediate risk of serious physical harm or death to Deputy Peay and the other officers when she rammed her truck into Deputy Peay's patrol car. Graham, 490 U.S. at 396. Importantly, his belief did not have to be correct; it just had to be reasonable under the circumstances (as judged without 20/20 hindsight). Id.; Thomas, 607 F.3d at 666. Based on the undisputed record, the court finds that his belief, although perhaps mistaken, was reasonable.

Ms. Johnson showed no sign of yielding to the officers' lights and sirens during the chase, even when she had to drive on tire rims after three of her tires disintegrated from damage caused by tire spikes. And after she slowed to a stop, Ms. Johnson immediately backed up and drove straight toward the officers and the patrol cars that blocked her path. Her truck was only feet away from the officers and their cars. She deliberately ran into Sergeant Peay's car, even as he was pointing a gun at her through the windshield and ordering her to stop. She looked directly at Sergeant Peay. She had a look of rage on her face[10] and was yelling something. Then she revved her engine, backed up again, turned her steering wheel, and aimed for the other cars. It was reasonable to believe that she was going to ram into those cars as well without regard to the

---

[10]Contrary to Ms. Johnson's assertion, Sergeant Peay's characterization of her facial expression as a "look of rage" is relevant. See Robinson v. Arrugueta, 415 F.3d 1252, 1254 (11th Cir. 2005) (citing to the officer's testimony that the driver of the car, which was only feet away from the officer, defied the order to put his hands up and instead "made eye contact" with the officer and "grinned" as he drove directly toward the officer). But even if the evidence of Ms. Johnson's facial expression and scream were not part of the evidence, the outcome would be the same. It is clear from the video that when Ms. Johnson stopped and turned around, she had changed from flight mode to aggressive mode when she drove toward the cars and struck them.

presence of any officer.

And Sergeant Peay's belief that Deputy Peay was in harm's way was reasonable. The situation was rapidly changing. Deputy Peay was to Sergeant Peay's right. When Sergeant Peay rushed out of his truck and drew his gun, he was focused on Ms. Johnson. She did not respond to orders to stop. She had just deliberately hit Sergeant Peay's truck. She was wielding a deadly weapon—i.e., the truck. See Brosseau, 543 U.S. at 200 ("'[A] car can be a deadly weapon.'") (quoting Smith v. Freland, 954 F.2d 343, 347 (6th Cir. 1992)). And she was heading in the direction Sergeant Peay last saw Deputy Peay. When Deputy Peay dropped out of Sergeant Peay's line of sight, Sergeant Peay reasonably believed that Deputy Peay was about to be pinned between the two cars or otherwise hit. "[I]f threatened by [a] weapon (which may include a vehicle attempting to run over an officer), an officer may use deadly force." Thomas, 607 F.3d at 664. The entire event lasted about thirty seconds. And only seven seconds elapsed between the second time Ms. Johnson backed up and the time she deliberately collided with Deputy Peay's car. (See Dingman Video 11:01-11:08.)

Under the circumstances, Sergeant Peay acted reasonably. And the court's conclusion does not change despite Ms. Johnson's remaining arguments.

Ms. Johnson emphasizes that the severity of the force far outweighed the severity of the crime. Ms. Johnson cites to the "severity of the crime" factor in Graham to support her contention that Sergeant Peay's actions were unreasonable. She points out that Deputy Peay attempted to pull her over for a minor traffic infraction (driving a vehicle at night with the headlights off), and so, she asserts, that fact should weigh against Sergeant Peay. To some extent that is true. But even though the minor infraction spurred the events, Ms. Johnson's flight

quickly escalated the situation. The officers were no longer dealing with a traffic stop. They were dealing with an unknown driver who disobeyed officers' commands to pull over and who led the officers on a thirty-minute chase. Moreover, the danger that Ms. Johnson posed at the time of the shooting had nothing to do with her headlights and everything to do with the maneuvering of a big pickup truck in an aggressive way in close proximity to officers. "The fact that flight from a traffic stop may have precipitated these events does not make the vehicle any less dangerous." Thomas, 607 F.3d at 671.

Ms. Johnson contends that Sergeant Peay recklessly created the need for force. Based on her view of the record, Sergeant Peay unnecessarily placed himself at risk when he "unadvisedly walk[ed] up to within a foot or two of the front of [Ms. Johnson's] truck as she continue[d] to maneuver." (Pl.'s Reply at xxviii.) That, she contends, adds to her conclusion that Sergeant Peay's use of deadly force was unreasonable. In support, she cites to the Tenth Circuit's recent decision in Pauly v. White, 814 F.3d 1060 (10th Cir. 2016), request for reh'g en banc denied, 817 F.3d 715 (10th Cir. 2016). The court in Pauly confirmed the rule that "the reasonableness of the use of force depends not only on whether the officers were in danger at the precise moment they used force, but also on whether the officers' own reckless or deliberate conduct during the seizure unreasonably created the need to use such force." Id. at 1071 (internal quotation marks and citations omitted).

Her argument fails for a couple of reasons. First, Sergeant Peay does not justify his use of deadly force based on any risk of harm to himself; he focused on the safety of Deputy Peay. Second, his actions were not reckless under the circumstances. In order to do his job (i.e., stop the driver and take her into custody), he needed to get out of his patrol car. He protected himself

as much as he could; he cautiously approached the truck and kept some distance between them. The fact that Ms. Johnson drove her truck directly at him and in the direction of other officers is not his fault.

The court in Thomas, which dealt with the use of deadly force on a driver, rejected a similar argument. In Thomas, the officer shot the driver of a Lincoln town car after the driver pulled away from an encounter with law enforcement agents. The officer was in the path of the Lincoln and rolled off the hood. As the car drove away, the officer fired shots. The Tenth Circuit majority panel disagreed with the dissent's statement that "'it was unreasonable to step deliberately in front of the Lincoln and use deadly force to try to stop its flight from a traffic stop.'" 607 F.3d at 670 (quoting dissent at 674 n.12). The majority responded that "[o]nce the Lincoln pulled away, [the officer] was certainly entitled to assist in regaining control of the situation even if it brought him into close proximity of the Lincoln." Id.[11]

Finally, Ms. Johnson asserts that Sergeant Peay could have chosen an alternative to deadly force had he more clearly assessed the scene and determined that Deputy Peay was not actually in danger. According to Ms. Johnson, Sergeant Peay, before firing his gun, could have and should have checked whether Deputy Peay was directly between the truck and Deputy Peay's car. This, she says, shows that Sergeant Peay did not act reasonably because he "had plenty of time to assess the situation. . . . [H]e claims that he shot Ms. [Johnson] because he believed his

_____

[11]Ms. Johnson's argument is also vaguely reminiscent of an analogous argument rejected in Scott v. Harris, 550 U.S. 372 (2007). There, the plaintiff suggested that the officers should have let the fleeing suspect go rather than engage in a dangerous high speed chase that put others at risk. The Court rejected a rule of "impunity-earned-by-recklessness" in which the fleeing suspect need only act more dangerously in order to ensure escape. See id. at 386. Here, Sergeant Peay did not create the situation requiring the force. Ms. Johnson, by driving her car toward the officers and their cars, did.

brother was in danger. However, due to Sgt. Peay's location, and being out of the way of the [truck], he had plenty of time to look and find out where his brother was. This is all evidenced by the video." (Pl.'s Reply at 16.) The court disagrees with this assessment for a variety of reasons. First, the question of whether Deputy Peay was actually in danger is not relevant. "An officer may be found to have acted reasonably even if he has a mistaken belief as to the facts establishing the existence of exigent circumstances." Thomas, 607 F.3d at 666. Second, Ms. Johnson makes her statement from the position of 20/20 hindsight. The court may not evaluate the circumstances with 20/20 hindsight. Graham v. Connor, 490 U.S. 386, 396 (1989). Third, the video does not definitively support Ms. Johnson's conclusion that Sergeant Peay had "plenty of time to look and find out where his brother was." The time it took for Ms. Johnson to back up from hitting Sergeant Peay's truck to hitting Deputy Peay's car was approximately seven seconds. Not only is that a short period of time to assess a stressful situation but Ms. Johnson's argument assumes that it would be reasonable for an officer to take his eyes off a suspect who had just rammed her truck into the officer's car and was driving her truck within feet of the officer toward another police car and officers. The court is not allowed to judge the officer's actions in hindsight or second guess what the officer should have done, especially when the truck was being used as a weapon.

> [U]nder Graham, we must avoid substituting our personal notions of proper police procedure for the instantaneous decision of the officer at the scene. We must never allow the theoretical, sanitized world of our imagination to replace the dangerous and complex world that police [officers] face every day. What constitutes "reasonable" action may seem quite different to someone facing a possible assailant to someone analyzing the question at leisure.

Smith v. Freland, 954 F.2d 343, 347 (6th Cir. 1992).

Sergeant Peay was faced with a situation that was "tense, uncertain, and rapidly evolving." Graham, 490 U.S. at 396-97. Looking at the situation from the perspective of a reasonable officer in all of the circumstances, the court finds that Sergeant Peay's use of force against Ms. Johnson was reasonable under the Fourth Amendment.

　　　　2.　　　Whether the Law Was Clearly Established

Even if Sergeant Peay used excessive force, the court finds that the contours of Ms. Johnson's right were not clearly established at the time of the incident.

A right is clearly established if there is "a Supreme Court or Tenth Circuit decision on point, or the clearly established weight of authority from other courts must have found the law to be as the plaintiff maintains." Medina v. City & Cty. of Denver, 960 F.2d 1493, 1498 (10th Cir. 1992). A clearly established right is one that is "sufficiently clear that every reasonable official would have understood that what he is doing violates that right." Reichle v. Howards, 132 S. Ct. 2088, 2093, 182 L. Ed. 2d 985 (2012). In other words, the existence of the right in the case law must be "beyond debate." Ashcroft v. al-Kidd, 563 U.S. 731, 741 (2011), quoted in Mullenix v. Luna, 136 S. Ct. 305, 309 (2015). Only at that point will the officer have "fair notice that her conduct was unlawful" at the time the conduct occurred. Brosseau, 543 U.S. at 198; Mullenix, 136 S. Ct. at 308. "While there does not have to be a case that is factually identical, it must still be apparent to a reasonable officer in light of pre-existing case law that his conduct was unlawful." Thomas, 607 F.3d at 669.

Ms. Johnson cites to two excessive force cases to show that the law was clearly established at the time of the incident. First, she cites to Tennessee v. Garner, 471 U.S. 1 (1985), and quotes the following language: "Where the suspect poses no immediate threat to the officer

and no threat to others, the harm resulting from failing to apprehend him does not justify the use of deadly force[.]" Id. at 11 (quoted in Pl.'s Reply at 2). Second, she cites to Graham v. Connor, 490 U.S. 386 (1989), where the Court said that deadly force is reasonable when "the suspect poses an immediate threat to the safety of the officers or others[.]" Id. at 396 (quoted in Pl.'s Reply at 2). But Ms. Johnson describes the right at too general a level. The Supreme Court emphasizes that the "clearly established" inquiry

> "must be undertaken in light of the specific context of the case, not as a broad general proposition." As we previously said in this very context:
>
>> [T]here is no doubt that Graham v. Connor clearly establishes the general proposition that use of force is contrary to the Fourth Amendment if it is excessive under objective standards of reasonableness. Yet that is not enough. . . . The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted.
>
> Graham and Garner, following the lead of the Fourth Amendment's text, are cast at a high level of generality.

Brosseau, 543 U.S. at 198-99 (quoting Saucier v. Katz, 533 U.S. 194, 201-02 (2001)) (internal citations omitted) (emphasis added). The proper question is "whether the violative nature of *particular* conduct is clearly established." al-Kidd, 563 U.S. at 742 (emphasis added). "Such specificity is especially important in the Fourth Amendment context, where the Court has recognized that '[i]t is sometimes difficult for an officer to determine how the relevant legal doctrine, here excessive force, will apply to the factual situation the officer confronts.'" Mullenix, 136 S. Ct. at 308 (quoting Saucier, 533 U.S. at 205).

Neither Graham nor Garner dealt with a high-speed chase or the movement of a car in close quarters. The facts in those cases are not similar in any material way to the circumstances

at issue here. "[I]t would be unreasonable to expect a police officer to make the numerous legal conclusions necessary to apply <u>Garner</u> to a high-speed car chase . . . ." <u>Pasco v. Knoblauch</u>, 566 F.3d 572, 580 (5th Cir. 2009), <u>quoted in</u> <u>Mullenix</u>, 136 S. Ct. at 309.

Here the court looked for cases that prohibit an officer from shooting a suspect who refused to yield to officers during a car chase and who, after the chase, was about to ram her truck into a patrol car where another officer was standing in close quarters between the truck and the patrol car. Despite the search, the court did not find any Tenth Circuit or Supreme Court cases (or line of cases established in the federal courts) that would have put Sergeant Peay on notice that what he did was clearly unconstitutional. In fact, decisions existing at the time of the shooting and decisions issued since then suggest that Sergeant Peay's use of deadly force was constitutional.

The Tenth Circuit's 2010 decision in <u>Thomas v. Durastanti</u>, 607 F.3d 655 (10th Cir. 2010), is a very good example. That case concerned an officer who shot and wounded the driver of a car that was pulling away from a traffic stop, in violation of officer commands, and moving at a relatively low speed toward an officer just feet from the car. The <u>Thomas</u> court, finding that the officer's action was reasonable under the circumstances, observed that "courts have little difficulty in concluding that an officer's reasonable perception that a vehicle may be used as a weapon may allow the use of deadly force." <u>Id.</u> at 671.

Two decisions in the Eleventh Circuit address situations in which the suspect used or threatened to use his car as a weapon right before the officer used deadly force. In both of those cases, the court granted qualified immunity.

In <u>Robinson v. Arrugueta</u>, 415 F.3d 1252 (11th Cir. 2005), the court granted qualified

17

immunity to an officer who shot a suspect after the suspect disobeyed the officer's orders and slowly drove his car toward the officer. After the officer pointed his gun at the suspect, identified himself as a police officer, and told the suspect to put his hands up, the suspect

> made eye contact with [the officer and] . . . grinned at [the officer] as the [car (a Ford Escort)] slowly began to move forward at a likely speed of around one to two miles per hour. [The officer, who was standing in front of another car just feet from the Escort,] had, at most, 2.72 seconds to react before getting crushed between the two cars. As [the officer] tried to get out of the way of the moving car, he shot [the suspect] through the windshield. The [car] stopped immediately thereafter.

Id. at 1254. The court concluded that

> a reasonable officer could have perceived that [the suspect] was using the [car] as a deadly weapon. [The officer] had probable cause to believe that the [suspect] posed a threat of serious physical harm . . . . Because it is constitutionally reasonable for an officer to use deadly force when a suspect is threatening escape and possible harm to others, it is also constitutionally reasonable for an officer to use deadly force when he has probable cause to believe that his own life is in peril.

Id. at 1256.

In McCullough v. Antolini, 559 F.3d 1201 (11th Cir. 2009), the Eleventh Circuit held that sheriff's deputies were entitled to qualified immunity from suit for shooting a driver of a white pickup truck. The driver had "disobeyed a police command and refused to pull his truck over, led the police on a high speed chase, and then after finally pulling over, refused to show his hands or respond to the deputy sheriff's orders and drove his truck in the direction of a sheriff's deputy standing nearby." Id. at 1202.

As the above-cited cases demonstrate, the law favors Sergeant Peay under either prong of the qualified immunity analysis.

"Put simply, qualified immunity protects 'all but the plainly incompetent or those who

knowingly violate the law.'" <u>Mullenix</u>, 136 S. Ct. at 308 (quoting <u>Malley v. Briggs</u>, 475 U.S. 335, 341 (1986)).  And Sergeant Peay was neither.  Accordingly, he is entitled to qualified immunity.

*   *   *

**<u>Request for Sanctions For Spoliation of Evidence</u>**

Ms. Johnson asks the court to impose sanctions for Defendants' spoliation of evidence. "'Spoliation' results from the destruction or significant alteration of evidence, or the failure to preserve property for another's use as evidence in pending or reasonably foreseeable litigation." <u>Zbylski v. Douglas Cty. Sch. Dist.</u>, ___ F. Supp. 3d ___, Civ. Action No. 14-cv-01676-MSK-NYW, 2015 WL 9583380, at *7 (D. Colo. Dec. 31, 2015) (internal citation and quotation marks omitted).  The evidence at issue is an internal review board document addressing Morgan County's decision that Sergeant Peay's shooting of Ms. Johnson did not violate Morgan County's policies.

During discovery, Ms. Johnson filed a request for production of any "internal affairs reports or internal investigation reports" regarding the incident.  (Pl.'s Second Set of Discovery (dated December 1, 2015) at 3, Docket No. 46-2.)  Defendants responded that Sergeant Peay appeared before the Morgan County internal review board (that is standard procedure) after which he was cleared and returned to active duty.  (<u>See</u> Defs.' Response to Pl.'s Second Set of Discovery at 4.)  The Defendants told Ms. Johnson that a letter drafted by Chief Deputy Kevin Edwards (the Report) memorialized the decision but could not be located at that time.  (<u>See</u> <u>id.</u>) Defendants promised that when they located the Report, they would promptly produce it.  (<u>See</u> <u>id.</u>)  That was in December 2015.

On February 1, 2016, Ms. Johnson filed a motion to compel documents related to Christian Peay. At the same time Ms. Johnson filed the motion to compel, she filed the motion for sanctions that is now before the court.

During the magistrate judge's March 23, 2016 hearing on the motion to compel, the parties discussed the Report. The magistrate judge's order explained that "[a]t the conclusion of the hearing the Court required Defendant Peay to submit to the court for *in camera* review by April 6th, 2016, any investigative reports regarding this incident involving Christian Peay or Sergeant Peay." (Apr. 8, 2016 Order on Pl.'s Mot. to Compel Discovery at 1, Docket No. 64.) After the Defendants submitted the documents, the court reviewed the declaration of Chief Deputy Edwards, who stated that his work computer crashed in Spring of 2015 and the Report and other data were lost. (See Feb. 8, 2016 Decl. of Chief Deputy Kevin Edwards ¶ 8, Docket No. 50-1; Order on Mot. Compel at 3.) Based on that review, the court said that it was "reluctant to compel the production of a document that is no longer in the possession of Morgan County." (Order on Mot. to Compel at 3-4.) In lieu of production or a discovery sanction, the court ordered the Defendants to produce Chief Deputy Edwards' declaration. The magistrate judge's order also clarified that its denial of the Motion to Compel "shall have no bearing on Plaintiff's Motion for Sanctions for Spoliation of Evidence." (Id. at 5.)

In Chief Deputy Edwards' declaration, which the Defendants submit here, Chief Deputy Edwards states that he prepared the Report, and that, "as is standard practice within our office, [I] confirmed that Sergeant Peay went before the Internal Review Shooting Board to ensure that his actions were in accord with Morgan County's policies. The Report said that after review, Sergeant Peay's actions were found to be in compliance with Morgan County's Policies."

20

(Edwards Decl. ¶¶ 4-5.)  The Report exonerating Sergeant Peay would be favorable to the Defendants, not Ms. Johnson.

In her spoliation motion, Ms. Johnson asks for a variety of sanctions.  She asks for "a finding and jury instruction that the content of the missing review board report is adverse to Defendants."  (Pl.'s Mot. Sanctions at 2, Docket No. 46.)  In the alternative, she seeks "an Order forbidding Defendants from alleging or providing evidence at trial that the shooting was justified."  (Id.)  She also requests an order to compel (a relief the court has already denied), and requests attorney's fees and costs associated with the motion for sanctions.

"A spoliation sanction is proper where (1) a party has a duty to preserve evidence because it knew, or should have known, that litigation was imminent, and (2) the adverse party was prejudiced by the destruction of the evidence."  Burlington N. & Santa Fe Ry. Co. v. Grant, 505 F.3d 1013, 1032 (10th Cir. 2007).  Ms. Johnson must establish both elements by a preponderance of the evidence.  Zbylski, 2015 WL 9583380 at *8.  In addition, because Ms. Johnson asks the court for an adverse inference jury instruction or, alternatively, an order excluding certain evidence, she must show that the Defendants acted in bad faith when the Report, in electronic form, was destroyed.  Oldenkamp v. United Amer. Ins. Co., 619 F.3d 1243, 1250-51 (10th Cir. 2010).  The bad faith requirement is imposed because "[a]n adverse inference is a powerful sanction as it brands one party as a bad actor and necessarily opens the door to a certain degree of speculation by the jury, which is admonished that it may infer the presence of damaging information in the unknown contents of [a lost piece of evidence]."  Henning v. Union Pac. R.R. Co., 530 F.3d 1206, 1219 (10th Cir. 2008) (internal citation and quotation marks omitted).

<u>Destruction of the Report or Failure to Preserve</u>

"A moving party has the burden of proving, by a preponderance of the evidence, that the opposing party failed to preserve evidence or destroyed it." <u>Zbylski</u> at *8. The Defendants assert that Ms. Johnson has not established that the Report is altogether destroyed, and point out that:

> Plaintiff's motion includes communication with Defendants' counsel stating that the letter has not been located but that a search is ongoing. Plaintiff even admits that she "is uncertain whether Defendants have 'spoiled' the evidence, simply not searched very hard, or are intentionally withholding it." (Pl.'s Mot. for Sanctions at 2–3.)

(Defs.' Opp'n to Mot. for Sanctions at 5, Docket No. 50.)

No one disputes that the electronic copy was destroyed. But Defendants contend that it is too early to conclude that the Report is completely destroyed. They continue to search for a hard copy of the Report and have expressed their intent to produce the Report if and when it is located. Still, after months of searching, nothing has turned up. At this stage it appears that the Report, in any form, is not in the Defendants' possession. Accordingly, for purposes of this order, the court assumes that the document is permanently lost.

Because Ms. Johnson requests an adverse instruction or exclusion of evidence, she must not only establish that the document is destroyed but also that the Defendants destroyed the document in bad faith. No evidence of bad faith exists.

Chief Deputy Edwards' computer crashed. The County successfully recovered some of the data but was not able to pull up the Report. This was explained in the uncontradicted sworn statement of Chief Deputy Edwards. Yet Ms. Johnson questions the veracity of the County's

explanation,[12] speculating that because the Report remains missing and no hard copy can be found, the County is being less than forthcoming.  According to Ms. Johnson, "[s]ince the subject review board report disappeared in the possession of Defendant Morgan County, it may be inferred that the notes contained incriminating admissions or evidence directly adverse to Defendants' position[.]"  (Pl.'s Mot. for Sanctions at 9.)

There is no evidence to suggest that the Defendants' explanation for loss of the electronic copy is disingenuous.  Ms. Johnson only speculates that the report contains information that is prejudicial to the Defendants.  In fact, the circumstances suggest otherwise.  The Defendants are as interested, if not more, in finding the Report because they believe it supports their case.

> [The Report] stated that Sergeant Peay's actions were consistent with Morgan County's policies.  This is reaffirmed by Sergeant Peay's sworn deposition testimony and the fact that he was back on duty after only a couple of weeks.  If the Review Board came to a conclusion that Sergeant Peay's actions were not consistent with policy, surely he would have faced some discipline—which he did not—and would not have been permitted to return to duty.

(Defs.' Opp'n to Mot. Sanctions at 8.)

Lack of bad faith forecloses the substantive sanctions Ms. Johnson requests.  But she requests other non-substantive sanctions, that is, attorney's fees and any other relief the court determines is proper.  Accordingly, the court will analyze the remaining spoliation elements that she must establish to obtain the fees or other relief.

Duty to Preserve the Report

The Defendants contend that Ms. Johnson has not met her burden to establish the

---

[12]According to Ms. Johnson, "Defendants have spoiled, failed to produce, <u>withheld</u>, lost, or <u>intentionally 'not found'</u> key documents and other evidence."  (Pl.'s Mot. Sanctions at 8 (emphasis added).)

Defendants' duty to preserve the Report. A party has a duty to preserve evidence if it knew, or should have known, that litigation was imminent. Burlington, 505 F.3d at 1032.

Ms. Johnson was seriously injured by a police officer when he shot her in the face. It is reasonably foreseeable that the victim in an officer-involved shooting would file a lawsuit against the officer or his employer. In fact, it was standard practice to memorialize, in writing, the result of Morgan County's internal review of Sergeant Peay's actions (apparently undertaken on Morgan County's behalf by officials from Davis County). The fact that Davis County officials conducted the review does not change the fact that Morgan County's employment of Sergeant Peay placed it at risk of being sued. And certainly Sergeant Peay, who actually shot Ms. Johnson, would be a potential defendant in an excessive force case. For those reasons, the court finds that the Defendants had a duty to preserve the Report.

Prejudice

The next question is whether Ms. Johnson was prejudiced by loss of the Report. The Report memorialized the conclusion of the internal review board clearing Sergeant Peay after it reviewed the shooting incident. That evidence could be relevant or lead to relevant evidence. But Ms. Johnson speculates about what else, if anything, was contained in the Report: "Defendants' inability to locate the subject report has damaged or deprived Plaintiff of objective evidence necessary to establish a central issue in this case, i.e., was any officer in imminent danger when Scott Peay used deadly force? The report is critical." (Pl.'s Mot. for Sanctions at 11 (emphasis added).)

To establish prejudice, Ms. Johnson must show that she "'was actually, rather than merely theoretically, prejudiced'" by loss of the Report. Turner v. Pub. Serv. Co. of Colo., 563

F.3d 1136, 1150 (10th Cir. 2009) (quoting Burlington, 505 F.3d at 1013).  She offers nothing but speculation that the Report contains the information she needs: "evidence necessary to establish a central issue in this case, i.e., was any officer in imminent danger when Scott Peay used deadly force."  (Pl.'s Mot. for Sanctions at 11.)

Chief Deputy Edwards, who authored the Report, described the Report in his declaration and stated that the internal review board found that Sergeant Peay did not violate Morgan County policies.  His sworn statement about the Report's content is a sufficient substitute for the document.

For the foregoing reasons, Ms. Johnson has not met her burden to show prejudice and so she is not entitled to sanctions.

## ORDER

For the foregoing reasons, the Defendant's Motion for Sanctions Against Defendants for Spoliation of Evidence (Docket No. 46) is DENIED; Plaintiff's Motion for Summary Judgment on Liability Against Defendant Peay (Docket No. 37) is DENIED; and  Defendants' Amended Cross-Motion for Summary Judgment (Docket No. 51) is GRANTED.

DATED this 8th day of August, 2016.

BY THE COURT:

TENA CAMPBELL
U.S. District Court Judge